**No. 24-5546**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

TENNESSEE CONFERENCE OF THE NATIONAL ASSOCIATION
FOR THE ADVANCEMENT OF COLORED PEOPLE,

*Plaintiff-Appellee,*

v.

TRE HARGETT & MARK GOINS,

*Defendants-Appellants.*

On appeal from the United States District Court
for the Middle District of Tennessee
No. 3:20-cv-1039

### Brief for the Appellants

Jonathan Skrmetti
*Attorney General and Reporter*

Zachary Barker
*Senior Assistant Attorney General*

Dawn Jordan
*Special Counsel*

J. Matthew Rice
*Solicitor General*

Philip Hammersley
*Assistant Solicitor General*

State of Tennessee
Office of the Attorney General
P.O. Box 20207
Nashville, TN 37202
Philip.Hammersley@ag.tn.gov
Phone:  (615) 532-7874

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

ORAL ARGUMENT REQUEST ................................................................ x

JURISDICTION ............................................................................... xi

ISSUES ......................................................................................... xii

INTRODUCTION ............................................................................. 1

STATEMENT OF THE CASE ............................................................. 3

A.  Legal Background.................................................................. 3

    1.  The constitutional framework for election regulation............ 3

    2.  The National Voter Registration Act of 1993 ...................... 5

    3.  Tennessee's Voter-Registration Procedures ......................... 8

B.  Procedural Background........................................................ 11

    1.  The NAACP sues Tennessee in federal court ..................... 11

    2.  The district court grants the NAACP judgment and issues a universal permanent injunction............................ 12

    3.  Tennessee obtains a stay pending appeal............................ 14

SUMMARY OF THE ARGUMENT .................................................... 15

STANDARD OF REVIEW................................................................ 17

ARGUMENT ................................................................................. 17

I.  The NAACP Lacks Organizational Standing to Challenge the Documentation Policy. ........................................................ 17

    A.  The NAACP's standing theories fail as a matter of law. ..... 17

        1.  The diversion-of-resources theory falls short. ............. 19

        2.  The NAACP cannot show standing under *Havens*...... 22

        3.  The NAACP differs from the aggrieved consumer hypothesized in the stay opinion................................. 27

    B.  NAACP's standing theories fail as a matter of fact............. 32

II.  The Documentation Policy Complies with the NVRA. .................. 36

    A.  The Documentation Policy does not require applicants to submit unnecessary information...................................... 37

1.  The Documentation Policy requests "only" information "necessary" to verify the voter eligibility.........................................................37

2.  Supreme Court precedent supports finding the Documentation Policy lawful under the NVRA...........48

3.  The district court's interpretation of the NVRA also raises serious constitutional concerns.................50

B.  The Documentation Policy ensures that eligible applicants are registered to vote. ...........................................52

C.  The Documentation Policy complies with the NVRA's uniformity-and-nondiscrimination requirement. ................54

1.  The district court wrongly characterized the uniformity claim as undisputed. ...................................55

2.  Voter-registration procedures cannot violate the NVRA's uniformity requirement. ...............................56

3.  The Documentation Policy applies uniformly to all felons who are similarly situated. ................................58

III.  The District Court Granted Improper Relief. ..................................58

A.  The NAACP never proved that it needs a permanent injunction to prevent irreparable harm. ...............................59

B.  The district court erred by granting a universal injunction rather than an appropriately tailored remedy. ..................................................................................61

CONCLUSION ........................................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Canoe Ass'n, Inc. v.*
*City of Louisa Water & Sewer Comm'n,*
389 F.3d 536 (6th Cir. 2004) ........................................................ 26

*Ammex, Inc. v. United States,*
367 F.3d 530 (6th Cir. 2004) ........................................................ 29

*Arizona v. Inter Tribal Council of Arizona, Inc.,*
570 U.S. 1 (2013) ............................................................... *passim*

*Audi AG v. D'Amato,*
469 F.3d 534 (6th Cir. 2006) ........................................................ 60

*Ayestas v. Davis,*
584 U.S. 28 (2018) ............................................................... 39, 40

*Bellitto v. Snipes,*
935 F.3d 1192 (11th Cir. 2019) ...................................................... 54

*Braxton v. Amoco Oil Co.,*
202 F.3d 272 (7th Cir. 1999) ........................................................ 57

*Carrington v. Rash,*
380 U.S. 89 (1965) ............................................................... 1, 51

*Changizi v. Dep't of Health & Human Servs.,*
82 F.4th 492 (6th Cir. 2024) ........................................................ 19

*Clapper v. Amnesty Int'l,*
568 U.S. 398 (2013) ................................................................. 22

*Commonwealth v. Biden,*
57 F.4th 545 (6th Cir. 2023) ........................................................ 62

*Competitive Enter. Inst. v. FCC,*
970 F.3d 372 (D.C. Cir. 2020) ...................................................... 29

*Corley v. United States,*
  556 U.S. 303 (2009) ................................................................ 41

*Crawford v. U.S. Dep't of Treasury,*
  868 F.3d 438 (6th Cir. 2017) ............................................... 30

*Crutchfield v. Collins,*
  607 S.W.2d 478 (Tenn. 1980) ................................................. 8

*Ctr. for Biological Diversity v. Lueckel,*
  417 F.3d 532 (6th Cir. 2005) ............................................... 36

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) ................................................................ 2

*Davis v. Colerain Twp.,*
  51 F.4th 164 (6th Cir. 2022) ............................................... 27

*In re Davis,*
  960 F.3d 346 (6th Cir. 2020) ............................................... 41

*Dep't of Treasury v. FLRA,*
  494 U.S. 922 (1990) .............................................................. 41

*Dobbs v. Jackson Women's Health Org.,*
  597 U.S. 215 (2022) .............................................................. 39

*Equal Rights Ctr. v. Post Props.,*
  633 F.3d 1136 (D.C. Cir. 2011) ........................................... 34

*FAA v. Cooper,*
  566 U.S. 284 (2012) .............................................................. 39

*Fair Elections Ohio v. Husted,*
  770 F.3d 456 (6th Cir. 2014) ....................................... *passim*

*Falls v. Goins,*
  673 S.W.3d 173 (Tenn. 2023) ............................... 9, 10, 42

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024) ..................................................... *passim*

iv

*Fish v. Kobach*,
840 F.3d 710 (10th Cir. 2016) ....................................................... 40, 60

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ............................................................ 26

*Food Mktg. Inst. v. Argus Leader Media*,
588 U.S. 427 (2019) ........................................................................... 39

*Foster v. Love*,
522 U.S. 67 (1997) ............................................................................... 4

*General Motors Corp. v. Tracy*,
519 U.S. 278 (1997) ........................................................................... 28

*Gill v. Whitford*,
585 U.S. 48 (2018) ............................................................................. 61

*Greater Cincinnati Coal. for the Homeless v.
City of Cincinnati*,
56 F.3d 710 (6th Cir. 1995) ............................................................... 30

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ................................................................... *passim*

*Hibbs v. Winn*,
542 U.S. 88 (2004) ............................................................................. 41

*Husted v. A. Philip Randolph Inst.*,
584 U.S. 756 (2018) ....................................................................... 3, 58

*ITT Educational Servs., Inc. v. Arce*,
533 F.3d 342 (5th Cir. 2008) ............................................................. 60

*Kallstrom v. City of Columbus*,
136 F.3d 1055 (6th Cir. 1998) ........................................................... 60

*L.W. by and through Williams v. Skrmetti*,
83 F.4th 460 (6th Cir. 2023) ........................................................ 61, 62

*Labrador v. Poe*,
144 S. Ct. 921 (2024) ........................................................................ 62

*Lane v. Holder*,
703 F.3d 668 (4th Cir. 2012)............................................................. 28

*Maben v. Thelen*,
887 F.3d 252 (6th Cir. 2018)............................................................. 17

*Marx v. Gen. Revenue Corp.*,
568 U.S. 371 (2013) ....................................................................... 41

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819)........................................................... 39

*McKay v. Federspiel*,
823 F.3d 862 (6th Cir. 2016)............................................................. 18

*McKay v. Thompson*,
226 F.3d 752 (6th Cir. 2000)............................................................. 48

*In re MCP No. 165*,
21 F.4th 357 (6th Cir. 2021) ........................................................ 39, 40

*Mi Familia Vota v. Fontes*,
691 F. Supp. 3d 1077 (D. Ariz. 2023) ........................................... 58, 59

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010)....................................................................... 60

*Ohio Democratic Party v. Husted*,
834 F.3d 620 (6th Cir. 2016)............................................................. 45

*Online Merchants Guild v. Cameron*,
995 F.3d 540 (6th Cir. 2021)............................................................. 22

*Pa. State Conf. of the NAACP v. Sec'y of Commw. of Pa.*,
97 F.4th 120 (3d Cir. 2024)............................................. 33, 34, 35, 52

*PETA v. USDA*,
797 F.3d 1087 (D.C. Cir. 2015) ......................................................... 21

*Reform America v. City of Detroit*,
37 F.4th 1138 (6th Cir. 2022) ........................................................... 36

*Russello v. United States,*
464 U.S. 16 (1983) ........................................................... 40, 41

*Schickel v. Dilger,*
925 F.3d 858 (6th Cir. 2019) .............................................. 25

*Shelby Advocs. for Valid Elections v. Hargett,*
947 F.3d 977 (6th Cir. 2020) (per curiam) .................................. 21, 34

*Ex Parte Siebold,*
100 U.S. 371 (1880) ........................................................... 4

*Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.,*
256 F.3d 879 (9th Cir. 2001) .............................................. 29

*Tenn. Conf. of the NAACP v. Lee,*
105 F.4th 888, 892 (6th Cir. 2024) (per curiam) ........................... *passim*

*Troche v. Crabtree,*
814 F.3d 795 (6th Cir. 2016) .............................................. 45

*Turner v. City of Taylor,*
412 F.3d 629 (6th Cir. 2005) .............................................. 17

*United States v. King,*
853 F.3d 267 (6th Cir. 2017) .............................................. 22

*Viet v. Le,*
951 F.3d 818 (6th Cir. 2020) .............................................. 16, 32, 60, 61

*Vitolo v. Guzman,*
999 F.3d 353 (6th Cir. 2021) .............................................. 60

*Vote.org v. Callanen,*
89 F.4th 459 (5th Cir. 2023) .............................................. 45

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ........................................................... 59

*Young v. Fordice,*
520 U.S. 273 (1997) ........................................................... 7, 50

## Constitutional Provisions

Tenn. Const. art. IV, § 2 (1843) .................................................... 8

U.S. Const. amend. XVII ........................................................... 3

U.S. Const., art. I, § 2, cl. 1 ...................................................... 3

U.S. Const. art. I, § 4, cl. 1 ................................................... 4, 5

## Statutes

28 U.S.C. § 1292 .................................................................... xi

28 U.S.C. § 1331 .................................................................... xi

52 U.S.C. § 20501 .............................................................. 5, 8

52 U.S.C. § 20504 ...................................................... 40, 41, 42

52 U.S.C. § 20505 ......................................................... *passim*

52 U.S.C. § 20507 ......................................................... *passim*

52 U.S.C. § 20508 ......................................................... *passim*

52 U.S.C. § 21083 ................................................................. 57

National Voter Registration Act of 1993,
    Pub. L. 103-31, 107 Stat. 79 ............................................... 5

Tenn. Code Ann. § 2-2-102 ...................................................... 8

Tenn. Code Ann. § 2-2-139 ........................................ 9, 10, 38, 53

Tenn. Code Ann. § 2-19-143 .................................................. 9, 38

Tenn. Code Ann. § 40-20-112 ................................................. 8, 9

Tenn. Code Ann. § 40-2712 (1973) ............................................. 8

## Other Authorities

1 Joseph Story, Commentaries on the Constitution of the
  United States (1833) ................................................................ 51

American Heritage Dictionary of the English Language (3d
  ed. 1992) ................................................................................ 58

Black's Law Dictionary (6th ed. 1990) ................................ 41, 58

Fed. R. App. P. 34 ........................................................................ x

Fed. R. Civ. P. 56 ................................................................... 17, 56

Webster's New World Dictionary & Thesaurus (1996) ........... 58

## ORAL ARGUMENT REQUEST

This Court instructed the Clerk to schedule oral argument "upon the completing of briefing." Dkt. 33. Defendants-Appellants Tre Hargett and Mark Goins agree that oral argument will help resolve this appeal. *See* Fed. R. App. P. 34(a). This dispute raises important questions about (1) organizational standing after the Supreme Court's decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), and (2) the scope of the National Voter Registration Act of 1993. Oral argument would aid the Court's consideration of these issues.

## JURISDICTION

The district court had subject-matter jurisdiction because the dispute "aris[es] under the Constitution" and "laws … of the United States." 28 U.S.C. § 1331; Am. Compl., R. 102 at 613.[1]

On April 18, 2024, the district court granted Plaintiff-Appellee Tennessee Conference of the National Association for the Advancement of Colored People ("NAACP") partial summary judgment.  *See* Memo. Op., R. 221 at 3685–91; Order, R. 222.  On June 5, 2024, the district court permanently enjoined Tennessee from applying the challenged voter-registration policies.  *See* Order, R. 237.

The Defendants-Appellants noticed an appeal on June 7, 2024.  Notice, R. 242.  This Court has appellate jurisdiction over the district court's interlocutory order granting an injunction under 28 U.S.C. § 1292(a)(1).

---

[1]  Unless otherwise noted, record citations refer to the docket, No. 3:20-cv-1039 (M.D. Tenn.).  All record pincites refer to the "Page ID" numbers in the district court's ECF file stamps.

# ISSUES

Under Tennessee law, some (but not all) felons qualify to vote. So Tennessee requires certain felons who apply for voter registration to submit documentary proof that they are eligible. The NAACP challenged that voter-eligibility-verification procedure—known as the Documentation Policy—under the National Voter Registration Act of 1993 ("NVRA").

This appeal raises three issues:

    **I.** Did the district court err by holding that the NAACP has organizational standing to challenge the Documentation Policy?

    **II.** Did the district court err by holding that the Documentation Policy violates the NVRA?

    **III.** Did the district court err by issuing a universal injunction that bars enforcement of the Documentation Policy against everyone rather than entering a remedy that tailors its relief to the NAACP?

## INTRODUCTION

Our constitutional structure leaves "no doubt" that States may establish "qualifications for the exercise of the franchise." *Carrington v. Rash*, 380 U.S. 89, 91 (1965). Tennessee used that constitutional authority to forbid felons with certain convictions from registering to vote unless they have completed a rights-restoration process. To enforce that voter qualification, Tennessee requires some felons to submit documentary proof related to their conviction showing that they are eligible to register to vote (the "Documentation Policy"). That gives election officials the information they need to ensure that only eligible applicants are registered.

The decisions below found that policy unlawful and enjoined the State from using it. In doing so, the district court endorsed a theory of standing that allows virtually everyone to challenge whatever policies they dislike. It used a cramped reading of federal law that contradicts Supreme Court precedent and hamstrings the power of States to enforce their voting qualifications. And worse still, it entered a remedy extending far beyond the parties to this action—contrary to binding precedent. Reversible error thus infects every step of the district court's decisionmaking process—from jurisdiction and the merits to the remedy.

1

This Court should reverse the decisions below.  It should do so first to preserve "the proper—and properly limited—role of courts in a democratic society." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (citation omitted).  The NAACP's argument that organizations can manufacture their own standing by spending time and resources opposing the Documentation Policy proves too much.  It flouts the Supreme Court's recent decision in *FDA v. Alliance for Hippocratic Medicine* and would allow virtually all organizations to challenge whatever policies they dislike.  And even if the NAACP had a legally valid standing theory, it still lacks standing because it did not provide specific facts to prove its standing arguments—a defect this Court already recognized in its stay decision.

It should also reverse the decisions below to protect the State's constitutional authority to establish voter qualifications.  That right would be meaningless without the power to enforce those qualifications.  And the means that the State has chosen to enforce its qualifications—the Documentation Policy—fits within Supreme Court precedent endorsing a State's authority to request documentary proof of eligibility for applicants using state-created voter-registration forms.  Unless the Court vacates or

2

reverses the decisions below, Tennessee will not be able to fully enforce its voter qualifications related to infamous felony convictions.

## STATEMENT OF THE CASE

### A. Legal Background

### 1. The constitutional framework for election regulation

The Constitution vests States with exclusive authority to establish voter qualifications. The Voter Qualifications Clause provides that, in elections for the House of Representatives, "the Electors in each State"—in other words, voters—"shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const., art. I, § 2, cl. 1. The Seventeenth Amendment in turn creates an identical rule for elections of U.S. Senators. And finally, the Constitution "recognizes the authority of States to 'appoint' Presidential electors 'in such Manner as the Legislature thereof may direct.'" *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 780 (2018) (Thomas, J., concurring) (quoting U.S. Const. art. II, § 2, cl. 1). Those provisions make clear that Congress "cannot control … voting qualifications in federal elections," *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 16 (2013) (quoting

3

*Oregon v. Mitchell*, 400 U.S. 112, 210 (1970) (Harlan, J., concurring in part and dissenting in part)); instead, those powers belong to the States.

Although States decide who qualifies to vote, the Elections Clause still creates an important role for Congress in regulating federal elections. The Elections Clause, U.S. Const. art. I, § 4, cl. 1, provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators.

That Clause serves "two functions." *Arizona*, 570 U.S. at 8. It first "invests the States with responsibility for the mechanics of congressional elections," *Foster v. Love*, 522 U.S. 67, 69 (1997), which includes the authority to implement "regulations relating to [voter] 'registration,'" *Arizona*, 570 U.S. at 9 (citation omitted). And it also empowers Congress to "make or alter" those regulations. U.S. Const. art. I, § 4, cl. 1. That congressional power "is paramount, and may be exercised at any time, and to any extent which it deems expedient; and so far as it is exercised, and no farther, the regulations effected supersede those of the State which are inconsistent therewith." *Ex Parte Siebold*, 100 U.S. 371, 392 (1880).

### 2.    The National Voter Registration Act of 1993

Consistent with that framework, States administer the voter-registration process for state and federal elections.  The federal government does not receive, review, or approve voter-registration applications.  Rather than play a direct role in voter registration, Congress may use its authority under the Elections Clause to regulate the "Manner" in which States register voters for federal elections.  U.S. Const. art. I, § 4, cl. 1.

As relevant here, Congress exercised that power by enacting the National Voter Registration Act of 1993, Pub. L. 103-31, 107 Stat. 79 (codified as amended at 52 U.S.C. §§ 20501–20511).  It did so to encourage voter registration in a manner that "protect[s] the integrity of the electoral process."  52 U.S.C. § 20501(b)(3), (b)(1).  To advance those goals, the NVRA requires election officials to accept two different types of mail-in voter-registration applications.  *See id.* §§ 20501(b)(1), 20505(a).

The first application would-be voters can use is called the Federal Form.  A federal agency develops that mail-in form along with the chief election officers of the States.  *Id.* § 20508(a)(1), (2).  "This 'standard' form looks the same for all States and lacks any space for applicants to identify prior felonies."  *TN NAACP v. Lee*, 105 F.4th 888, 892 (6th Cir. 2024) (per

5

curiam); *see* Federal Form, R. 156-10. Applicants using this form are given State-specific instructions and must "swear or affirm that they meet their State's 'eligibility requirements' under penalty of perjury." *NAACP*, 105 F.4th at 892. Under the NVRA, States must "accept and use" completed Federal Forms "for the registration of voters in elections for Federal office," 52 U.S.C. § 20505(a)(1), which means States must process timely submitted forms without requesting any additional documentation from the applicant, *see Arizona*, 570 U.S. at 20.

The second application would-be voters can use is the State Form. The NVRA expressly authorizes States to "develop and use" their own forms, 52 U.S.C. § 20505(a)(2), which usually registers applicants to vote in federal and state elections, *e.g.*, State Form, R.156-10 at 2503. On those forms, States may "require information the Federal Form does not" so that election officials can verify voter eligibility. *Arizona*, 570 U.S. at 13.

Whichever mail-in form an applicant decides to use, both forms must include certain content. For starters, they must incorporate a statement that specifies each voter-eligibility requirement, contain an attestation that the applicant meets those requirements, and require the applicant's signature. 52 U.S.C. §§ 20505(a)(2), 20508(a)–(b). The forms also may

"require only such identifying information … and other information … as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id.* §§ 20508(b)(1), 20505(a)(2).

Once election officials receive a mail-in application, they must "ensure that any eligible applicant is registered to vote in an election . . . if the valid voter registration form of the applicant is postmarked not later than the lesser of 30 days, or the period provided by State law, before the date of the election." *Id.* § 20507(a)(1)(B). And after election officials place qualified applicants on the voter rolls, they must "maint[ain]" those rolls in a "uniform" and "nondiscriminatory" manner. *Id.* § 20507(b)(1).

That framework accomplishes the NVRA's goals while giving States "room for policy choice" about how best to enforce their voter qualifications. *See Young v. Fordice*, 520 U.S. 273, 286 (1997). As the Supreme Court put it, "[n]o matter what procedural hurdles a State's own form imposes" on applicants to verify their eligibility, "the Federal Form guarantees that a simple means of registering to vote in federal elections will be available." *Arizona*, 570 U.S. at 13. And by obligating States to register "eligible" applicants that submit "valid" applications, the NVRA advances

its purpose of "establish[ing] procedures that will increase the number of citizens who register to vote."  52 U.S.C. § 20501(b)(1).

### 3.    Tennessee's Voter-Registration Procedures

Against that backdrop, Tennessee exercised its "constitutional authority to establish qualifications . . . for voting."  *Arizona*, 570 U.S. at 16. The Tennessee Constitution has for nearly two centuries authorized felon disenfranchisement.  *See* Tenn. Const. art. IV, § 2 (1843).  Consistent with that constitutional provision, the General Assembly declared that "[a] citizen of the United States eighteen (18) years of age or older who is a resident of this state is a qualified voter *unless* the citizen is disqualified under … a judgment of infamy pursuant to § 40-20-112."  Tenn. Code Ann. § 2-2-102(a) (emphasis added).  Section 40-20-112 in turn provides that a "judgment of infamy" occurs "[u]pon conviction for any felony" that the legislature classifies as "infamous."  Tenn. Code Ann. § 40-20-112.

Under Tennessee law, the crimes that qualify as "infamous" and thus disenfranchising have changed over time:

- **<u>Felons with Pre-January 15, 1973 Convictions</u>**.  Before January 15, 1973, only some felonies were disenfranchising—the General Assembly enumerated specific felonies that it deemed infamous, *see* Tenn. Code Ann. § 40-2712 (1973); *Crutchfield v. Collins*, 607 S.W.2d 478, 480–81 (Tenn. 1980), and individuals convicted of those felonies lost their voting

8

rights so long as the criminal judgment rendered that person "infamous," Older Felonies Memo., R. 156-20 at 2575 (directing officials to reject applications from felons convicted for certain crimes who have been "declared infamous").

- **Felons with Grace-Period Convictions**.  All persons with felony convictions between January 15, 1973, and May 17, 1981, were never disenfranchised and thus are eligible to vote. *See* Older Felonies Memo., R. 156-20 at 2575.

- **Felons with Post-May 18, 1981 Convictions**.  Starting on May 18, 1981, Tennessee law classified all felony convictions as infamous and thus disenfranchising. *See Falls v. Goins*, 673 S.W.3d 173, 176 n.1 (Tenn. 2023).

So whether a felon lost their voting rights depends on the date of their conviction and, for felons convicted before January 15, 1973, the crime for which they were convicted, as well as their criminal judgment.

Felons that have been disenfranchised cannot vote unless their voting rights have been restored.  Tenn. Code Ann. §§ 2-19-143, 2-2-139(a), 40-20-112.  For a disenfranchised felon to regain their right to vote, they must obtain a pardon or restoration of their full citizenship rights along with a certificate of restoration.  *Falls,* 673 S.W.3d at 184 (citing statutory provisions).  Only once a felon completes that process may they vote.

That legal framework requires election officials to know when and where the conviction occurred.  Because some but not all felons qualify to vote, election officials must distinguish between ineligible felons and

9

eligible felons when reviewing voter-registration applications. Tennessee's election officials, exercising their power to develop procedures "for verifying the registration eligibility of any person convicted of an infamous crime," Tenn. Code Ann. § 2-2-139(c), implemented the Documentation Policy. That procedure requires felons who have previously been disenfranchised to submit documentary proof that they are eligible to vote. Two groups of applicants must comply with the policy—(1) individuals convicted of an infamous felony before January 15, 1973 who have been disenfranchised, *see* Older Felonies Memo., R. 151-2, 1095, and (2) individuals convicted of any felony on or after May 18, 1981, the date when Tennessee made all felonies infamous, *Falls*, 673 S.W.3d at 176 n.1.[2]

In addition, under current policy, individuals who were convicted before January 15, 1973 of an infamous felony who claim to be eligible because the sentencing judge failed to declare them infamous in the criminal

---

[2] As this Court acknowledged, "[o]ver time, the Coordinator of Elections has changed the procedure for processing the registration forms of those who mark that they have been convicted of felonies." *NAACP*, 105 F.4th at 893. For some time, the Documentation Policy applied to all individuals with felony convictions. *See id.* "In July 2023, however, the Coordinator of Elections narrowed the Documentation Policy to 'avoid the unnecessary rejection' of felon applicants," *id.* so that the policy applied to the categories described above.

10

judgment must provide that judgment to show that they were not disenfranchised and are thus eligible to vote.  Hall Dep., R. 156-05 at 2444–45.  But it is "extremely rare" that election officials confront this situation, *see* Older Felonies Memo., R. 151-2 at 1095, in part because those convictions are over fifty years old and because the applicant's claim to eligibility depends on the sentencing judge declining to find the applicant infamous.

The State Form "refers to the Documentation Policy by, among other things, asking felon applicants to provide a 'copy' of the document restoring their voting rights." *NAACP*, 105 F.4th at 899.  Tennessee rejects applications that do not comply with the Documentation Policy.

## B.    Procedural Background

### 1.    The NAACP sues Tennessee in federal court

Plaintiff-Appellee NAACP sued various state officials and raised challenges to the Documentation Policy.  The operative complaint alleges that Coordinator Goins and Secretary Hargett enforce voter-registration policies that violate the NVRA.  *See* Am. Compl., R. 102 at 627–28, 644–45, 656–57.  The NAACP specifically claims in count six that the Documentation Policy violates the NVRA's requirements (1) that States "accept and use" the Federal Form, (2) that States request only information

11

"necessary" to assess voter eligibility, (3) that States "ensure" that "eligible voters" are registered, and (4) that States maintain voter rolls in a "uniform" and "nondiscriminatory" manner. *See* Memo. ISO MSJ, R.1 54 at 2294-2306.  The NAACP (along with other individual plaintiffs) brought other claims that are currently pending before the district court.

After discovery, and in response to a Tennessee Supreme Court decision, Coordinator Goins clarified that only individuals with post-May 18, 1981, convictions and individuals convicted of an infamous felony before January 15, 1973 need to submit proof of eligibility under the Documentation Policy.  Goins Supp. Decl., R. 180-1 at 2892; *supra* n.2.  The parties later cross moved for summary judgment on the NVRA claim.  *See* State's MSJ, R. 150 at 1045; NAACP's MSJ, R. 153 at 2274–75.

### 2.    The district court grants the NAACP judgment and issues a universal permanent injunction

The district court granted partial summary judgment to the NAACP. The court "first held that the NAACP had standing to challenge the . . . Documentation Policy" because that policy "made it more 'costly' for the NAACP to help felons register and thus had 'diverted' the organization's time and money away from other activities."  *NAACP*, 105 F.4th at 894 (citations omitted).  On the merits, the district court "held that the

Documentation Policy violated the NVRA" because it required applicants to submit information that the State supposedly had in its possession, which it believed breached the NVRA's provision that "allowed the State Form to require only that 'information' that was 'necessary to enable' election officials to determine an applicant's eligibility." *Id.* (quoting 52 U.S.C. § 20508(b)(1)); *see* Memo. Op., R. 221 at 3685–91. The district court also held that the Documentation Policy violates the NVRA by imposing an "unnecessary requirement in a non-uniform manner that does not ensure eligible applicants are registered if their valid registration form is timely received." Memo. Op., R. 221 at 3691; *see* Order, R. 222 at 3692.

Months later, on June 5, 2024, the district court issued a permanent injunction against the Documentation Policy. The district court declared that the policy "of rejecting valid, timely submitted mail in voter registration forms . . . based solely on an indication that the applicant has a past felony conviction and requiring the applicant to provide additional documentary proof of eligibility before being placed on the voter rolls" violated the NVRA. Order, R. 237 at 3825. The court then permanently enjoined Tennessee's election officials from "enforcing, applying, or implementing" the Documentation Policy against anyone. *Id.* at 3285. "The injunction

13

instructed election officials that they '[s]hall process valid, timely mail in voter registration forms . . . submitted by individuals with prior felony convictions who are otherwise eligible to vote.'" *NAACP*, 105 F.4th at 894 (quoting R. 237 at 3826). "It added that these officials '[s]hall register individuals with prior felony convictions who submit valid, timely mail in voter registration forms . . . absent credible information establishing that they are ineligible to vote.'" *Id.* (quoting R. 237 at 3826).

### 3. Tennessee obtains a stay pending appeal

Two days after the injunction took effect, the State noticed an appeal and filed in the district court an emergency motion for a stay pending appeal. Notice, R. 242; Mot. to Stay, R. 243. Shortly thereafter, on June 12, 2024, the State filed in this Court an emergency motion for a stay pending appeal and an administrative stay. Dkt. 9. The Court granted the administrative stay on June 14, 2024, *see* Dkt. 11, and granted a stay pending appeal two weeks later, *see* Dkt. 27; *NAACP*, 105 F.4th at 907.

The per curiam order granted the stay after concluding that Tennessee "will likely 'prevail on the merits' in this appeal." *NAACP*, 105 F.4th at 901. The panel concluded that "the district court here likely erred when it granted summary judgment to the NAACP on this standing question"

14

because the NAACP "potential[ly]" failed to present a legally sound standing theory and because in any event it "likely" failed to provide sufficient facts to prove its standing theory.  *Id.* at 901, 904, 905.

## SUMMARY OF THE ARGUMENT

The decision below commits reversible error at each step.  The district court never should have considered the asserted claim because the NAACP lacks organizational standing.  On the merits, the district court misinterpreted both the NVRA and the record en route to holding the Documentation Policy unlawful.  And at the remedial stage, the district court issued an injunction without first finding irreparable harm and without any party-specific tailoring.  This Court should reverse the challenged orders below and either remand with instructions to dismiss count six for lack of jurisdiction (if the NAACP lacks standing) or reverse the grant of summary judgment and remand with instructions to enter judgment on count six for the Defendants (if the State prevails on the merits).

**I.**    The NAACP lacks standing to challenge the Documentation Policy.  As the Supreme Court's decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) makes clear, the NAACP's resource-diversion theory fails as a matter of law.  None of the arguments that the

15

NAACP made below—or that this Court suggested at the stay stage—support standing here.  But even if the NAACP had a tenable standing theory, it never proved that theory through the "specific facts" needed at summary judgment.  *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020).

**II.**    The Documentation Policy complies with the NVRA.  It requests information that election officials need to verify voter eligibility.  52 U.S.C. § 20508(b)(1).  It directs election officials to register "eligible" felons that submit a "valid" application.  *Id.* § 20507(a)(1).  And it does not create *any* procedures for "maint[aining]" voter rolls—much less a non-uniform or discriminatory procedure.  *Id.* § 20507(b)(1).  The holding below that the Documentation Policy violates the NVRA flouts the statutory text and precedent and creates serious constitutional problems.

**III.**    The permanent injunction exceeds the district court's remedial authority.  An injunction cannot be issued unless the movant shows they will suffer irreparable harm.  The district court never made that finding here.  And even if the district court had made that finding, it abused its discretion by issuing a universal injunction against the Documentation Policy rather than an appropriately tailored remedy.

16

## STANDARD OF REVIEW

This Court reviews an order granting summary judgment de novo. *Maben v. Thelen*, 887 F.3d 252, 263 (6th Cir. 2018). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law, *see Maben*, 887 F.3d at 263, and "[a]ll evidence must be viewed in the light most favorable to the nonmoving party," *Turner v. City of Taylor*, 412 F.3d 629, 638 (6th Cir. 2005).

## ARGUMENT

### I. The NAACP Lacks Organizational Standing to Challenge the Documentation Policy.

The district court erred by adjudicating this dispute at all. This litigation does not belong in federal court because the NAACP lacks standing to seek prospective relief. This Court should reverse and remand with instructions to dismiss count six of the complaint for lack of jurisdiction.

#### A. The NAACP's standing theories fail as a matter of law.

"A party may not invoke the federal judiciary's coercive powers against an adversary unless their dispute has taken the shape of the

17

'Cases' or 'Controversies' that fall within Article III's text." *NAACP*, 105 F.4th at 901 (quoting U.S. Const. art. III, § 2). And that bedrock requirement is not satisfied "unless the plaintiff has standing to sue." *Id.* at 902. To establish standing, the NAACP needed to prove three elements as a matter of law—namely, "that it has suffered (or will suffer) a 'concrete and particularized' injury; that a 'causal connection' exists between the injury and the defendant's conduct; and that the requested remedy will redress the injury." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *see McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016).

That burden is "substantially more difficult" for the NAACP because it challenges government conduct that regulates "someone else" rather than the organization itself. *NAACP*, 105 F.4th at 902 (quoting *Lujan*, 504 U.S. at 562). As this Court noted when granting the stay pending appeal, the Documentation Policy "'neither require[s] nor forbid[s] any action' on [the] part" of the NAACP. *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). Instead, "the policy regulates other parties (certain registration applicants with felony convictions) by requiring them to submit paperwork (such as restoration-of-rights documents) that confirms their eligibility to vote." *Id.* So the NAACP needs "much more"

18

than usual to show that the Documentation Policy actually causes the organization to suffer any cognizable injury. *Changizi v. Dep't of Health & Human Servs.*, 82 F.4th 492, 496 (6th Cir. 2024) (citation omitted).

The NAACP did not and cannot meet that burden. The standing arguments raised below or hypothesized in this Court's stay opinion fail as a matter of law.

### 1. The diversion-of-resources theory falls short.

The district court held that the Documentation Policy injures the NAACP by "caus[ing] the organization's scarce volunteer time and money to be diverted away from its other mission furthering activities" and towards "voter registration assistance." Memo. Op., R. 221 at 3668. The court found that "drain on [the NAACP's] resources [was] sufficient to prove injury in fact to the organization itself at summary judgment. *Id.*

That holding cannot survive the Supreme Court's decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). There, various medical associations challenged FDA regulations that made it easier for pregnant women to obtain an abortion pill called mifepristone. *Id.* at 372–74, 394. Those medical associations argued they had organizational standing because "the FDA regulations" they challenged "had rendered

19

their public-education efforts more costly by forcing them to devote extra time and expense to informing the public about the risks of the abortion drug." *NAACP*, 105 F.4th at 905 (citing *All. for Hippocratic Med.*, 602 U.S. at 393–95). But the Supreme Court found those costs insufficient because "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 394.

Like the medical associations in *Alliance for Hippocratic Medicine*, the NAACP too lacks standing because the organization itself suffers no concrete injury from the Documentation Policy. The NAACP neither pled nor proved any direct injury to the organization from the challenged conduct. And the time and money that the NAACP spent fighting the Documentation Policy is not enough because "a plaintiff's voluntary expenditure of resources to counteract governmental action that only indirectly affects the plaintiff does not support standing." *PETA v. USDA*, 797 F.3d 1087, 1099 (D.C. Cir. 2015) (Millett, J., dubitante); *see All. for Hippocratic Med.*, 602 U.S. at 393–95. At most, the resource-diversion theory shows that the NAACP voluntarily expended resources assisting and "advis[ing]

20

others how to comport with" the Documentation Policy.  *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014).  The NAACP cannot "manufacture its own standing" in that manner by voluntarily spending resources to counteract conduct that does not concretely harm the organization itself.  *All. for Hippocratic Med.*, 602 U.S. at 394; *see Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977, 982 (6th Cir. 2020) (per curiam); *Fair Elections*, 770 F.3d at 460–61.

Indeed, accepting the NAACP's standing theory here would create the exact free-for-all the Supreme Court warned about in the mifepristone case.  The Court rejected the diversion-of-resources argument there because it would mean that "all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies."  *All. for Hippocratic Med.*, 602 U.S. at 395.  Here too, the inevitable consequence of the resource-diversion theory adopted below is that all organizations could spend their way into federal court to challenge policies that inflict no other concrete organizational injury.  That "expansive theory of standing" defies the limited role of federal courts, *id.*, and flouts "separation-of-powers principles," *Clapper v. Amnesty Int'l*, 568 U.S. 398, 408 (2013).

Concluding otherwise, the district court found the NAACP's bare resource costs sufficient based on now-abrogated precedent. *See* Memo. Op., R. 221 at 3667–69 (collecting cases). The district court cited *Online Merchants Guild v. Cameron*, 995 F.3d 540, 548 (6th Cir. 2021) to hold that "within-mission organizational expenditures are enough to establish direct organizational standing." Whatever value that decision previously had for this case, *but see NAACP*, 105 F.4th at 906–07, its reasoning no longer survives in a post-*Alliance for Hippocratic Medicine* world. Neither *Online Merchants* nor any other case remains good law insofar as they suggest that standing may arise from voluntary organizational expenditures alone. *See United States v. King*, 853 F.3d 267, 274 (6th Cir. 2017).

### 2. The NAACP cannot show standing under *Havens*.

Setting aside organizational expenditures, this Court in its stay decision left open the possibility that the NAACP might nevertheless have standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). *See NAACP*, 105 F.4th at 905. Both the law and the facts confirm that the NAACP falls outside *Havens*' "narrow domain." *Id.* at 903.

To begin, *Havens* was an "unusual case" which the Supreme Court "has been careful not to extend." *All. for Hippocratic Med.*, 602 U.S. at

22

396. The organizational plaintiff there ("HOME") "operated a housing counseling service" that existed alongside the organization's issue-advocacy efforts. *Id.* Under federal law, HOME enjoyed "a broad legal right" to "truthful information concerning the availability of housing"—"a right that cu[t] to the core" of its counseling-and-referral services. *Fair Elections*, 770 F.3d at 460 n.1 (quoting *Havens*, 455 U.S. at 373). So when the defendant directly gave false information to HOME, that "perceptibly impaired HOME's ability to provide [its] counseling and referral services." *Havens*, 455 U.S. at 379. "In other words, [the defendant's] actions directly affected and interfered with HOME's core business activities[,] not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *All. for Hippocratic Med.*, 602 U.S. at 395. That "noneconomic" injury created standing. *Havens*, 455 U.S. at 379 n.20.

*Havens* does not give the NAACP standing. That decision rests on two premises—(1) HOME operated its own business separate from its advocacy efforts, and (2) the challenged conduct directly interfered with that business's legal right to truthful information under federal law. *Havens*, 455 U.S. at 378–79. Neither premise is met here.

23

First, the NAACP operates no businesses akin to HOME's counseling agency. The Court in *Havens* found it "critica[l]" that HOME's "housing counseling service," *All. for Hippocratic Med.*, 602 U.S. at 395, suffered a "direc[t]" injury to its own statutorily protected "legal right," *Fair Elections*, 770 F.3d at 460 n.1. The NAACP by contrast describes itself as an "advocacy group" that "advocate[s] for the rights of individuals who have been discriminated against." Morris Dep. Tr., R. 151-4 at 1324. The organization's voter-registration efforts are incidental to its "public education workshops" and "community outreach events." Sweet-Love Decl., R. 156-2 at 2356. The NAACP does not run a business whose legal rights the Documentation Policy impairs; unlike in *Havens*, the Documentation Policy only affects the NAACP indirectly. *NAACP*, 105 F.4th at 902, 904–05.

That makes the NAACP analogous to the medical associations that lacked standing in *Alliance for Hippocratic Medicine*. Like those groups, the challenged conduct does not concretely "imped[e]" the NAACP's ability to engage in its issue advocacy, *All. for Hippocratic Med.*, 602 U.S. at 395, or inflict a "direc[t]" injury to the NAACP's own statutorily protected "legal right," *Fair Elections*, 770 F.3d at 460 n.1. The only way that the Documentation Policy affects the NAACP is by imposing what the organization

24

perceives to be an inequitable barrier to voting that it voluntarily spends resources to help *others* overcome. And that kind of burden is merely a "setback to the organization's abstract social interests" rather than a legally cognizable injury. *Havens*, 455 U.S. at 379.

To be sure, this Court suggested in its stay opinion that the NAACP "arguably *alleges* that it is in the business of registering voters," *NAACP*, 105 F.4th at 905 (emphasis added), and thus would be similarly situated to HOME for standing purposes. But "mere allegations" do not establish standing at summary judgment. *Schickel v. Dilger*, 925 F.3d 858, 866 (6th Cir. 2019). Whatever the NAACP alleges or argues before this Court, the record contains no evidence that the NAACP acts like HOME by engaging "in the business of registering voters." *NAACP*, 105 F.4th at 905. The NAACP's admissions show otherwise. Morris Dep. Tr., R. 151-4 at 1324.

Second, even spotting that the NAACP operates a voter-registration "business," the organization provided no evidence that the Documentation Policy "perceptibly impair[s]" that enterprise. *Havens*, 455 U.S. at 379. Actionable impairment occurs when the challenged conduct materially disrupts the organization's "daily operations." *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 546 (6th Cir. 2004).

25

Here, no record evidence "indicates that [the NAACP's] organizational activities have been perceptibly impaired in any way," *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 921 (D.C. Cir. 2015), or that the NAACP has been "directly" injured like HOME was in *Havens*, *Fair Elections*, 770 F.3d at 460 n.1.   The NAACP continues to offer voter-registration services (among other services), *see* Supp. Sweet-Love Decl., R. 192-1 at 3236, just like it did before the Documentation Policy.   The NAACP's failure to prove that the policy concretely impaired its voter-registration business suggests that no such impairment exists.   After all, the Documentation Policy dates to 2014, yet the NAACP could not muster any specific evidence that it tangibly harms the organization or identify any voters that the organization spent resources helping.   *See NAACP*, 105 F.4th at 893, 906; *infra* I.B.

Anyway, even setting all that aside, *Havens* is ill-suited to this dispute because the NAACP seeks prospective relief rather than just damages for past harm.   *NAACP*, 105 F.4th at 904–05.   That matters because the standard for obtaining forward-looking relief is different than the standard for recovering damages.   *See Davis v. Colerain Twp.*, 51 F.4th 164, 171 (6th Cir. 2022).   "*Havens* thus said nothing about the types of *future* injuries that plaintiffs must allege."   *NAACP*, 105 F.4th at 904.

Again, NAACP must produce 'specific facts' that support its standing" for future harms, *id.* at 903, and again it fails to do so.  *See infra* I.B.  Because *Havens* differs from this case in those ways, this Court should follow Supreme Court and "not extend" that decision "beyond its context."  *All. for Hippocratic Med.*, 602 U.S. at 396.

### 3. The NAACP differs from the aggrieved consumer hypothesized in the stay opinion.

Besides *Havens*, this Court in its stay decision suggested another theory that might support the NAACP's standing.  Citing *General Motors Corp. v. Tracy*, 519 U.S. 278, 286–87 (1997), this Court noted that "[a] State's tax on a manufacturer, for example, might give the manufacturer's *customers* standing by raising their prices for some commodity."  *NAACP*, 105 F.4th at 905.  And that prompted the question that, "[i]f a customer's expenditure for the commodity sufficed to give it standing, why shouldn't the NAACP's expenditure for its voter-registration efforts?"  *Id.*

Two points.  First, *General Motors* is inapposite.  There, Ohio levied sales and use taxes on the purchase of natural gas.  *Gen. Motors Corp.*, 519 U.S. at 282–83.  General Motors challenged that taxation scheme under the Commerce Clause.  And the Supreme Court held that General Motors had standing to bring that challenge because, as the *purchaser* of

27

natural gas, "it was liable for payment of the tax." *Id.* at 286. General Motors was thus "burdened directly" by the challenged conduct; its injury was not downstream from taxes imposed on a third party. *Lane v. Holder*, 703 F.3d 668, 672 (4th Cir. 2012). Here, however, no evidence shows that the Documentation Policy "directly" burdens the NAACP at all. *See NAACP*, 105 F.4th at 902, 904. That policy applies exclusively to certain convicted felons and nothing in it requires the NAACP to take any action or pay any additional costs to continue its voter-registration efforts.

Second, the court's hypothetical does not support NAACP's standing. *See NAACP*, 105 F.4th at 905. The pocketbook injury that a consumer purchasing gasoline suffers downstream from a tax qualifies as a textbook injury in fact. And because the tax causes that injury, the customer argu-ably has standing.[3] But the Documentation Policy does not make it more

---

[3] To be sure, it is unclear whether unregulated consumers have standing to challenge conduct that causes downstream pocketbook inju-ries. *Compare cf. Ammex, Inc. v. United States*, 367 F.3d 530, 533–34 (6th Cir. 2004) (holding that a retailer lacked standing to challenge a tax levied on a third-party fuel supplier even though the retailer had to pay the supplier an amount equal to the excise tax upfront at the time of pur-chase because that pocketbook harm "was not occasioned by the Govern-ment"), *Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.*, 256 F.3d 879, 885 (9th Cir. 2001) (holding that there is no "injury in fact" to tobacco purchasers "when a manufacturer passes on higher costs in the form of price increases" to tobacco products), *with Competitive Enter. Inst.*

costly for the NAACP to assist with voter registration. If eligible applicants have the proper documentation readily accessible, there is no reason why the Documentation Policy would require the NAACP to spend materially more time and resources assisting the applicant. All the applicant must do is submit that proof along with the completed form. The NAACP would only need to spend more time and resources if the applicants do not have the proper documentation on hand, and the organization's volunteers decide to help "track down" those materials for the applicant. Sweet-Love Decl., R. 156-2 at 2357. So it is the *applicant's* failure to maintain that documentation and the NAACP volunteer's independent choice that drives the NAACP to spend more resources, not the Documentation Policy. *See Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 455–57 (6th Cir. 2017).

That underscores the key difference between the NAACP and the aggrieved gas consumer: causation. The NAACP obviously "disagree[s]" with the Documentation Policy, *All. for Hippocratic Med.*, 602 U.S. at 394, but that that does not force the NAACP to make any expenditures.

---

*v. FCC*, 970 F.3d 372, 386 (D.C. Cir. 2020) (finding an injury because the challenged conduct would require consumers to pay "higher prices" for broadband services). The State assumes for purposes of the question posed by the Court that the hypothetical consumer has standing.

29

Whatever resources the NAACP diverts flows from its voluntary choice to help voters track down materials required by the Documentation Policy, as well as the applicant's independent failure to maintain and provide that documentation to the NAACP when the applicant seeks help registering to vote. That makes the Documentation Policy unlike the tax on the commodity manufacturer because "[t]he chain of causation" between the resource costs and government action "is simply too attenuated" to find standing. *Id.* at 391; *cf. Greater Cincinnati Coal. for the Homeless v. City of Cincinnati*, 56 F.3d 710, 716–17 (6th Cir. 1995).

*Alliance for Hippocratic Medicine* drives that point home. The plaintiff doctors in that case argued they had standing because the challenged FDA regulations forced them to "diver[t] resources and time from other patients to treat patients with mifepristone complications." *All. for Hippocratic Med.*, 602 U.S. at 390. But those resource costs were "too attenuated" for standing purposes: "the law has never permitted doctors to challenge the government's loosening of general public safety requirements simply because more individuals might then show up at emergency rooms or in doctors' offices with follow-on injuries." *Id.* at 391.

The Court offered some other examples. Suppose "EPA rolls back emissions standards for power plants—does a doctor have standing to sue because she may need to spend more time treating asthma patients?" *Id.* Or consider "[a] local school district [that] starts a middle school football league—does a pediatrician have standing to challenge its constitutionality because she might need to spend more time treating concussions?" *Id.* And how about if "[t]he government repeals certain restrictions on guns—does a surgeon have standing to sue because he might have to operate on more gunshot victims?" *Id.* The answer in those cases is "no" because "[t]he chain of causation is simply too attenuated." *Id.*

All those examples involve the same flawed causation theory that the NAACP asserts here. The NAACP never claimed that the Documentation Policy imposes direct resource costs. They argue that they choose to spend resources combatting the attenuated consequences of the Documentation Policy, just like the doctor who must treat more asthma patients, the pediatrician that spends more time on concussions, and the surgeon who operates on more gunshot victims. Article III requires more.

31

**B.    NAACP's standing theories fail as a matter of fact.**

Even assuming the NAACP offers a *legally* sound standing theory, there are not enough *specific facts* in the record to prove that theory up.

At summary judgment, the record must contain "specific facts, as opposed to general allegations" proving the NAACP's injury.  *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (citation omitted).  Just like "a plaintiff may not rely on conclusory allegations to proceed past the pleading stage, so too a plaintiff may not rely on conclusory evidence to proceed past the summary-judgment stage."  *Viet*, 951 F.3d at 823 (citation omitted); *see*, *e.g.*, *Fair Elections*, 770 F.3d at 460–61 (vacating grant of summary judgment because the record lacked "specific facts" establishing standing).

To find that the NAACP met that burden, the district court relied on a declaration submitted after discovery closed.  *See* Memo. Op., R. 221 at 3668 (citing R. 156-2).  That declaration, tendered by the organization's president, "generically discusses what the NAACP has done when election officials have rejected the registration forms of voters that the NAACP has assisted."  *NAACP*, 105 F.4th at 905.  For example, the declarant states her "aware[ness] … of individuals" with grace-period convictions who are eligible to vote but are "nonetheless unable to register using the state voter

32

registration form." Sweet-Love Decl., R. 156-2 at 2357. It further states that, "[w]hen an eligible voter that the TN NAACP is assisting is incorrectly denied the ability to register to vote or is required to present additional paperwork to prove their eligibility beyond the voter registration form," the NAACP "divert[s] significant resources from other mission-furthering activities to follow up with the eligible voter and communicate with various governmental authorities." *Id.*

Neither that declaration nor any other evidence in the record provides the specific facts that the NAACP needs to prove standing. *See NAACP*, 105 F.4th at 905 (stating that the NAACP's evidence "likely fails to 'identify specific facts'" to prove its standing (citation omitted)).

First, the NAACP offered no "specific facts" showing that the Documentation Policy caused it to divert resources. The declaration states that the NAACP redirects resources "when" an *eligible* voter is "denied the ability to register to vote or is required to present additional paperwork," Sweet-Love Decl., R. 156-2 at 2357, but it never says that any applicants it helped were erroneously denied or required to present more paperwork. As this Court already explained, the deficiencies in the declaration are obvious—it fails to "identify a single voter that the Documentation Policy has

ever affected," it provides no timeframe about "when the NAACP provided … assistance" to those unidentified voters, and it lacks detail about "how often these issues have arisen for the organization." *NAACP*, 105 F.4th at 905–06; *see Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1141 (D.C. Cir. 2011). What is more, because the declaration "does not identify the reasons why election officials have rejected the registration forms of other unidentified voters that the NAACP has assisted," the Court is left with "no idea whether the Documentation Policy (or some other issue) affected these unidentified voters." *NAACP*, 105 F.4th at 905.

Second, the NAACP offered no "specific facts" showing that the Documentation Policy causes the NAACP ongoing or future harm. Even assuming the NAACP previously diverted resources because of the Documentation Policy, that does not justify forward-looking relief. *See Shelby Advocs.*, 947 F.3d at 980–82. No evidence shows that the NAACP "would likely 'again experience' a diversion of resources from the Documentation Policy." *NAACP*, 105 F.4th at 906 (citation omitted). This is especially true since the only example that NAACP gave involved "grace period" felons being denied, *see* Sweet-Love Decl., R. 156-2 at 2357, but the Documentation Policy no longer applies to those individuals, *NAACP*, 105 F.4th

at 893. Absent "specific facts" showing the harm is ongoing or "certainly impending," *id.* (citations omitted), the NAACP lacks standing.

Third, the NAACP offered no "specific facts" establishing its standing to challenge the Documentation Policy as applied to the Federal Form. The NAACP offered no evidence that it has *ever* assisted someone using the Federal Form whose application has been rejected because of the Documentation Policy. That matters because the NAACP alleged that it "almost exclusively" uses the State Form or an online portal when registering voters, Am. Compl., R. 102 at 620-21, yet it insists that it has standing to challenge the State's policies for the Federal Form. The failure to present evidence dooms the NVRA claim as applied to the Federal Form.

Although the NAACP tried to cure that evidentiary deficiency through a supplemental declaration, that declaration merely states that "there are regular events where [it] use[s] the Federal Form," such as "large-scale events that draw people from out of state." Supp. Sweet-Love Decl., R. 192-1 at 3237. That does not show that the NAACP has assisted—and will continue to assist—felons whose Federal Form application has been rejected because of the Documentation Policy.

Those factual deficiencies make this case like many others where organizational plaintiffs tried and failed to establish standing at summary judgment with insufficiently detailed evidence. That did not work for the voter-outreach organization seeking prospective relief against Ohio's absentee-ballot procedures. *See Fair Elections*, 770 F.3d at 458–61 (holding that the plaintiff had no standing when the record lacked "specific facts" to establish jurisdiction). It did not work for the environmental organizations seeking prospective relief against the Forest Service's actions. *See Ctr. for Biological Diversity v. Lueckel*, 417 F.3d 532, 537–38 (6th Cir. 2005) (same). And it did not work for the anti-abortion organization seeking prospective relief against speech restrictions imposed by the City of Detroit. *See Reform America v. City of Detroit*, 37 F.4th 1138, 1148 (6th Cir. 2022) (same). It should not work for the NAACP here either.

The bottom line: The NAACP lacks standing to bring the NVRA claim, either because its standing theory fails as a matter of law or because it failed to prove that theory as a matter of fact.

## II. The Documentation Policy Complies with the NVRA.

The Documentation Policy enables election officials to distinguish between eligible and ineligible voter-registration applicants. It faithfully

36

complies with the NVRA's various requirements and fits comfortably within existing precedent. The district court concluded otherwise only by misinterpreting the statutory text and misstating the record. So if this Court reaches the merits, it should reverse.

### A. The Documentation Policy does not require applicants to submit unnecessary information.

The NVRA regulates the content of "mail voter registration forms." 52 U.S.C. § 20508(b). Under § 20508(b)(1), those forms "may require only such . . . information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." The NVRA's text, binding precedent, and the canon of constitutional avoidance all confirm that the NVRA permits Tennessee to use the Documentation Policy.

### 1. The Documentation Policy requests "only" information "necessary" to verify the voter eligibility.

To determine whether a convicted felon is eligible to vote, election officials need to know information about the felon's conviction, such as the date of conviction, the crime of conviction, and whether the felon has restored the rights lost upon conviction. This information is necessary because Tennessee law forbids certain felons from voting unless they have

fulfilled specific requirements.  *See* Tenn. Code Ann. §§ 2-2-139(a); 2-19-143; 40-29-202.  The Documentation Policy ensures that election officials have the necessary information to determine a convicted felon's eligibility.

The Documentation Policy thus seeks "necessary" information from applicants under any plausible meaning of that word.  The NAACP thinks that because Tennessee election officials have "access to" certain information, the Documentation Policy requests information that is not "necessary" under § 20508(b).  Memo. Op., R. 221 at 3687.  But just because election officials could *theoretically* track down information does not mean the Documentation Policy seeks unnecessary information.  Whether that term is construed according to its strictest meaning (as the NAACP argues) or its more conventional meaning (as the State argues), the Documentation Policy passes muster because it seeks information that is essential to the voter-registration process.  By holding to the contrary, the district court misconstrued what "necessary" means in this context and misapplied bedrock summary-judgment principles.

a.    The "proper starting point" for evaluating the NAACP's claim that the Documentation Policy seeks unnecessary information is "a careful

examination of the ordinary meaning and structure" of the NVRA. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019).

Begin with ordinary meaning. "The term 'necessary' has a range of meanings—from 'essential' to merely 'useful.'" *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 282 (2022) (citations omitted); *see Ayestas v. Davis*, 584 U.S. 28, 44 (2018). Of course, "[e]very American law student will be familiar with these dueling meanings of 'necessary,' prominently displayed in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819)." *In re MCP No. 165*, 21 F.4th 357, 392 (6th Cir. 2021) (Larsen, J., dissenting). Because of the "chameleon-like quality" of that word, the Court "cannot rely on any all-purpose definition but must consider the particular context in which the term appears." *FAA v. Cooper*, 566 U.S. 284, 294 (2012); *see In re MCP No. 165*, 21 F.4th at 392 (Larsen, J., dissenting) ("the choice between" the competing meanings of "necessary" "is revealed by context").

That statutory context confirms that § 20508(b) uses "necessary" in its less strict sense. Another provision in the NVRA instructs that voter-registration forms accompanying driver's license applications "may require only the minimum amount of information necessary to . . . enable State election officials to assess the eligibility of the applicant and to

39

administer voter registration and other parts of the election process." 52 U.S.C. § 20504(c)(2)(B)(ii). That provision largely mirrors § 20508(b), but notably it limits election officials to requesting the bare "minimum" amount of information "necessary" to verify voter eligibility and administer elections. By limiting election officials to the "minimum" information necessary in § 20504, and excluding that qualifier from § 20508(b), Congress gave election officials greater discretion to request information from applicants under § 20508 than § 20504. *Fish v. Kobach*, 840 F.3d 710, 734 (10th Cir. 2016); *see Russello v. United States*, 464 U.S. 16, 23 (1983).

That supports interpreting "necessary" in § 20508(b) as people use that term "in ordinary speech"—as an adjective to describe information that is merely "useful" or "conducive." *Ayestas*, 584 U.S. at 44 (quoting Black's Law Dictionary (5th ed. 1979)); *see In re MCP No. 165*, 21 F.4th at 392 (Larsen, J., dissenting). After all, Congress knew how to constrain election officials to seeking only information that is "indispensable" or "essential." Necessary, Black's Law Dictionary (6th ed. 1990). It did so in § 20504 by limiting officials "to only the minimum amount of information necessary." 52 U.S.C. § 20504(c)(2)(B)(ii). It would be an interpretive error to give § 20508(b) "the same meaning" as § 20504 despite the "differing

language" in the relevant statutory provisions.  *Russello*, 464 U.S. at 23 (1983); *see Dep't of Treasury v. FLRA*, 494 U.S. 922, 932–33 (1990).

The "canon against surplusage" strengthens that approach.  *In re Davis*, 960 F.3d 346, 354 (6th Cir. 2020).  "[O]ne of the most basic interpretive canons" in the judicial toolbox, *Corley v. United States*, 556 U.S. 303, 314 (2009), the presumption against surplusage instructs courts to "give effect, if possible, to every word Congress used."  *In re Davis*, 960 F.3d at 354 (citation omitted).  That ensures "that no part" of a statute "will be inoperative or superfluous."  *Hibbs v. Winn*, 542 U.S. 88, 101 (2004).  And that canon carries especially strong force when, as is true here, "an interpretation would render superfluous another part of the same statutory scheme."  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013).  The NAACP runs headlong into that presumption by interpreting "necessary" in its strictest sense, Memo. ISO MSJ, R. 154 at 2299–30 (arguing § 20508(b) "sharply restricts" the information that "states can require" to the State Form itself), thus erasing "minimum" from § 20504 entirely.  The State gives effect to "minimum" by using it to limit information requested under § 20504 to that which is "essential."

41

Applying those principles to this dispute, the Documentation Policy requests information that is "useful" or "conducive" to the eligibility-verification process. 52 U.S.C. § 20508(b)(1). Applicants subject to the Documentation Policy were disenfranchised after conviction for an infamous felony or claim to be eligible despite conviction for a pre-January 15, 1973 infamous felony. The Documentation Policy is unquestionably "useful" because it "facilitate[s] … administrative review of whether [those] applicants [are] qualified to vote" by requiring them to submit information showing their voting rights have been restored. *NAACP*, 105 F.4th at 900.

The Documentation Policy eases administrative review by placing the burden on the applicant to supply the information needed to establish their eligibility. The reality is that election officials do not always have enough information to verify an applicant's eligibility. There are "many reasons why" election officials "cannot" find that information and must rely on the Documentation Policy. Lim Dep., R. 151-3 at 1283. Sometimes the applicant provides insufficient information about where or when they were convicted for election officials to independently confirm their eligibility. *Id.* Other times election officials simply cannot access the necessary documents because courts refuse to hand them over to anyone other than

42

the applicant.  *Id.*  In short, the "potential voter"—not election officials—"has the best information about their conviction," and is thus "in the best position" to obtain and supply the necessary documentation.  *Id.*

For those reasons, even if "necessary" means "indispensable," the Documentation Policy still fits the bill because it seeks information that is essential to the voter-verification process.  Tennessee cannot approve an application from a disenfranchised felon unless it knows the applicant has had their voting rights restored.  So the policy is narrowly tailored to seeking the bare minimum information necessary to verify eligibility.  And that policy is necessary because officials do not always have enough information to verify eligibility absent the Documentation Policy.  *See id.*

More generally, the State's approach best fits the underlying constitutional and statutory framework.  State and local governments receive staggering amounts of information about felons and voter-registration applicants.  Those entities might in theory have certain information in their possession, but election officials often are either unaware of that information or it is unduly burdensome to find that information.  The district court's approach requires election officials to track that down for the applicant rather than having the prospective voter do that work.  *But see*

*Falls*, 673 S.W.3d at 179 (describing the burden to prove eligibility as resting with the applicant).  That creates enormous administrative problems for the electoral process that the NVRA neither requires nor contemplates.  And it would come at the cost of making it extremely difficult for the State to exercise its constitutional authority to establish voter qualifications.

**b.**    The district court nevertheless offered two reasons for finding the Documentation Policy unlawful under § 20508(b).  Neither persuades.

First, the district court flat-out refused to consider Tennessee's argument that "it needs documentation to assess the eligibility of applicants with felony convictions" because the court believed that the defendants "fail[ed] to direct the Court to any evidence in the record of Tennessee making such a determination."  Memo. Op., R. 221 at 3691.  But the policy itself evidences that determination.  Tennessee's election officials use the Documentation Policy because they believe they need that information to determine an applicant's eligibility.  The district court's suggestion that election officials must prove that *they determined* they need the information that *their own policies require* is nonsensical, turns federalism upside down, and encourages federal courts to "become entangled, as

44

overseers and micromanagers, in the minutiae of state election processes." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 622 (6th Cir. 2016).

At minimum, the district court's refusal to consider the State's argument flouts bedrock summary-judgment principles. Assume for the moment that the district court correctly concluded that neither party presented evidence about whether Tennessee's election officials determined that they need the Documentation Policy. All reasonable inferences must be drawn in favor of the State as the non-moving party. *Troche v. Crabtree*, 814 F.3d 795, 798 (6th Cir. 2016). But here, the court assumed from the record's silence that no such determination had been made. That draws an unsupported inference against the non-moving party—a move that is especially egregious because the NAACP bears the burden of proof, and because the State receives "considerable deference" when setting election procedures. *Vote.org v. Callanen*, 89 F.4th 459, 481 (5th Cir. 2023).

Second, the district court held that the Documentation Policy violates "the NVRA's prohibition against requiring unnecessary information" because "it is undisputed that county and state election officials have the information the State says it needs to assess an applicant's eligibility." Memo. Op., R. 221 at 3691. But the defendants *did* dispute—and continue

to dispute—that the election officials already have the information they need to verify voter eligibility even without the Documentation Policy. Defs.' Resp., R. 181 at 2920; *see* Lim Dep., R. 151-3 at 1123, 1226 (the Division of Elections does not possess felony conviction information from before 1973 because felony records were digitized in the 1990s); *id.* at 1283 (explaining that election officials cannot always find the documentation necessary to establish voter eligibility); *id.* at 1425 ("the voter is the one who knows where they were convicted" and "without their help" the State "wouldn't be able to get" the "documentation").[4]

The district court cited no evidence—*none*—to support its finding that the State "has the information [it] says it needs to assess an applicant's eligibility." Memo. Op., R. 221 at 3689. And although the NAACP certainly *argued* that the State already has all that information, it offered no evidence to prove that point. For example, the NAACP in its briefing highlighted various steps that election officials can take to try to track

---

[4]  Lim's testimony at page 2425 concerns how the State would go about verifying whether an applicant has a grace-period conviction. Although the Documentation Policy does not apply to individuals with grace-period convictions, this testimony illustrates that election officials do not always have all the information they need to confirm whether the applicant is eligible for voter registration.

down an applicant's eligibility—ranging from checking databases to contacting courts or submitting public-records requests. NAACP Memo., R. 154 at 2302–05. Yet none of that shows that the relevant election officials already have the information they need to verify an applicant's eligibility. Defs.' Resp., R. 181 at 2920. It just shows that officials can sometimes take various (burdensome) steps to obtain that documentation. The court nevertheless improperly credited the NAACP's "contentions" as fact and used that to grant summary judgment. Memo. Op., R. 221 at 3688.

More to the point, the ruling below rests on the premise that States cannot require applicants to provide information that election officials already have in their possession. That is wrong twice over. The NVRA *itself* refutes that position by authorizing election officials to request "data relating to previous registration by the applicant," 52 U.S.C. § 20508(b)(2), which is information that election officials may already have if the person was previously registered in Tennessee. And in *McKay v. Thompson*, 226 F.3d 752 (6th Cir. 2000), this Court rejected the argument that the NVRA forbids States from requesting information already in its possession. There, the Court held that the NVRA allows Tennessee to require

47

applicants to submit their social security numbers—information the State unquestionably already has. *Id.* at 755–56.

> ### 2. Supreme Court precedent supports finding the Documentation Policy lawful under the NVRA.

Although the NVRA's text standing alone justifies reversing on the merits, *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013) further confirms that Tennessee may use the Documentation Policy.

In *Arizona*, the Supreme Court considered a policy that rejected voter-registration applications submitted on the Federal Form unless the applicant also provided "concrete evidence of citizenship." *Id.* at 5. The Court held that Arizona's policy violated the NVRA's requirement that States "accept and use" the Federal Form, 52 U.S.C. § 20505(a)(1), which it interpreted to require States to "accep[t]" a completed form by itself "*as sufficient*" for the purpose of registering voters, *Arizona*, 570 U.S. at 10.

While Arizona could not enforce its policy as applied to applicants using the Federal Form, *see id.* at 20, nothing in the Court's decision "question[ed] [a State's] authority … to create its own application form that demands proof of citizenship," *id.* at 39 (Alito, J., dissenting); *see* 52 U.S.C. § 20505(a)(2) (empowering States to "develop and use" their own mail-in forms). On the contrary, the Court agreed that State Forms "may require

48

information the Federal Form does not," and acknowledged that States may impose "procedural hurdles" on their own "more demanding state form" to ensure that applicants are eligible to vote. *Arizona*, 570 U.S. at 12 & 12 n.4 (majority opinion). As an example of what information a State may request, the Court pointed to Arizona's requirement that applicants using the state form provide documentary proof of citizenship. *Id.* at 7, 12 (Proposition 200 required "documentary proof of citizenship").

As applied to State Form applicants, the Documentation Policy rests soundly under the Court's reasoning in *Arizona*. That policy, as referenced on Tennessee's State Form, requires applicants to submit information "the Federal Form does not." *Id.* at 12. The type of "information" it seeks is documentary proof of eligibility in the form of proof of a felon's voting-rights restoration. That is materially indistinguishable from the documentary proof of citizenship that the Supreme Court blessed in *Arizona*. And the reason Tennessee requires that information is to "enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration." 52 U.S.C. § 20508(b)(1).

The decisions below flout *Arizona* because they forbid Tennessee from requiring felons "to present documentary proof of eligibility." Order,

49

R. 237 at 3825.  That blatantly defies the Supreme Court's instruction in *Arizona* that States "may require information the Federal Form does not," including by making requests for documentary evidence. 570 U.S. at 12. If NAACP's interpretation is accepted, that would mean that the Supreme Court's decision in *Arizona* that Arizona may require proof of citizenship for State Form applicants is wrong.  And it also ignores the Supreme Court's earlier admonitions that the NVRA "leaves room for policy choice" about what "information the State may—or may not—provide or request." *Young*, 520 U.S. at 286.

### 3.  The district court's interpretation of the NVRA also raises serious constitutional concerns.

There is "no doubt" that States may impose "qualifications for the exercise of the franchise." *Carrington*, 380 U.S. at 91; *see supra* Statement of the Case A.1 (collecting constitutional provisions).  Likewise, the State's authority to establish voter qualifications comes with "all the ordinary and appropriate means to execute" that authority.  *See* 1 Joseph Story, Commentaries on the Constitution of the United States 412–13 (1833).  Those implied powers logically follow because "the power to establish voting requirements is of little value without the power to enforce those requirements." *Arizona*, 570 U.S. at 17.  That is why the Supreme Court warned

50

in *Arizona* that "it would raise serious constitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications." *Id.*

Yet the injunction here does just that. The record shows that election officials sometimes cannot track down enough information to verify voter eligibility one way or another. *See supra* Argument II.A.1. The injunction forbids Tennessee from requiring applicants to submit documentary proof establishing their eligibility. And it also requires the State to register those applicants unless the State possesses "credible information establishing that they are ineligible to vote." Order, R. 237 at 3825. The consequence of the injunction is that Tennessee must register applicants even though it is unsure whether they satisfy the State's voter qualifications. The injunction thus hamstrings Tennessee's "constitutional authority to establish qualifications … for voting," and raises "serious constitutional doubts" about the decisions below. *See Arizona*, 570 U.S. at 16, 17.

Whether viewed as a constitutional defect with the injunction and grant of summary judgment, or as another reason for rejecting the NAACP's interpretation of the NVRA, that serious constitutional problem supports reversing on the merits. *Cf. Pa. State Conf. of the NAACP v. Sec'y*

51

*of Commw. of Pa.*, 97 F.4th 120, 135 (3d Cir. 2024) (find it "implausible that federal law bars a State from enforcing vote-casting rules that it has deemed necessary to administer its elections").

## B.   The Documentation Policy ensures that eligible applicants are registered to vote.

States must "ensure that any eligible applicant is registered to vote in an election . . . if the valid voter registration form of the applicant is postmarked not later than the lesser of 30 days, or the period provided by State law, before the date of the election."  52 U.S.C. § 20507(a)(1)(B). The district court held in a conclusory sentence that the Documentation Policy violates § 20507(a)(1) because "it is undisputed that" the policy "does not ensure that eligible applicants are registered if their valid registration form is timely received."  Memo. Op., R. 221 at 3691.  Not so.

Section 20507(a)'s registration mandate kicks in once an applicant meets two conditions.  The applicant must first submit a "valid registration form" in a timely manner.  *Id.* § 20507(a)(1)(B).  And the applicant must also be "eligible" to vote.  *Id.*  Only once both conditions are met does the State become obligated to register the applicant.  The Documentation Policy complies with § 20507(a) because it instructs election officials to deny applications that do not satisfy both preconditions.

To begin, a convicted felon who lost their voting rights does not submit a "valid" form unless they comply with the Documentation Policy. States decide what qualifies as a "valid" State Form application. *See* 52 U.S.C. § 20505(a)(2); *Arizona*, 570 U.S. at 12–13. Here, Tennessee's election officials established the Documentation Procedure to help "verif[y] the registration eligibility of any person convicted of an infamous crime." Tenn. Code Ann. § 2-2-139(c). Because an application from a convicted felon who lost their voting rights is not "valid" unless they follow that process, the State does not violate § 20507(a) by rejecting applications that ignore the Documentation Policy.

*Arizona* does not hold otherwise. The Supreme Court suggested in that decision that a Federal Form application is "valid" whenever the applicant submits "a completed copy of the form." 570 U.S. at 12. But that is simply because the federal election agency decided not to require any additional documentation for Federal Form applications, *see id.* at 11–12; if the federal agency also requested documentary proof of eligibility, then the Federal Form would not be "valid" unless the application came with that information. Here, because States create their own registration

53

forms, the determination whether State Form applications are "valid" depends on what the States require an applicant to do.

Next, assuming the application complies with the Documentation Policy, election officials will register the applicant if they are "eligible." 52 U.S.C. § 20507(a)(1)(B). "The use of the word 'eligible'" in that provision obviously "limits the affirmative obligation" to register persons under the NVRA to applicants that meet Tennessee's relevant voter qualifications. *Bellitto v. Snipes*, 935 F.3d 1192, 1201 (11th Cir. 2019). With the information provided by the Documentation Policy, election officials have what they need to distinguish eligible felons from ineligible felons, and thereby register only those that meet the State's voter qualifications.

Neither the district court nor the NAACP provided evidence that eligible applicants who submitted "valid" applications were rejected. Nor did the State fail to genuinely dispute that the Documentation Policy violates this provision of the NVRA. *See* State's Opp., R. 180 at 2880–83. So the district court erred by granting summary judgment on that basis.

## C. The Documentation Policy complies with the NVRA's uniformity-and-nondiscrimination requirement.

The district court also held in passing that the Documentation Policy violates the NVRA's prohibition against maintaining voter-

54

registration rolls in a non-uniform and discriminatory manner.  Memo. Op., R. 221 at 3691.  But that holding flouts the relevant statutory text and rests on a fundamental misunderstanding of the record.

### 1.    The district court wrongly characterized the uniformity claim as undisputed.

Without any record citations, and after just one sentence of explanation, the district court granted summary judgment for the NAACP because it believed it was "undisputed [that] Tennessee's documentation policy imposes an unnecessary requirement in a non-uniform manner" in violation of § 20507(b)(1).  Memo. Op., R. 221 at 3691.  That was an error.

For starters, the State disputed that the NAACP provided enough factual and legal support to merit summary judgment.  *See* Fed. R. Civ. P. 56(c)(1) (allowing the nonmoving party to establish a genuine dispute by "showing that the materials cited" by the moving party "do not establish the absence … of a genuine dispute").  The State in its opposition to the NAACP's summary-judgment motion highlighted its utter failure to "put forth evidence" or identify "any case" showing that "Tennessee's voter-registration policies violate the NVRA's uniformity and non-discriminatory requirements."  State's Opp., R. 180 at 2885.  The State also pointed out the NAACP's failure to identify any voters affected by the

55

allegedly non-uniform and discriminatory policy. *Id*. at 2886. Because the "materials cited" by the NAACP do not establish liability, the district court erred by granting summary judgment. Fed. R. Civ. P. 56(c)(1).

Next, the State also made affirmative arguments explaining why "Tennessee's voter-registration policies are uniform and nondiscriminatory." State's Opp., R. 180 at 2885. It explained that the Documentation Policy complies with the NVRA because it does "not single out any class of applicants based on an irrelevant characteristic," and it argued that the Documentation Policy was justified by the State's interest in verifying voter eligibility, accurate recordkeeping, and preventing fraud. *Id*.

In short, there was no basis for the district court to find that the State conceded that the Documentation Policy violated the NVRA. That failure provides an independent basis for vacating the grant of summary judgment on the uniformity-and-nondiscrimination issue. *See*, *e.g.*, *Braxton v. Amoco Oil Co.*, 202 F.3d 272 (7th Cir. 1999) (unpublished order).

### 2. Voter-registration procedures cannot violate the NVRA's uniformity requirement.

The district court's holding fails for the more fundamental reason that it misunderstands § 20507(b)'s scope. That provision simply does not apply to voter-registration procedures like the Documentation Policy.

Section 20507(b) regulates what steps officials may take to "maint[ain] . . . accurate and current voter registration roll[s] for elections for Federal office."  52 U.S.C. § 20507(b).  Voter rolls are centralized lists of every registered voter.  *See id.* § 21083(a).  And § 20507(b)(1) provides that those "voter . . . rolls" must be "maint[ained]" in a "uniform" and "nondiscriminatory" manner.  That means officials must "keep up" or "in good order" the list of registered voters without purging persons in a non-uniform manner.  Maintain, Black's Law Dictionary (6th ed. 1990); Maintain, Webster's New World Dictionary & Thesaurus (1996), Maintain, American Heritage Dictionary of the English Language (3d ed. 1992).

By its plain terms, § 20507(b) "appli[es] to state *removal* programs" rather than voter *registration* policies.  *Husted*, 584 U.S. at 764 (emphasis added).  That matters here because the Documentation Policy regulates what applicants must to do be "place[d] *on* the voter rolls."  Am. Compl., R. 102 at 643 (emphasis added).  It says nothing about what steps officials may take to "maint[ain]" voter rolls.  52 U.S.C. § 20507(b)(1).

This Court should follow other courts in applying that straightforward text to dismiss the § 20507(b)(1) claim.  In Arizona, for example, various plaintiffs argued that the State's requirement that voter-

registration applicants submit proof of eligibility violated § 20507(b)(1). *Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1094–95 (D. Ariz. 2023). "Based on the plain language of the NVRA," the district court agreed that § 20507(b) "does not apply to state programs regarding individuals not yet registered to vote" because that provision "speaks to ensuring the *maintenance*, not the enlargement, of current voter registration rolls." *Id.* at 1095. So the court granted judgment to the State, *see id.* at 1104, as the district court here should have done too.

### 3. The Documentation Policy applies uniformly to all felons who are similarly situated.

Assuming § 20507(b)(1) applies, the Documentation Policy operates uniformly. Individuals without a disqualifying conviction need not provide documentary proof. And those who have such a conviction simply need to provide documentary proof of eligibility.

## III. The District Court Granted Improper Relief.

Even *if* the district court properly granted the NAACP summary judgment, the injunction it issued should be reversed because the NAACP never proved that it would suffer irreparable harm absent relief. And even if injunctive relief *were* appropriate, the district court erred by

entering "a *universal* injunction that bars enforcement of the Documentation Policy against everyone." *NAACP*, 105 F.4th at 906.

## A.    The NAACP never proved that it needs a permanent injunction to prevent irreparable harm.

An injunction is an equitable remedy that "does not follow from success on the merits as a matter of course." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).  Because an injunction is a "drastic and extraordinary remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), "[a] plaintiff seeking a permanent injunction must demonstrate that it has suffered irreparable injury," *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006); *see Kallstrom v. City of Columbus*, 136 F.3d 1055, 1068 (6th Cir. 1998).  At summary judgment, it must make that showing through "specific facts." *Viet*, 951 F.3d at 823; *see ITT Educational Services, Inc. v. Arce*, 533 F.3d 342, 347 (5th Cir. 2008).

Yet the district court made no finding that the NAACP would suffer irreparable harm absent injunctive relief.  *See* Memo. Op., R. 221; Order, R. 222; Order, R. 240.  Unlike the typical case involving equitable relief, the injunction here rests on purported *statutory* rather than *constitutional* violations.  The district court thus could not presume irreparable harm.  *Compare Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021)

("irreparable injury is presumed" when "constitutional rights are threat-ened or impaired"), *with Fish*, 840 F.3d at 751 n.24 (rejecting the argu-ment that irreparable harm can be presumed based on NVRA violations). Nor has the NAACP tried "to treat its alleged injuries (the extra time and money incurred as a result of the Documentation Policy) as irreparable." *NAACP*, 105 F.4th at 898. Because the NAACP made no showing of ir-reparable harm, the injunction was improperly entered.

The NAACP cannot save the injunction by bootstrapping constitu-tional injuries that other voters allegedly suffer from the Documentation Policy. Although the NAACP brought a constitutional claim in connec-tion with Tennessee's voter-registration procedures, *see* Am. Compl., R. 102 at 655–56, the district court has not yet adjudicated that claim, *see* Memo. Op., R. 221 at 3664, 3672, and the NAACP has yet to "identify a single specific example of any eligible individual who has been hindered by the longstanding Documentation Policy," *NAACP*, 105 F.4th at 898. So the record lacks "specific facts" showing any constitutional injury, *Viet*, 951 F.3d at 823, as is necessary to support the injunction.

**B.    The district court erred by granting a universal injunction rather than an appropriately tailored remedy.**

Article III requires federal courts to "operate in a party-specific and injury-focused manner." *L.W. by and through Williams v. Skrmetti*, 83 F.4th 460, 490 (6th Cir. 2023), *cert. granted*, No. 23-477, 2024 WL 3089532 (June 24, 2024). That means, when granting relief, courts must limit the remedy "to the inadequacy that produced the injury in fact that the plaintiff has established." *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996). "A court order that goes beyond the injuries of a particular plaintiff to enjoin government action against nonparties exceeds the norms of judicial power." *L.W.*, 83 F.4th at 490; *see Commonwealth v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023) (district court abused its discretion by enjoining nonparties).

The permanent injunction defies those "foundational principles." *Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring). As this Court already observed, "the [district] court granted a *universal* injunction that bars enforcement of the Documentation Policy against everyone—including applicants that the NAACP has no plans to assist." *NAACP*, 105 F.4th at 906. The district court's failure to issue a "*tailored* injunction" resulted from the NAACP's failure to "identify any specific

applicants that it planned to assist in the future." *Id.* The upshot is that the injunction "exceeds the norms of judicial power" by enjoining the Documentation Policy from being applied to anyone. *L.W.*, 83 F.4th at 490.

## CONCLUSION

This Court should vacate the permanent injunction and either remand with instructions to dismiss count six for lack of jurisdiction (if the NAACP lacks standing) or reverse the grant of summary judgment and remand with instructions to enter judgment on count six for the State Defendants (if the State prevails on the merits).

62

Dated: August 14, 2024          Respectfully Submitted,

Jonathan Skrmetti
*Attorney General and Reporter*

J. Matthew Rice
*Solicitor General*

Zachary Barker
*Senior Assistant Attorney General*

Dawn Jordan
*Special Counsel*


*/s/Philip Hammersley*

Philip Hammersley
*Assistant Solicitor General*

State of Tennessee
Office of the Attorney General
P.O. Box 20207
Nashville, TN 37202
Philip.Hammersley@ag.tn.gov

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's type-volume limitations because it contains 12,939 words, excluding portions omitted from the Court's required word count. This brief complies with the Court's typeface requirements because it has been prepared in Microsoft Word using fourteen-point Century Schoolbook font.


*/s/Philip Hammersley*
Philip Hammersley

## CERTIFICATE OF SERVICE

On August 14, 2024, I filed an electronic copy of this brief with the Clerk of the Sixth Circuit using the CM/ECF system. That system sends a Notice of Docket Activity to all registered attorneys in this case. Under Sixth Circuit Rule 25(f)(1)(A), "[t]his constitutes service on them and no other service is necessary."

*/s/ Philip Hammersley*
Philip Hammersley

## DESIGNATION OF RELEVANT DOCUMENTS

Under Sixth Circuit Rule 28(b)(1)(A)(i), the appellants designate the following district court documents as relevant to this appeal:

| Document | R. | PageID Nos. |
|---|---|---|
| First Amended Complaint | 102 | 610–60 |
| Answer | 199 | 3272–91 |
| State's Motion for Summary Judgment | 150 | 1044–47 |
| Memo. ISO the State's Motion for Summary Judgment | 151 | 1048–90 |
| Goins Declaration | 151-1 | 1091–94 |
| Older Felonies Memo. | 151-2 | 1095–96 |
| Lim Deposition | 151-3 | 1097–1306 |
| Morris Deposition | 151-4 | 1307–92 |
| State's Statement of Undisputed Material Facts | 152 | 2259–73 |
| NAACP's Motion for Summary Judgment | 153 | 2274–77 |
| Memo. ISO NAACP's Motion for Summary Judgment | 154 | 2278–314 |

| | | |
|---|---|---|
| NAACP's Statement of Undisputed Material Facts | 155 | 2315–46 |
| Sweet-Love Declaration | 156-2 | 2355–58 |
| Hall Deposition | 156-5 | 2434–64 |
| State Form | 156-10 | 2503–04 |
| Federal Form | 156-11 | 2505–09 |
| State's Response to NAACP's Motion for Summary Judgment | 180 | 2858–89 |
| Supp. Goins Declaration | 180-1 | 2890–93 |
| State's Response to NAACP's Statement of Undisputed Material Facts & Statement of Additional Undisputed Material Facts | 181 | 2894–935 |
| NAACP's Response to State's Motion for Summary Judgment | 182 | 2936–63 |
| NAACP's Response to State's Statement of Undisputed Material Facts | 183 | 2964–82 |
| NAACP's Statement of Additional Undisputed Material Facts | 184 | 2983–90 |
| Reply ISO State's Motion for Summary Judgment | 190 | 3194–206 |

| | | |
|---|---|---|
| State's Reply to NAACP's Statement of Additional Undisputed Material Facts | 191 | 3207–19 |
| Reply ISO NAACP's Motion for Summary Judgment | 192 | 3222–34 |
| Supp. Sweet-Love Declaration | 192-1 | 3236–39 |
| NAACP's Response to State's Statement of Additional Undisputed Material Facts | 193 | 3240–50 |
| Memorandum Opinion | 221 | 3641–91 |
| Order Granting Summary Judgment | 222 | 3692–93 |
| Permanent Injunction | 237 | 3824–27 |
| Notice of Appeal | 242 | 3865–67 |
| State's Emergency Stay Motion | 243 | 3868–75 |
| Order Clarifying Injunction and Setting Briefing Schedule | 245 | 3884 |
| NAACP's Response to State's Emergency Stay Motion | 251 | 3906–27 |
| State's Reply ISO Emergency Stay Motion | 254 | 4419–26 |
| NAACP's Sur-Reply to State's Emergency Stay Motion | 260 | 4504–13 |

| | | |
|---|---|---|
| State's Sur-Sur Reply ISO State's Emergency Stay Motion | 264 | 4644–53 |

# ADDENDUM

Under Federal Rule of Appellate Procedure 28(f), the appellants herein reproduce the National Voter Registration Act of 1993 as amended, 52 U.S.C. §§ 20501–20511, which is relevant to this appeal.

\*    \*    \*

**52 U.S.C. § 20501.  Findings and purposes.**

**(a)    Findings**

The Congress finds that—

(1)    the right of citizens of the United States to vote is a fundamental right;

(2)    it is the duty of the Federal, State, and local governments to promote the exercise of that right; and

(3)    discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

**(b)    Purposes**

The purposes of this chapter are—

(1)    to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

(2)    to make it possible for Federal, State, and local governments to implement this chapter in a manner that

enhances the participation of eligible citizens as voters in elections for Federal office;

(3)    to protect the integrity of the electoral process; and

(4)    to ensure that accurate and current voter registration rolls are maintained.

## 52 U.S.C. § 20502.  Definitions.

As used in this chapter—

(1)    the term "election" has the meaning stated in section 30101(1) of this title;

(2)    the term "Federal office" has the meaning stated in section 30101(3) of this title;

(3)    the term "motor vehicle driver's license" includes any personal identification document issued by a State motor vehicle authority;

(4)    the term "State" means a State of the United States and the District of Columbia; and

(5)    the term "voter registration agency" means an office designated under section 20506(a)(1) of this title to perform voter registration activities.

## 52 U.S.C. § 20503.  National procedures for voter registration for elections for Federal office.

### (a)   In general

Except as provided in subsection (b), notwithstanding any other Federal or State law, in addition to any other method of voter registration provided for under State law, each State shall establish procedures to register to vote in elections for Federal office—

    (1)    by application made simultaneously with an application for a motor vehicle driver's license pursuant to section 20504 of this title;

    (2)    by mail application pursuant to section 20505 of this title; and

    (3)    by application in person—

        (A)    at the appropriate registration site designated with respect to the residence of the applicant in accordance with State law; and

        (B)    at a Federal, State, or nongovernmental office designated under section 20506 of this title.

**(b)   Nonapplicability to certain States**

This chapter does not apply to a State described in either or both of the following paragraphs:

    (1)    A State in which, under law that is in effect continuously on and after August 1, 1994, there is no voter registration requirement for any voter in the State with respect to an election for Federal office.

    (2)    A State in which, under law that is in effect continuously on and after August 1, 1994, or that was enacted on or prior to August 1, 1994, and by its terms is to come into effect upon the enactment of this chapter, so long as that law remains in effect, all voters in the State may register to vote at the polling place at the time of voting in a general election for Federal office.

**52 U.S.C. § 20504.  Simultaneous application for voter registration and application for motor vehicle driver's license.**

**(a)**  **In general**

    (1)    Each State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application.

    (2)    An application for voter registration submitted under paragraph (1) shall be considered as updating any previous voter registration by the applicant.

**(b)**  **Limitation on use of information**

No information relating to the failure of an applicant for a State motor vehicle driver's license to sign a voter registration application may be used for any purpose other than voter registration.

**(c)**  **Forms and procedures**

    (1)    Each State shall include a voter registration application form for elections for Federal office as part of an application for a State motor vehicle driver's license.

    (2)    The voter registration application portion of an application for a State motor vehicle driver's license—

        (A)    may not require any information that duplicates information required in the driver's license portion of the form (other than a second signature or other information necessary under subparagraph (C));

        (B)    may require only the minimum amount of information necessary to—

            (i)    prevent duplicate voter registrations; and

(ii)    enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;

(C)    shall include a statement that—

(i)    states each eligibility requirement (including citizenship);

(ii)    contains an attestation that the applicant meets each such requirement; and

(iii)    requires the signature of the applicant, under penalty of perjury;

(D)    shall include, in print that is identical to that used in the attestation portion of the application—

(i)    the information required in section 20507(a)(5)(A) and (B) of this title;

(ii)    a statement that, if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and

(iii)    a statement that if an applicant does register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes; and

(E)    shall be made available (as submitted by the applicant, or in machine readable or other format) to the appropriate State election official as provided by State law.

**(d)    Change of address**

Any change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as notification of change of address for voter registration with respect to elections for Federal office for the registrant involved unless the registrant states on the form that the change of address is not for voter registration purposes.

**(e)    Transmittal deadline**

(1)    Subject to paragraph (2), a completed voter registration portion of an application for a State motor vehicle driver's license accepted at a State motor vehicle authority shall be transmitted to the appropriate State election official not later than 10 days after the date of acceptance.

(2)    If a registration application is accepted within 5 days before the last day for registration to vote in an election, the application shall be transmitted to the appropriate State election official not later than 5 days after the date of acceptance.

**52 U.S.C. § 20505.   Mail registration.**

**(a)    Form**

(1)    Each State shall accept and use the mail voter registration application form prescribed by the Federal Election Commission pursuant to section 20508(a)(2) of this title for the registration of voters in elections for Federal office.

(2)    In addition to accepting and using the form described in paragraph (1), a State may develop and use a mail voter registration form that meets all of the criteria stated in

section 20508(b) of this title for the registration of voters in elections for Federal office.

(3)     A form described in paragraph (1) or (2) shall be accepted and used for notification of a registrant's change of address.

**(b)  Availability of forms**

The chief State election official of a State shall make the forms described in subsection (a) available for distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs.

**(c)  First-time voters**

(1)     Subject to paragraph (2), a State may by law require a person to vote in person if—

    (A)     the person was registered to vote in a jurisdiction by mail; and

    (B)     the person has not previously voted in that jurisdiction.

(2)     Paragraph (1) does not apply in the case of a person—

    (A)     who is entitled to vote by absentee ballot under the Uniformed and Overseas Citizens Absentee Voting Act [52 U.S.C. 20301 et seq.];

    (B)     who is provided the right to vote otherwise than in person under section 20102(b)(2)(B)(ii) of this title; or

    (C)     who is entitled to vote otherwise than in person under any other Federal law.

**(d)  Undelivered notices**

If a notice of the disposition of a mail voter registration application under section 20507(a)(2) of this title is sent by nonforwardable mail and is returned undelivered, the registrar may proceed in accordance with section 20507(d) of this title.

**52 U.S.C. § 20506.  Voter registration agencies.**

**(a)  Designation**

(1)  Each State shall designate agencies for the registration of voters in elections for Federal office.

(2)  Each State shall designate as voter registration agencies—

(A)  all offices in the State that provide public assistance; and

(B)  all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities.

(3)

(A)  In addition to voter registration agencies designated under paragraph (2), each State shall designate other offices within the State as voter registration agencies.

(B)  Voter registration agencies designated under subparagraph (A) may include—

(i)  State or local government offices such as public libraries, public schools, offices of city and county clerks (including marriage license bureaus), fishing and hunting license

bureaus, government revenue offices, unemployment compensation offices, and offices not described in paragraph (2)(B) that provide services to persons with disabilities; and

(ii)  Federal and nongovernmental offices, with the agreement of such offices.

(4)

(A)  At each voter registration agency, the following services shall be made available:

(i)  Distribution of mail voter registration application forms in accordance with paragraph (6).

(ii)  Assistance to applicants in completing voter registration application forms, unless the applicant refuses such assistance.

(iii)  Acceptance of completed voter registration application forms for transmittal to the appropriate State election official.

(B)  If a voter registration agency designated under paragraph (2)(B) provides services to a person with a disability at the person's home, the agency shall provide the services described in subparagraph (A) at the person's home.

(5)  A person who provides service described in paragraph (4) shall not—

(A)  seek to influence an applicant's political preference or party registration;

(B)  display any such political preference or party allegiance;

(C)    make any statement to an applicant or take any action the purpose or effect of which is to discourage the applicant from registering to vote; or

(D)    make any statement to an applicant or take any action the purpose or effect of which is to lead the applicant to believe that a decision to register or not to register has any bearing on the availability of services or benefits.

(6)    A voter registration agency that is an office that provides service or assistance in addition to conducting voter registration shall—

(A)    distribute with each application for such service or assistance, and with each recertification, renewal, or change of address form relating to such service or assistance—

(i)    the mail voter registration application form described in section 20508(a)(2) of this title, including a statement that—

(I)    specifies each eligibility requirement (including citizenship);

(II)    contains an attestation that the applicant meets each such requirement; and

(III)    requires the signature of the applicant, under penalty of perjury; or

(ii)    the office's own form if it is equivalent to the form described in section 20508(a)(2) of this title,

unless the applicant, in writing, declines to register to vote;

(B)    provide a form that includes—

(i)    the question, "If you are not registered to vote where you live now, would you like to apply to register to vote here today";

(ii)    if the agency provides public assistance, the statement, "Applying to register or declining to register to vote will not affect the amount of assistance that you will be provided by this agency.";

(iii)    boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote (failure to check either box being deemed to constitute a declination to register for purposes of subparagraph (C)), together with the statement (in close proximity to the boxes and in prominent type), "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME.";

(iv)    the statement, "If you would like help in filling out the voter registration application form, we will help you. The decision whether to seek or accept help is yours. You may fill out the application form in private."; and

(v)    the statement, "If you believe that someone has interfered with your right to register or to decline to register to vote, your right to privacy in deciding whether to register or in applying to register to vote, or your right to

choose your own political party or other political preference, you may file a complaint with _____.", the blank being filled by the name, address, and telephone number of the appropriate official to whom such a complaint should be addressed; and

(C)    provide to each applicant who does not decline to register to vote the same degree of assistance with regard to the completion of the registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance.

(7)    No information relating to a declination to register to vote in connection with an application made at an office described in paragraph (6) may be used for any purpose other than voter registration.

**(b)    Federal Government and private sector cooperation**

All departments, agencies, and other entities of the executive branch of the Federal Government shall, to the greatest extent practicable, cooperate with the States in carrying out subsection (a), and all nongovernmental entities are encouraged to do so.

**(c)    Armed Forces recruitment offices**

(1)    Each State and the Secretary of Defense shall jointly develop and implement procedures for persons to apply to register to vote at recruitment offices of the Armed Forces of the United States.

(2)    A recruitment office of the Armed Forces of the United States shall be considered to be a voter registration agency designated under subsection (a)(2) for all purposes of this chapter.

**(d)   Transmittal deadline**

(1)   Subject to paragraph (2), a completed registration application accepted at a voter registration agency shall be transmitted to the appropriate State election official not later than 10 days after the date of acceptance.

(2)   If a registration application is accepted within 5 days before the last day for registration to vote in an election, the application shall be transmitted to the appropriate State election official not later than 5 days after the date of acceptance.

## 52 U.S.C. § 20507. Requirements with respect to administration of voter registration.

**(a)   In general**

In the administration of voter registration for elections for Federal office, each State shall—

(1)   ensure that any eligible applicant is registered to vote in an election—

(A)   in the case of registration with a motor vehicle application under section 20504 of this title, if the valid voter registration form of the applicant is submitted to the appropriate State motor vehicle authority not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(B)   in the case of registration by mail under section 20505 of this title, if the valid voter registration form of the applicant is postmarked not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(C)  in the case of registration at a voter registration agency, if the valid voter registration form of the applicant is accepted at the voter registration agency not later than the lesser of 30 days, or the period provided by State law, before the date of the election; and

(D)  in any other case, if the valid voter registration form of the applicant is received by the appropriate State election official not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(2)  require the appropriate State election official to send notice to each applicant of the disposition of the application;

(3)  provide that the name of a registrant may not be removed from the official list of eligible voters except—

(A)  at the request of the registrant;

(B)  as provided by State law, by reason of criminal conviction or mental incapacity; or

(C)  as provided under paragraph (4);

(4)  conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of—

(A)  the death of the registrant; or

(B)  a change in the residence of the registrant, in accordance with subsections (b), (c), and (d);

(5)  inform applicants under sections 20504, 20505, and 20506 of this title of—

(A)  voter eligibility requirements; and

(B)  penalties provided by law for submission of a false voter registration application; and

(6)  ensure that the identity of the voter registration agency through which any particular voter is registered is not disclosed to the public.

**(b)  Confirmation of voter registration**

Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office—

(1)  shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 (42 U.S.C. 1973 et seq.) [now 52 U.S.C. 10301 et seq.]; and

(2)  shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote, except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters if the individual—

(A)  has not either notified the applicable registrar (in person or in writing) or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then

(B)  has not voted or appeared to vote in 2 or more consecutive general elections for Federal office.

**(c)  Voter removal programs**

(1)    A State may meet the requirement of subsection (a)(4) by establishing a program under which—

    (A)    change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed; and

    (B)    if it appears from information provided by the Postal Service that—

        (i)    a registrant has moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information; or

        (ii)    the registrant has moved to a different residence address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) to confirm the change of address.

(2)

    (A)    A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

(B)    Subparagraph (A) shall not be construed to preclude—

    (i)    the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a); or

    (ii)    correction of registration records pursuant to this chapter.

**(d)    Removal of names from voting rolls**

(1)    A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant—

    (A)    confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or

    (B)

        (i)    has failed to respond to a notice described in paragraph (2); and

        (ii)    has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

(2)    A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her

current address, together with a notice to the following effect:

(A)   If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.

(B)   If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

(3)   A voting registrar shall correct an official list of eligible voters in elections for Federal office in accordance with change of residence information obtained in conformance with this subsection.

**(e)   Procedure for voting following failure to return card**

(1)   A registrant who has moved from an address in the area covered by a polling place to an address in the same area shall, notwithstanding failure to notify the registrar of the change of address prior to the date of an election, be permitted to vote at that polling place upon oral or

written affirmation by the registrant of the change of address before an election official at that polling place.

(2)

   (A)   A registrant who has moved from an address in the area covered by one polling place to an address in an area covered by a second polling place within the same registrar's jurisdiction and the same congressional district and who has failed to notify the registrar of the change of address prior to the date of an election, at the option of the registrant—

      (i)   shall be permitted to correct the voting records and vote at the registrant's former polling place, upon oral or written affirmation by the registrant of the new address before an election official at that polling place; or

      (ii)

         (I)   shall be permitted to correct the voting records and vote at a central location within the same registrar's jurisdiction designated by the registrar where a list of eligible voters is maintained, upon written affirmation by the registrant of the new address on a standard form provided by the registrar at the central location; or

        (II)   shall be permitted to correct the voting records for purposes of voting in future elections at the appropriate polling place for the current address and, if permitted by State law, shall be permitted to vote in the present election, upon confirmation by the registrant of

the new address by such means as are required by law.

(B)    If State law permits the registrant to vote in the current election upon oral or written affirmation by the registrant of the new address at a polling place described in subparagraph (A)(i) or (A)(ii)(II), voting at the other locations described in subparagraph (A) need not be provided as options.

(3)    If the registration records indicate that a registrant has moved from an address in the area covered by a polling place, the registrant shall, upon oral or written affirmation by the registrant before an election official at that polling place that the registrant continues to reside at the address previously made known to the registrar, be permitted to vote at that polling place.

**(f)    Change of voting address within a jurisdiction**

In the case of a change of address, for voting purposes, of a registrant to another address within the same registrar's jurisdiction, the registrar shall correct the voting registration list accordingly, and the registrant's name may not be removed from the official list of eligible voters by reason of such a change of address except as provided in subsection (d).

**(g)    Conviction in Federal court**

(1)    On the conviction of a person of a felony in a district court of the United States, the United States attorney shall give written notice of the conviction to the chief State election official designated under section 20509 of this title of the State of the person's residence.

(2)    A notice given pursuant to paragraph (1) shall include—

(A)    the name of the offender;

    (B)    the offender's age and residence address;

    (C)    the date of entry of the judgment;

    (D)    a description of the offenses of which the offender was convicted; and

    (E)    the sentence imposed by the court.

(3)    On request of the chief State election official of a State or other State official with responsibility for determining the effect that a conviction may have on an offender's qualification to vote, the United States attorney shall provide such additional information as the United States attorney may have concerning the offender and the offense of which the offender was convicted.

(4)    If a conviction of which notice was given pursuant to paragraph (1) is overturned, the United States attorney shall give the official to whom the notice was given written notice of the vacation of the judgment.

(5)    The chief State election official shall notify the voter registration officials of the local jurisdiction in which an offender resides of the information received under this subsection.

## (h) Omitted

## (i) Public disclosure of voter registration activities

(1)    Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the

extent that such records relate to a declination to regis-
ter to vote or to the identity of a voter registration
agency through which any particular voter is registered.

(2)    The records maintained pursuant to paragraph (1) shall
include lists of the names and addresses of all persons
to whom notices described in subsection (d)(2) are sent,
and information concerning whether or not each such
person has responded to the notice as of the date that
inspection of the records is made.

## (j)    "Registrar's jurisdiction" defined

For the purposes of this section, the term "registrar's jurisdiction"
means—

(1)    an incorporated city, town, borough, or other form of mu-
nicipality;

(2)    if voter registration is maintained by a county, parish,
or other unit of government that governs a larger geo-
graphic area than a municipality, the geographic area
governed by that unit of government; or

(3)    if voter registration is maintained on a consolidated ba-
sis for more than one municipality or other unit of gov-
ernment by an office that performs all of the functions
of a voting registrar, the geographic area of the consoli-
dated municipalities or other geographic units.

## 52 U.S.C. § 20508.  Federal coordination and regulations.

## (a)    In general

The Election Assistance Commission—

(1)    in consultation with the chief election officers of the States, shall prescribe such regulations as are necessary to carry out paragraphs (2) and (3);

(2)    in consultation with the chief election officers of the States, shall develop a mail voter registration application form for elections for Federal office;

(3)    not later than June 30 of each odd-numbered year, shall submit to the Congress a report assessing the impact of this chapter on the administration of elections for Federal office during the preceding 2-year period and including recommendations for improvements in Federal and State procedures, forms, and other matters affected by this chapter; and

(4)    shall provide information to the States with respect to the responsibilities of the States under this chapter.

**(b)**    **Contents of mail voter registration form**

The mail voter registration form developed under subsection (a)(2)—

(1)    may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;

(2)    shall include a statement that—

(A)    specifies each eligibility requirement (including citizenship);

(B)    contains an attestation that the applicant meets each such requirement; and

(C)    requires the signature of the applicant, under penalty of perjury;

(3)    may not include any requirement for notarization or other formal authentication; and

(4)    shall include, in print that is identical to that used in the attestation portion of the application—

(i)    the information required in section 20507(a)(5)(A) and (B) of this title;

(ii)    a statement that, if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and

(iii)    a statement that if an applicant does register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes.

## 52 U.S.C. § 20509. Designation of chief State election official.

Each State shall designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under this chapter.

## 52 U.S.C. § 20510.  Civil enforcement and private right of action.

## (a)    Attorney General

The Attorney General may bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out this chapter.

**(b)    Private right of action**

(1)    A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved.

(2)    If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

(3)    If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).

**(c)    Attorney's fees**

In a civil action under this section, the court may allow the prevailing party (other than the United States) reasonable attorney fees, including litigation expenses, and costs.

**(d)    Relation to other laws**

(1)    The rights and remedies established by this section are in addition to all other rights and remedies provided by law, and neither the rights and remedies established by this section nor any other provision of this chapter shall supersede, restrict, or limit the application of the Voting

Rights Act of 1965 (42 U.S.C. 1973 et seq.) [now 52 U.S.C. 10301 et seq.].

(2)    Nothing in this chapter authorizes or requires conduct that is prohibited by the Voting Rights Act of 1965 (42 U.S.C. 1973 et seq.) [now 52 U.S.C. 10301 et seq.].

## 52 U.S.C. § 20511.  Criminal penalties.

A person, including an election official, who in any election for Federal office—

(1)    knowingly and willfully intimidates, threatens, or coerces, or attempts to intimidate, threaten, or coerce, any person for—

(A)    registering to vote, or voting, or attempting to register or vote;

(B)    urging or aiding any person to register to vote, to vote, or to attempt to register or vote; or

(C)    exercising any right under this chapter; or

(2)    knowingly and willfully deprives, defrauds, or attempts to deprive or defraud the residents of a State of a fair and impartially conducted election process, by—

(A)    the procurement or submission of voter registration applications that are known by the person to be materially false, fictitious, or fraudulent under the laws of the State in which the election is held; or

(B)    the procurement, casting, or tabulation of ballots that are known by the person to be materially false, fictitious, or fraudulent under the laws of the State in which the election is held,

shall be fined in accordance with title 18 (which fines shall be paid into the general fund of the Treasury, miscellaneous receipts (pursuant to section 3302 of title 31), notwithstanding any other law), or imprisoned not more than 5 years, or both.