**No. 24-5546**

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

TENNESSEE CONFERENCE OF THE NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED PEOPLE,

*Plaintiff-Appellee*,

v.

TRE HARGETT, in his official capacity as Secretary of State of Tennessee, and
MARK GOINS, in his official capacity as Coordinator of Elections for the State
of Tennessee,

*Defendants-Appellants.*

On Appeal from the
United States District Court for the Middle District of Tennessee

## BRIEF OF PLAINTIFF-APPELLEE

| | |
|---|---|
| Charles K. Grant<br>Denmark J. Grant<br>BAKER, DONELSON, BEARMAN,<br>CALDWELL & BERKOWITZ, PC<br>211 Commerce Street, Suite 800<br>Nashville, TN 37201<br>(615) 726-5600 | Blair S. Bowie<br>Danielle M. Lang<br>Alice C.C. Huling<br>Kathryn Huddleston<br>Valencia Richardson<br>Ellen M. Boettcher<br>Kate Uyeda<br>CAMPAIGN LEGAL CENTER<br>1101 14th St. NW, Suite 400<br>Washington, DC 20005<br>(202) 736-2200 |

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT REGARDING ORAL ARGUMENT ................................................. 1

INTRODUCTION .............................................................................. 2

STATEMENT OF THE ISSUES ............................................................. 2

STATEMENT OF THE CASE ................................................................. 3

    I.    Legal Background ................................................................. 3

    II.    Tennessee's Unlawful Blanket Rejection and Additional Documentation Policy for Eligible Registration Applicants with Felony Convictions ....... 4

    III.    Proceedings Below ................................................................. 6

SUMMARY OF THE ARGUMENT ................................................................. 8

STANDARD OF REVIEW ................................................................. 9

ARGUMENT ................................................................. 10

I.    Plaintiff TN NAACP Has Standing ................................................. 10

    A.    TN NAACP Has Direct Organizational Standing Consistent with *Havens* and *AHM* ................................................................. 10

    B.    TN NAACP's Evidence of Standing Is Sufficient ............................... 17

II.    Tennessee's Blanket Rejection and Documentation Policy Violates the NVRA ................................................................. 21

    A.    Many of Defendants' Arguments Are Forfeited ................................. 22

    B.    Defendants' Policy Is Unlawful Because It Requires More Than "Only … Necessary" Information from Voters ................................. 23

        1.    Text and Context Confirm that "Only Such … Information … Necessary" in § 20508(b)(1) Means Solely Essential or Required Information ................................................. 24

            a.    "Only Such … Information … Necessary" Means Solely Essential or Required Information ................................. 25

            b.    The NVRA's Structure Confirms that "Only Such … Information … Necessary" in Section 20508(b)(1) Means Solely Required Information ................................. 29

i

2. The Documentation Policy Is Not "Necessary" ......................32

3. The District Court's Ruling Is Consistent with Controlling Supreme Court and Sixth Circuit Precedent.............................37

C. The Challenged Policy Violates the NVRA's Mandate to Ensure Registration of Eligible Voters Who Submit Timely Valid Registration Forms ...............................................................40

D. Tennessee's policy Violates the Uniformity and Non-Discriminatory Provision of the NVRA. ........................................................46

A. The District Court Correctly Held That Tennessee's Voter Registration Policy Applies Nonuniformly and is Discriminatory. ........................................................47

B. The Uniformity Provision Applies to Defendants' Voter Registration Policy. ...................................................50

III. The District Court's Injunctive Relief is Proper. .........................54

CONCLUSION ...................................................................57

CERTIFICATE OF COMPLIANCE .....................................................58

CERTIFICATE OF SERVICE ........................................................59

DESIGNATION OF RELEVANT DOCUMENTS ................................................60

ADDENDUM .......................................................................63

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Action NC v. Strach*, 216 F. Supp. 3d 597 (M.D.N.C. 2016)...................................54

*Allstates Refractory Contractors, LLC v. Su*, 79 F.4th 755 (6th Cir. 2023).............26

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
    570 U.S. 1 (2013)....................................... 3, 28, 29, 30, 37, 38, 39, 40, 44, 45, 46

*Association of Community Organizations for Reform Now v. Miller*,
    129 F.3d 833 (6th Cir. 1997)...........................................................................3, 39

*Ault v. Walt Disney World Co.*, No. 6:07-cv-1785, 2009 WL 3242028
    (M.D. Fla. Oct. 6, 2009) .................................................................................28

*Ayestas v. Davis*, 584 U.S. 28 (2018)...........................................................24, 25, 27

*Basicomputer Corp. v. Scott*, 973 F.2d 507 (6th Cir. 1992)....................................55

*Board of Education of Ottawa Township High School District 140 v. Spellings*,
    517 F.3d 922 (7th Cir. 2008) ..........................................................................18

*Cash-Darling v. Recycling Equipment, Inc.*, 62 F.4th 969 (6th Cir. 2023).............22

*Cinnamon Hills Youth Crisis Center, Inc. v. Saint George City*, 685 F.3d 917
    (10th Cir. 2012)...............................................................................................25

*Coalition for Government Procurement v. Federal Prison Industries, Inc.*,
    365 F.3d 435 (6th Cir. 2004) ..........................................................................54

*Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009) .....................18

*Common Cause Indiana v. Lawson,* 937 F.3d 944 (7th Cir. 2019)...................13, 54

*Cottrell v. Alcon Labs.*, 874 F.3d 154 (3d Cir. 2017) ..............................................18

*Crutchfield v. Collins*, 607 S.W.2d 478 (Tenn. Ct. App. 1980) ...........................4, 5

*Davis v. Echo Valley Condominium Association*,
    945 F.3d 483 (6th Cir. 2019)...........................................................................26

*Dickson v. Direct Energy, LP*, 69 F.4th 338 (6th Cir. 2023) .......................18, 19, 20

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022)..................27

*Fair Elections Ohio v. Husted*, 770 F.3d 456 (6th Cir. 2014)..................................19

*Food and Drug Administration v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024) ................................................................10, 11, 12, 13, 14

*Federal Aviation Administration v. Cooper*, 566 U.S. 284 (2012) .........................28

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016).....................................30, 31, 32, 39

*Florida State Conference of the National Association for the Advancement of
    Colored People v. Browning*, 522 F.3d 1153 (11th Cir. 2008)...........................13

*Gaskin v. Collins*, 661 S.W.2d 865 (Tenn. 1983)...................................................5

*Gillis v. Miller*, 845 F.3d 677 (6th Cir. 2017) ...........................................................9

*Greater Birmingham Ministries v. Secretary of State for Alabama*,
    105 F.4th 1324 (11th Cir. 2024)..............................................................50, 51, 52

*Harkless v. Brunner*, 545 F.3d 445 (6th Cir. 2008)...................................................38

*Havens Realty Corporation v. Coleman*, 455 U.S. 363 (1982) .............10, 12, 13, 16

*Husted v. A. Philip Randolph Institute,* 584 U.S. 756 (2018)...................................52

*In re Microsoft Corporation Antitrust Litigation*,
    355 F.3d 322 (4th Cir. 2004).........................................................................25, 26

*Kreipke v. Wayne State University,* 807 F.3d 768 (6th Cir. 2015)............................23

*Labrador v. Poe by & through Poe*, 144 S. Ct. 921 (2024)....................................56

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ............................54

*League of Women Voters of North Carolina v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014)...............................................................................54

*Madej v. Maiden*, 951 F.3d 364 (6th Cir. 2020).......................................................26

*McKay v. Thompson*, 226 F.3d 752 (6th Cir. 2000) .................................................33

*Memphis A. Philip Randolph Institute v. Hargett*,
    978 F.3d 378 (6th Cir. 2020).................................................................................55

*Miami Valley Fair Housing Center v. Connor Group*,
    725 F.3d 571 (6th Cir. 2013)................................................................................18

*Michigan State A. Philip Randolph Institute v. Johnson*,
    833 F.3d 656 (6th Cir. 2016).................................................................................55

iv

*Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077 (D. Ariz. 2023) ..................52, 53

*Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB,
  2024 WL 862406 (D. Ariz. Feb. 29, 2024)....................................52, 53

*Norton v. Beasley*, No. 21-6053,
  2022 WL 17348385 (6th Cir. Dec. 1, 2022) ......................................17

*Obama for America v. Husted*, 697 F.3d 423 (6th Cir. 2012)...............................55

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017)...............................18

*Online Merchants Guild v. Cameron*, 995 F.3d 540 (6th Cir. 2021) ................10, 11

*Pennsylvania State Conference of NAACP Branches v. Secretary Commonwealth
  of Pennsylvania*, 97 F.4th 120 (3d Cir. 2024)...............................39, 40

*Preminger v. Peake*, 552 F.3d 757 (9th Cir. 2008).....................................18

*Project Vote v. Blackwell*, 455 F. Supp. 2d 694 (N.D. Ohio 2006).........................52

*Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012)................50

*Robinson v. Shell Oil*, 519 U.S. 337 (1997).............................................30

*Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019) ..........................................10, 18

*Scott v. Schedler*, 771 F.3d 831 (5th Cir. 2014) .......................................13

*Scottsdale Insurance Co. v. Flowers*, 513 F.3d 546 (6th Cir. 2008).........................2

*Sheet Metal Workers' Health & Welfare Fund v. Law Office of Demayo*,
  21 F.4th 350 (6th Cir. 2021)...............................................22, 23

*Shelby Advocates for Valid Elections v. Hargett*,
  947 F.3d 977 (6th Cir. 2020).......................................................16

*Sierra Club v. United States Army Corps of Engineers*,
  645 F.3d 978 (8th Cir. 2011)...............................................18

*Stringer v. Hughs*, No. SA-20-CV-46,
  2020 WL 6875182 (W.D. Tex. Aug. 28, 2020).....................................31

*Troche v. Crabtree*, 814 F.3d 795 (6th Cir. 2016)....................................36

*United States v. Miami University*, 294 F.3d 797 (6th Cir. 2002)...........................10

v

*United States v. Students Challenging Regulatory Agency Procedures*,
      412 U.S. 669 (1973) (*SCRAP*) .............................................................17

*United States Student Association Foundation v. Land*,
      546 F.3d 373 (6th Cir. 2008)...............................................................38

*Viet v. Le*, 951 F.3d 818 (6th Cir. 2020) ...........................................18, 19

Vorchheimer v. Philadelphian Owners Association,
      903 F.3d 100 (3d Cir. 2018)...........................................................26, 28

*Washburn v. Lawrence County Board of Commissioners*,
       720 F.3d 347 (6th Cir. 2013)................................................................27

*Women's Elevated Sober Living L.L.C.  v. City of Plano*, Texas,
      86 F.4th 1108 (5th Cir. 2023)...............................................................26

*Women's Medical Professional Corporation v. Taft*,
      353 F.3d 436 (6th Cir. 2003)................................................26, 29, 32

**Statutes, Reports, Rules, and Constitutional Provisions          Page**

52 U.S.C. § 20501 ...................................................................................29

52 U.S.C. § 20501(b)(1) ...........................................................................4

52 U.S.C. § 20501(b)(2) ...........................................................................4

52 U.S.C. § 20504(c)(2)......................................................................30, 31

52 U.S.C. § 20505 ...................................................................................45

52 U.S.C. § 20505(a)(2).......................................................................4, 23

52 U.S.C. § 20507(a)(1)(B) ................................. 22, 23, 40, 41, 43, 45, 46, 51, 52

52 U.S.C. § 20507(b) .........................................................................50, 51

52 U.S.C. § 20507(b)(1) .....................................................................22, 23

52 U.S.C. § 20508(b) .....................................................................4, 24, 38, 45

52 U.S.C. § 20508(b)(1) ................................. 4, 22, 24, 29, 30, 31, 45, 46

52 U.S.C. § 20510(b)(2) .........................................................................45

A.R.S. 16-1666(F)....................................................................................37

Fed. R. Civ. P. 56(a) ............................................................................9, 10

H.R. Rep. No. 103-66 (1993)............................................................33, 46

T.C.A. § 40-29-101 ..................................................................................5

T.C.A. § 40-29-201 ..................................................................................5

T.C.A. § 40-29-203(c)............................................................................43

T.C.A. § 40-29-203(d)............................................................................43

U.S. Const., Art. I, § 4, cl. 1 ...................................................................3

**Other Authorities**                                                          **Page**

Necessary, American Heritage Dictionary of the English Language
   (5th ed. 2022)....................................................................................25

Necessary, Oxford English Dictionary, *available at*
   https://www.oed.com/dictionary/necessary_adj?tab=meaning_and_use
   (last visited Sept. 7, 2024) ..............................................................25

Necessary, Black's Law Dictionary (12th ed. 2024) ..............................25

Only, Oxford English Dictionary, *available at*
   https://www.oed.com/dictionary/only_adv?tab=meaning_and_use
   (last visited Sept. 7, 2024) ..............................................................28

Valid, Black's Law Dictionary (6th ed. 1990) .......................................45

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellee Tennessee NAACP believes that oral argument will help resolve this appeal. *See* Fed. R. App. P. 34(a). It is Plaintiff-Appellee's understanding that this Court intends to schedule oral argument upon the completion of briefing. Dkt. 33.

# INTRODUCTION

Many Tennesseans with a prior felony conviction are eligible to vote. But in attempting to register, they face unlawful byzantine processes imposed by Defendants. As relevant here, Defendants have a policy of blanket rejection of voter registration applications from eligible applicants with felony convictions, instead requiring these applicants to provide unnecessary documentation to register in a burdensome process ("the Policy"). Defendants do not dispute that they have all the information necessary to verify the eligibility of registrants with felony convictions, and Plaintiffs demonstrated that the Policy violates the National Voter Registration Act ("NVRA") because it fails to ensure the registration of eligible voters, requires unnecessary documentation, and is neither uniform nor nondiscriminatory. The injunctive relief ordered by the district court was properly within its remedial authority and should be affirmed.

## STATEMENT OF THE ISSUES

1. Whether TN NAACP has standing to challenge the Policy based on the record below.

2. Whether the district court correctly held that the Policy violates the NVRA.

3. Whether the injunction entered by the district court was within the district court's broad remedial authority.

2

## STATEMENT OF THE CASE

### I.    Legal Background

The Elections Clause of the U.S. Constitution, Art. I, § 4, cl. 1, "has two functions": it "imposes the duty" upon states "to prescribe the time, place, and manner of electing Representatives and Senators," and "upon Congress it confers the power to alter those regulations or supplant them altogether." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013) (hereinafter *ITCA*). "The Clause's substantive scope is broad. 'Times, Places, and Manner' … are 'comprehensive words,' which 'embrace authority to provide a complete code for congressional elections,' including … regulations relating to 'registration.'" *Id.* at 8-9 (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)). Congress's power in this area "is paramount, and may be exercised at any time, and to any extent which it deems expedient." *Id.* at 9). "Although Article I section 4 does not specifically mention voter registration requirements, the Court recognized in *Smiley* the authority of Congress to regulate voter registration procedures, by virtue of its power to control the 'manner' of holding elections." *ACORN v. Miller*, 129 F.3d 833, 836 n.2 (6th Cir. 1997).

Congress enacted the NVRA pursuant to its Elections Clause authority, "[i]n an attempt to reinforce the right of qualified citizens to vote by reducing the restrictive nature of voter registration requirements." *Id.* at 835. The NVRA

3

accordingly regulates state registration procedures for elections to federal office to ensure maximum "participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501(b)(1), (2).

The NVRA requires that states "ensure that any eligible applicant is registered to vote in an election" upon receipt of a timely and valid voter registration application. *Id.* § 20507(a)(1). It requires that state voter registration programs and activities "shall be uniform" and "nondiscriminatory." *Id.* § 20507(b)(1). The NVRA also regulates the contents of both state and federal voter registration forms for federal elections. While states "may develop and use" their own voter registration forms for federal elections, 52 U.S.C. § 20505(a)(2), those forms must "meet[] all of the criteria … for" federal registration forms (Federal Forms). *Id.*; *id.* § 20508(b). Those criteria include that the registration form

> may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant) as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process[.]

*Id.* § 20508(b)(1).

## II.    Tennessee's Unlawful Blanket Rejection and Additional Documentation Policy for Eligible Registration Applicants with Felony Convictions

Many Tennesseans convicted of felonies maintain the right to vote. If a person was convicted before January 15, 1973, they are only disenfranchised if that

conviction is one of 21 specifically enumerated crimes *and* the judgment of conviction rendered their crime "infamous." *Crutchfield v. Collins*, 607 S.W.2d 478, 480 (Tenn. Ct. App. 1980). No felony convictions that occurred between January 15, 1973 and May 17, 1981 are disenfranchising, meaning that individuals who were convicted during that grace period never lost the right to vote. *Id.* at 482; *Gaskin v. Collins*, 661 S.W.2d 865, 866-68 (Tenn. 1983). Further, individuals who have lost their right to vote because of a felony conviction can restore their voting rights pursuant to Tennessee law.[1] *See* T.C.A. §§ 40-29-101 *et seq.*, 40-29-201 *et seq.*

These three categories of Tennesseans with past felony convictions—people with certain pre-1973 convictions, people with grace period convictions, and people who have had their voting rights restored—are all eligible to vote in Tennessee. Nonetheless, Defendants have long maintained a policy of rejecting all voter registration applications from any person with a felony conviction. *See* Lim Dep., R. 156-4 at 2404:5-11; Hall Dep., R. 156-5 at 2446:14-2448:14, 2454:3-16; Sivley Dep., R. 156-6 at 2471:1-15; McAllister Dep., R. 156-8 at 2494:10-19. The policy requires denying voter registrations even where the applicant has provided information sufficient to judge their eligibility on the registration form itself and

---

[1] Defendants have recently changed their understanding of the voter restoration requirements, imposing new highly burdensome requirements that are contested in other claims in this lawsuit. The legality of these policies is not relevant to the current claim and is not before this Court.

attested under penalty of perjury that the information is true. *See id.*; R. 156-10. Under the policy, the only way to overcome a denial is for the applicant to provide additional documentation showing that they were never disenfranchised to begin with or that they have since restored her right to vote. *See* R. 156-25 at 2631; Lim Dep., R. 156-4 at 2406:15-2407:22, 2419:25-2420:8; Hall Dep., R. 156-5 at 2451:18-2452:12; Sivley Dep., R. 156-6 at 2470:20-25; R. 156-27 at 2653. Moreover, if there were any valid or legally permissible reason to question the registrant's attestation that they meet the eligibility criteria, Defendants are the custodians of the relevant records for the majority of people erroneously denied under this policy: the files created and kept by the Elections Division documenting voting rights restorations. *See* Hall Dep., R. 156-5 at 2448:3-2450:10. Eligible applicants with pre-1981 convictions face significant difficulties obtaining the necessary documentation to become registered, even though they never legally lost their right to vote. *See* Lim Dep., R. 156-6 at 2426:16-2427:2, 2427:6-11; R. 156-30 at 2667-68; Hall Dep., R. 156-5 at 2452:13-16, 2456:18-25; Collins Dep., R. 156-9 at 2500:10-2501:6, 2502:4-11.

## III.    Proceedings Below

Plaintiff TN NAACP and additional Plaintiffs sued Defendants Hargett and Goins to challenge Tennessee's implementation of statutes governing restoration of voting rights to citizens who lost the right to vote because of a felony conviction,

6

and the voter registration process for individuals with felony convictions. First Amended Compl., R. 102. As relevant here, TN NAACP challenged Defendants' practice of blanket rejection of all applications of voter registrants who indicate that they have a felony conviction, absent documentation proving their eligibility to register to vote. *Id.* Specifically, TN NAACP alleged that this Policy violated the NVRA's mandate that states ensure that all facially eligible applicants be added to the voter rolls, that states "accept and use" the Federal Form or a conforming State Form without requiring unnecessary extra documentation, and that states administer voter registration in a uniform and nondiscriminatory manner. *Id.*

In July 2023, Defendants released guidance that purports to end the Policy for forms that indicate (i) a grace-period conviction or (ii) a pre-1973 conviction for a crime that is not on the list of 21 possibly infamous crimes. *See* Defs.' Resp. to Pls.' SOF, R. 181 at 2911, 2924-2925, ¶¶ 39, 75-77; Goins Decl., R. 151-1 at 1093, ¶ 4. But applications from all other groups of eligible voters with felony convictions must still be rejected absent documentation. *Id.* at ¶ 5.

TN NAACP and Defendants filed cross motions for summary judgment on Counts 4-6 of Plaintiffs' Complaint, which comprise the NVRA claims against the Policy. *See* Motion, R. 150; Motion, R. 153. On April 18, 2024, the district court granted TN NAACP summary judgment as to Count 4 in part and Count 6 in full. *See* MSJ Mem., R. 221; Order, R. 222.

7

The district court then ordered the parties to confer to propose an injunction on Count 6. Order, R. 222. The parties could not agree on a proposed injunction, and the district court entered a permanent injunction against Defendants. *See* Order, R. 237. The court required that Defendants accept voter registrations from facially eligible applicants (i.e., with respect to the felony qualification, anyone who indicates on the voter registration form that they have had their voting rights restored or never lost the right to vote because of the date and/or type of their conviction). *Id.* However, if Defendants possess credible information that an applicant is ineligible, they may request additional documentation from the applicant to prove eligibility. *Id.* The court further required Defendants to issue guidance explaining the above, and to provide at least one live, recorded training regarding the acceptance of facially eligible voter registration forms for people with felony convictions. *Id.* Defendants appealed the permanent injunction order. R. 242.

## SUMMARY OF THE ARGUMENT

The district court's decision should be affirmed. As an initial matter, TN NAACP had and has standing to pursue this injunctive relief. Voter registration assistance is a core business activity of TN NAACP, and Defendants' policy interferes with and perceptibly impairs that activity. The evidence TN NAACP has provided in support of its standing is far more than the "identifiable trifle" required and more than suffices for establishing standing on summary judgment.

8

Defendants' arguments seeking to overturn the district court's NVRA ruling fail. As an initial matter, many of these arguments as to NVRA statutory interpretation are forfeited because they were never raised at the district court.

On the merits, the district court's decision was correct. Tennessee's Policy violates the NVRA's requirement that states ensure all eligible voter registration applicants are placed on the voter rolls before Election Day. By rejecting facially eligible applications, Tennessee does not ensure that facially eligible applicants have been placed on the rolls. Tennessee's policy is inconsistent with the NVRA's requirement that states only require "necessary" information from voter registration applicants. And Tennessee's policy subjects registrants to nonuniform and discriminatory registration requirements and processes, in violation of the NVRA.

Finally, the district court's injunction was appropriate and well within the district court's broad discretion. TN NAACP and the public are harmed on an ongoing basis, warranting a permanent injunction. Further, the statewide injunction is necessary for workability, to afford TN NAACP complete relief.

This Court should affirm the district court's ruling.

## STANDARD OF REVIEW

This Court reviews an order granting summary judgment *de novo*, *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017). The movant is entitled to "summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court reviews the grant of a permanent injunction for abuse of discretion. *United States v. Miami Univ.*, 294 F.3d 797, 806 (6th Cir. 2002).

## ARGUMENT

### I.     Plaintiff TN NAACP Has Standing.

The district court correctly held that TN NAACP has direct organizational standing to seek permanent injunctive relief from the Policy. TN NAACP's standing is consistent with *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) (hereinafter *AHM*), and the long line of precedent holding that standing is available in similar contexts under the NVRA. TN NAACP's degree of specificity as to the basis for standing is likewise sufficient: standing is "qualitative, not quantitative." *Salcedo v. Hanna*, 936 F.3d 1162, 1173 (11th Cir. 2019).

### A.     TN NAACP Has Direct Organizational Standing Consistent with *Havens* and *AHM*.

Direct organizational standing exists where "organizations … satisfy the usual standards for injury in fact, causation, and redressability." *AHM*, 602 U.S. at 393-94. To establish such standing, "an organizational plaintiff … must demonstrate that the 'purportedly illegal action increases the resources the group must devote to programs *independent of its suit challenging the action*.'" *Online Merchants Guild*

10

*v. Cameron*, 995 F.3d 540, 547 (6th Cir. 2021).[2] As the Supreme Court recently explained in *AHM*, "an organization … cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." 602 U.S. at 394. *AHM* did not create a new rule for organizational standing but rather restated the longstanding principle that organizations can establish standing when a policy directly impairs their organizational functions but not when their only "injury" is borne of direct advocacy against the same policy.

In *AHM*, plaintiff medical associations attempted unsuccessfully to manufacture direct organizational standing to challenge specific FDA actions relaxing regulation of the drug mifepristone. *Id.* at 375-76, 397. The *AHM* plaintiff organizations claimed standing in part on the basis that the FDA's actions had "forced" them to "expend considerable time, energy, and resources" on filing a citizen petition with the FDA advocating for reversal of its actions and on "public advocacy and educational activities exposing the [purported] risks of FDA's … actions." Br. for Respondents, *AHM*, No. 23-235, at 44; *see also AHM*, 602 U.S. at 394. This diversion of resources through expenditure of time and money on direct advocacy against the FDA policies that the organizations were challenging was not

---

[2] Defendants expansively claim that *AHM* abrogated Sixth Circuit precedent. Br. at 35. Not so. *AHM* is a confirmation of direct organizational standing, stating that such standing cannot come from manufactured injury based on expenditures due to *advocating against the continued existence of the challenged policy*. 602 U.S. at 394-95.

11

enough to establish standing to also sue the FDA challenging these policies. *Id.* at 394-95. As the Supreme Court explained, standing on this basis would mean that any organization could "spend a single dollar" directly advocating against a policy it "dislike[d]" and then have standing to also sue to challenge that policy—and is not available. *Id.* at 395.

On the other hand, the Supreme Court has held "there can be no question" that an organization experiences an injury-in-fact where the defendant's challenged action has "perceptibly impaired" the organization's "ability to provide" direct services to individuals it aids. *Havens*, 455 U.S. at 379. *AHM* reaffirmed the ongoing force of *Havens*. As the Court explained, the organizational plaintiff in *Havens* "not only was an issue-advocacy organization, but also operated a housing counseling service." *AHM*, 602 U.S. at 395. Because the defendant supplied the organizational plaintiff with "false information about apartment availability," *AHM* explained, *id.* at 395, the defendant "perceptibly impaired [the plaintiff's] ability to provide counseling and referral services for low- and moderate-income homeseekers," *id.* (quoting *Havens*, 455 U.S. at 379). Thus, the *Havens* organizational plaintiff established injury-in-fact because the defendant's "actions directly affected and interfered with [the plaintiff's] core business activities." *AHM*, 602 U.S. at 395.[3]

---

[3] By contrast, the FDA's actions "ha[d] not imposed any similar impediment to the [*AHM*] medical associations' advocacy businesses," and the *AHM* plaintiffs had

The district court correctly found here that TN NAACP has established injury-in-fact for direct organizational standing, similar to the *Havens* organizational plaintiff. As the district court found, TN NAACP's "primary activity in furtherance of [its voting rights] goal is helping individuals register and turnout to vote." MSJ Mem., R. 221 at 3668; *see* 156-2 ¶¶ 7-8; 151-4 at 1327-28. Like the *Havens* organizational plaintiff, TN NAACP not only engages in issue advocacy but also provides direct services: instead of housing counseling as in *Havens*, TN NAACP engages in *voting* counseling (i.e., voter registration assistance). TN NAACP has further established that Defendants' policy "directly affect[s] and interfere[s] with" its "core business activities" of direct voter registration assistance—just as the defendant's actions in *Havens* "directly affected and interfered with" its core business activity of direct housing counseling and referral services. *See AHM*, 602 U.S. at 395.[4]

First, voter registration assistance is a "core business activity" of TN NAACP: it is integral to the organization's mission and the organization expends significant resources—primarily in volunteer time—in directly assisting voters in registering to

---

claimed no separate "core business activit[y]" that had been harmed. *AHM*, 602 U.S. at 395.

[4] Federal courts have regularly found similar voter assistance organizations have standing to challenge policies that impose burdens on voter registration. *See, e.g.*, *Common Cause Indiana v. Lawson*, 937 F.3d 944, 952 (7th Cir. 2019); *Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014); *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1164–65 (11th Cir. 2008).

vote.[5] TN NAACP works to ensure that all individuals are registered to vote and provides services to any individual, not just TN NAACP members. R. 151-4 at 1369:23-1370:2. As part of these efforts, "[m]any state units of the TN NAACP conduct voter registration as part of larger community outreach events, in partnership with other organizations. Tactics used at the TN NAACP's outreach events include door-to-door canvassing, tabling, texting, and word of mouth outreach with the goal of registering and turning out as many people as possible to the polls." R. 156-2 ¶ 9; *see* 151-4 at 1334:12-18.

Second, TN NAACP has shown that, as in *Havens*, Defendants' unlawful policies "directly affec[t] and interfer[e] with" TN NAACP's "core business activities" of voter registration assistance work. S*ee AHM*, 602 U.S. 367, 395. TN NAACP's voter registration assistance includes direct registration assistance to individuals with past felony convictions. R. 156-2 ¶ 8. In *Havens*, the defendant's unlawful action—providing false information as to apartment availability— "perceptibly impaired" the plaintiff organization's ability to provide housing counseling services. *See AHM*, 602 U.S. at 395. Here, Defendants' unlawful policies similarly "perceptibly impair" TN NAACP's "ability to provide" voter registration

---

[5]  Since TN NAACP is primarily volunteer run, R. 156-2 ¶ 5; 151-4 at 1334:24-25 its "primary resource" is volunteer time. R. 156-2 ¶ .7 But it also expends "limited" money in furtherance of its voter registration activities. *Id*.

assistance services to individuals with felony convictions and to prospective voters more broadly. *See id.*; R. 156-2 ¶¶ 11-16.

When Defendants unlawfully reject valid voter registration forms submitted by individuals with felony convictions, TN NAACP's voter registration assistance is stymied. R. 156-2 ¶ 12 ("TN NAACP's typical assistance is rendered ineffective."). Instead, "TN NAACP must divert significant resources from other mission-furthering activities to follow up with the eligible voter and communicate with various governmental authorities to rectify the situation." *Id.* ¶ 13. In such cases, TN NAACP assists eligible individuals in tracking down court records. *Id.* ¶¶ 15-16. TN NAACP prints online forms for voters who do not have access to a computer or the ability to look up records—a common occurrence. *Id.* ¶ 15. For voters who need records that only exist in paper form and must be obtained in person, TN NAACP "accompan[ies] or taxi[es] the individual to the court," and volunteers "occasionally help pay for those documents." *Id.* ¶ 16.

If an individual ultimately cannot register, the time expended by TN NAACP volunteers in this process is wasted—it is time that was not meaningfully dedicated to the organization's core activity of voter registration. *See id.* ¶ 18. And eligible individuals that TN NAACP sought to assist in voter registration who cannot register are individuals that TN NAACP is unable to serve. Even if individuals are ultimately able to register, the time that TN NAACP expends on assisting these individuals in

in advising them as to the process, tracking down court records, either in person or electronically, and in communicating with governmental entities is time that TN NAACP could have dedicated to other voter registration and voter turnout efforts. *See id.* ¶ 18. As in *Havens*, Defendants' actions have thus interfered with TN NAACP's "core business" of voter registration.

None of these activities constitute mere advocacy against the Policy; instead, they are necessary responses to address the direct injuries the Policy imposes on their core organizational function of voter registration assistance. TN NAACP has alleged concrete, "present ongoing harm": TN NAACP is harmed presently and on an ongoing basis by Defendants' unlawful Policy, which perceptibly impairs its ability to provide voter registration services. *See Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 981 (6th Cir. 2020) ("To obtain declaratory or injunctive relief, a [plaintiff] must show a present ongoing harm *or* imminent future harm.") (emphasis added). Such present injury to the organization itself is the basis for injunctive relief, as the district court ordered. R. 221 at 3668-69.

TN NAACP has also satisfied causation. But for the Policy, TN NAACP could help voters with felony convictions it encounters at community outreach events fully complete and submit their registration forms like any other voter. Because Defendants unlawfully demand additional documentation from these voters, TN NAACP volunteers must spend extra resources to help them ascertain,

16

find, and submit the necessary documents. R. 156-2 ¶¶ 10, 12-15. This interference with TN NAACP's core business activity and drain on resources is not due to some "failure" on the applicant—who would have their criminal judgment or pardon document "on hand" at, say, a Juneteenth parade? Br. 29. Rather, the impairment is the direct consequence of *Defendant's* failure to comply with the NVRA. The "chain of causation" between Defendants' unlawful conduct and TN NAACP's injury is short and uninterrupted. *AHM*, 602 U.S. at 390.

## B.    TN NAACP's Evidence of Standing Is Sufficient.

"The standard for an injury is one of kind and not degree, as even an 'identifiable trifle' will suffice." *Norton v. Beasley*, No. 21-6053, 2022 WL 17348385, at *7 (6th Cir. Dec. 1, 2022) (quoting *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 689 n.14 (1973) (*SCRAP*)). *SCRAP* held that the "direct stake in the litigation" from injury in fact may be "small," explaining that "an identifiable trifle" will suffice. *SCRAP*, 412 U.S. at 689 n.14. As *SCRAP* explained, "We have allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, *see Baker v. Carr*, 369 U.S. 186; a $5 fine and costs, *see McGowan v. Maryland*, 366 U.S. 420; and a $1.50 poll tax, *see Harper v. Virginia Bd. of Elections*, 383 U.S. 663." *SCRAP*, 412 U.S. at 689 n.14. Accordingly, this Court recently held that a single unsolicited call that went to voicemail sufficed for Article

III standing for invasion of privacy. *Dickson v. Direct Energy, LP*, 69 F.4th 338, 344-45 (6th Cir. 2023).

Consistent with this binding Supreme Court precedent, it is well established that standing is "qualitative, not quantitative." *Salcedo*, 936 F.3d at 1173. *E.g.*, *Cottrell v. Alcon Labs.*, 874 F.3d 154, 162 (3d Cir. 2017) ("The injury-in-fact requirement is very generous to claimants, demanding only that the claimant allege some specific, identifiable trifle of injury."); *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017); *Board of Educ. of Ottawa Tp. High Sch. Dist. 140 v. Spellings*, 517 F.3d 922, 925 (7th Cir. 2008); *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 988 (8th Cir. 2011); *Preminger v. Peake*, 552 F.3d 757, 763 (9th Cir. 2008); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009). That some organizational plaintiffs provide greater specificity as to degree of injury, *e.g., Miami Valley Fair Hous. Ctr. v. Connor Group*, 725 F.3d 571, 576-77 (6th Cir. 2013) (estimate of harm to the cent), does not mean that such exactness is an Article III requirement. A concrete harm is "real and not abstract," *Dickson*, 69 F.4th at 343, but the question for concreteness, injury-in-fact, and standing is whether *a* real harm exists—not the precise extent of that harm.

Defendants' reliance on *Viet v. Le*, 951 F.3d 818 (6th Cir. 2020), and other cases outside the standing context, is inapposite. It is true that at the summary judgment stage a party cannot rely on "[c]onclusory statements unadorned with

supporting facts." 951 F.3d at 823. But the specificity of the facts required depends on what is required to "establish[] the element," *id.* at 823. For standing, so long as those specific facts establish an "identifiable trifle" of injury, they are sufficient. *SCRAP*, 412 U.S. at 689 n.14. In *Viet*, the application of Rule 56 "in this FLSA context" required a greater degree of specificity as to "the level of evidence that employees must present to create a jury question over whether they worked overtime." 951 F.3d at 823. But that was a different legal question.

This case likewise differs from *Fair Elections Ohio v. Husted*, 770 F.3d 456 (6th Cir. 2014). There, this Court found that the specific facts alleged by plaintiffs did not suffice to establish standing: there was "no injury" in having inaccurate information on voter registration materials because of the law or holding a regularly scheduled meeting to train volunteers about the changed law. *Id.* at 459-60. Neither of these showings sufficed for standing, and plaintiffs had not met the summary judgment standard because they had not alleged any further specific facts. *Id.* at 460.

TN NAACP, by contrast, has alleged specific facts establishing far more than that "identifiable trifle." Surely, the expenditure of volunteer time in assisting individuals in tracking down court records in person, finding and printing electronic records, and following up with individuals with felony convictions and government offices, and the inability to help some eligible voters who seek assistance, far exceed

the injury of receiving a single phone call that went to voicemail. R. 156-2 ¶¶ 11. *See Dickson*, 69 F.4th at 344-45.

Defendants' contention that TN NAACP has not shown that it assists eligible voters subject to the Policy is incorrect. Br. 35. TN NAACP attested that it has and will continue to assist voters with felony convictions, necessitating the type of additional activities described above that would be unnecessary *but for* the Policy; that it is aware of eligible individuals subject to the Policy; and that it continues to assist all voters, including those with felony convictions, as a core part of its mission. R. 156-2 ¶ 12; 2d Sweet-Love Decl., R. 192-1 ¶¶ 4-5. In their summary judgment motion, TN NAACP also identified such a voter who was denied the fundamental right to vote immediately before the 2020 general election because neither she nor the Elections Division's attorney, Jessica Lim, could find the requisite documentation for her grace-period conviction. *See* R. 156-30 at 2667-68. No greater level of specificity is necessary for standing, including on summary judgment.

If this Court does not view TN NAACP's specific factual evidence as sufficient in light of *AHM*, however, remand for additional proceedings and the development of the record is appropriate because of intervening precedent and

20

because the record at least raises a genuine issue of material fact as to TN NAACP's standing.[6]

## II.    Tennessee's Blanket Rejection and Documentation Policy Violates the NVRA.

The Policy violates several NVRA provisions, and affirmance as to any one would uphold the district court's summary judgment decision. The Policy violates the NVRA's mandate that Tennessee ensure that all facially eligible voter registration applicants are placed on the active voter rolls because Tennessee rejects the applications of facially eligible applicants with felony convictions. As a result, the policy violates both (1) the NVRA's mandate that Tennessee "accept" and "use" the Federal Form or a conforming State Form of facially eligible voters, and (2) the NVRA's requirement that voter registration be implemented in a uniform and nondiscriminatory manner. Because any one of these violations would merit the

---

[6] In the continued litigation of TN NAACP's related claims in this case in the district court, organizational officers from around the state have attested that because the communities TN NAACP primarily serves are disproportionately disenfranchised, the organization very frequently encounters individuals with prior felony convictions in its voter registration assistance work. *See*, R. 291-29 ¶ 6; R. 291-30 ¶¶ 10-11 ; R. 291-31 ¶ 9; R. 291-32 ¶ 7. Furthermore, in recent months, at least one TN NAACP member who had previously lost her right to vote due to a felony conviction had her registration form rejected until she provided documentary proof of restoration. R. 291-31 ¶¶ 26-27. She had to drive to a different county election office to request necessary documentation and then submit it to the county election office that initially rejected her registration form—her form was eventually accepted. *Id.* ¶¶ 27-28. Her experience reflects that of other individuals TN NAACP assists on a regular basis.

21

district court's injunctive relief in favor of the Plaintiffs, this Court should affirm the ruling and ordered injunctive relief.

## A.     Many of Defendants' Arguments Are Forfeited.

As a threshold matter, many of Defendants' NVRA arguments are forfeited: their arguments as to administrability concerns, statutory interpretation, and constitutional avoidance, in support of their claim that the Policy requires only necessary information within the scope of 52 U.S.C. § 20508(b)(1), were never raised below, nor were their arguments as to the meaning of "valid" under 52 U.S.C. § 20507(a)(1) or that § 20507(b)(1) only applied to voter removals.

"As a general rule in this Circuit, arguments raised for the first time on appeal are forfeited, including those not raised in response to dispositive motions." *Cash-Darling v. Recycling Equipment, Inc.*, 62 F.4th 969, 975 (6th Cir. 2023). This Court's "function is to review the case presented to the district court, rather than a better case fashioned after a district court's unfavorable order." *Sheet Metal Workers' Health & Welfare Fund v. Law Office of Demayo*, 21 F.4th 350, 355 (6th Cir. 2021). "The failure to present an issue to the district court forfeits the right to have the argument addressed on appeal." *Id.* at 357; *accord Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546 (6th Cir. 2008) ("generally … an argument not raised before the district court is waived on appeal to this Court").

22

Below, Defendants did not make *any* statutory interpretation argument as to the meaning of "necessary," much less argue against Plaintiff's plain-language interpretation and for a definition that merely means "useful." *Compare* Br. at 55 *with* R. 180 at 2885. Defendants did not argue that the Documentation Policy was "necessary" because it "facilitate[d]" or "ease[d] administrative review." *Compare* Br. at 42, 55 *with* R. 180 at 2885. Nor did Defendants argue that constitutional avoidance compelled their interpretation. Further, Defendants did not argue that "valid" under 52 U.S.C. § 20507(a)(1) means anything other than a completed copy of the registration form. Nor did they argue that § 20507(b)(1) only applied to voter removals. Because Defendants failed to present any of those arguments below, they are forfeited here and the Court need not and should not address them on the merits.

In similar circumstances, this Court has held that arguments first raised on appeal are forfeited. *E.g.*, *Sheet Metal*, 21 F.4th at 357; *Kreipke v. Wayne State University*, 807 F.3d 768, 781 (6th Cir. 2015). This is not the rare case in which exercise of judicial discretion is warranted to prevent "a plain miscarriage of justice," *Sheet Metal*, 21 F.4th at 357—nor have Defendants even made *that* argument.

## B.    Defendants' Policy Is Unlawful Because It Requires More Than "Only … Necessary" Information from Voters.

States may develop and use their own voter registration forms for federal elections. 52 U.S.C. § 20505(a)(2). But those forms must meet the requirements of

23

§ 20508(b), which restricts the additional information states can require from people seeking to vote in federal elections. A State Form, like a Federal Form, "may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration." 52 U.S.C. § 20508(b)(1).

The district court correctly held that "Tennessee's challenged documentation policy does not comply with the NVRA's prohibition against requiring unnecessary information." MSJ Memo, R. 221 at 3691. Again, Section 20508(b)(1) limits the information that a state "may require" of applicants to "*only* such … information … *necessary* to enable the appropriate State election official to assess [applicant eligibility] and to administer voter registration." *Id.* (emphasis added). Documentary proof as to eligibility related to felony convictions is unnecessary—in any event and certainly considering Defendants' July 2023 policy change.

> ### 1. Text and Context Confirm that "Only Such … Information … Necessary"    in § 20508(b)(1) Means Solely Essential or Required Information

Defendants have forfeited their statutory interpretation argument as to the meaning of "necessary." They are also wrong on the merits: "only such … information … necessary" in § 20508(b)(1) means solely information that is essential or required—not merely "useful" or "conducive" information. *Compare*

Br. at 42. And even if this Court applies a laxer definition like "important," *Ayestas v. Davis*, 584 U.S. 28, 44 (2018), the Policy still fails.

> **a.    "Only Such … Information … Necessary" Means Solely Essential or Required Information**

"Necessary" is a "word[] of limitation." *In re Microsoft Corp. Antitrust Litigation*, 355 F.3d 322, 327 (4th Cir. 2004). "Necessary" means, fundamentally, "[t]hat is needed": "[in]dispensable, vital, essential; requisite." Oxford English Dictionary, *available at* https://www.oed.com/dictionary/necessary_adj?tab=meaning_and_use (last visited Sept. 7, 2024).[7] The American Heritage Dictionary of the English Language (5th ed. 2022) similarly defines "necessary" as "[n]eeded or required". Black's Law Dictionary (12th ed. 2024) defines "necessary" as "[t]hat is needed for some purpose or reason; essential," providing as an example "three elements necessary to meet standing requirements." Thus, for information to be "necessary" under § 20508(b)(1), it must be *needed*—required or essential.

As then-Judge Gorsuch explained in *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917 (10th Cir. 2012), "necessary" "implies more than something merely helpful or conducive. It suggests instead something 'indispensable,' 'essential,' something that 'cannot be done without.'" *Id.* at 923

---

[7] Necessary's alternate meanings—"[t]hat must be so" or "inevitable," and "intimately connected," as in "necessary friends," Oxford English Dictionary, are obviously irrelevant in statutory context.

(quoting Oxford English Dictionary (2d ed. 1989). The Third Circuit has defined "necessary" as "indispensable, requisite, essential, needful; that which cannot be done without, or absolutely required." *Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018). The Fourth and Fifth Circuits have recognized a similarly limited definition. *In re Microsoft*, 355 F.3d at 327; *Women's Elevated Sober Living v. City of Plano*, 86 F.4th 1108, 1113 & n.5 (5th Cir. 2023).

This Court has repeatedly understood "necessary" to be similarly limited. Relying on *Cinnamon Hills*, this Court has recognized in Fair Housing Amendments Act (FHAA) interpretation that "necessary" means "indispensable, essential, something that cannot be done without.'" *Madej v. Maiden*, 951 F.3d 364, 372 (6th Cir. 2020); *Davis v. Echo Valley Condominium Ass'n*, 945 F.3d 483, 490 (6th Cir. 2019). This Court has explained that "necessary" "cannot be emptied entirely of its distinctive meaning by being equated with 'desirable'" and that "a 'necessary' medical procedure surely is not the same thing as an 'optional' or 'preferable' one." *Women's Medical Professional Corp. v. Taft*, 353 F.3d 436, 447 (6th Cir. 2003). Just last year, this Court distinguished among "reasonable," "necessary," and "appropriate," explaining that "necessary" is "needed for the continuing existence or function of something; essential; indispensable." *Allstates Refractory Contractors, LLC v. Su*, 79 F.4th 755, 765 (6th Cir. 2023). Accordingly, this Court held, standards "'necessary ... to provide safe or healthful employment' are those

26

that are "needed for … the purpose of keeping workers safe." *Id.* And this Court has distinguished between "useful" and "necessary," explaining that airport "hangars are useful to provide cover to the aircraft" but "are not 'necessary' to aeronautical users." *Washburn v. Lawrence Cty. Bd. of Comm'rs*, 720 F.3d 347, 353 (6th Cir. 2013). This Court should rely on the same definition of "necessary" that is consistent with dictionary definitions, that other courts have regularly used, and that this Court has repeatedly relied upon: "necessary" means "essential," "needed," "indispensable," "something that cannot be done without."

Necessary therefore has a narrower range of meanings that typically excludes merely "useful." While Defendants rely on *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) and *Ayestas v. Davis*, 584 U.S. 28 (2018) for this interpretation, Br. 39, neither provide Defendants with much help in avoiding the precedent discussed above. First, in *Dobbs,* the Court merely noted that the term "necessary" *can* be vague—it did not adopt a definition of "necessary" as "useful." 597 U.S. at 282. Second, *Ayestas* adopted a laxer definition of necessary because the statutory language discussed what was "reasonably necessary" and "it makes little sense to refer to something as being 'reasonably essential.'" 584 U.S. at 44. No such modifier exists here. Further, both relied on a 1970s Black's Law Dictionary definition to construe necessary to extend to "useful." *Dobbs*, 597 U.S. at 282; *Ayestas*, 584 U.S. at 44. But dictionary definitions contemporaneous with the 1993 passage of the

27

NVRA, including the definition in Black's 1990 edition, are not so expansive: the American Heritage Dictionary in 1982, for example, defined necessary as "absolutely essential; indispensable." *Ault v. Walt Disney World Co.*, No. 6:07-cv-1785, 2009 WL 3242028 at *7 (M.D. Fla. Oct. 6, 2009) (quoting Am. Heritage Dictionary 834 (2d college ed. 1982)). Defendants acknowledge that the 1990 Black's Law Dictionary—published just three years before the NVRA's passage—defines necessary as "indispensable" or "essential." Br. 40. Finally, although "we sometimes use the verb 'need' loosely, we do not do the same with the adjective 'necessary.' Nor does Congress write statutes with such loose, colloquial phrasing." *Vorchheimer*, 903 F.3d at 105. Instead, "ordinary English speakers … use[] 'necessary' in th[e] strict sense of essential or indispensable." *Id.* at 106.[8]

And "necessary" is not the sole limiting word in § 20508(b)(1): the provision also includes "only." "Only" means "[s]olely, merely, exclusively; with no one or nothing more besides; as a single or solitary thing or fact; no more than." Oxford English Dictionary, *available at* https://www.oed.com/dictionary/only_adv?tab=meaning_and_use (last visited Sept. 7, 2024). "When writers"—such as Congress—"wish to tighten or loosen the degree of necessity, they add modifiers." *Vorchheimer*, 903 F.3d at 106-07; *cf. ITCA*, 570

---

[8] *FAA v. Cooper*, 566 U.S. 284 (2012), is inapposite because that case is about the meaning of "actual damages," not "necessary." 566 U.S. at 294.

U.S. 1 (2013) ("Words that can have more than one meaning are given content, however, by their surroundings."). This additional limiting language means that "*only* such … information *necessary* to enable" a state election official's assessment of eligibility and administration of voter registration means "solely," "exclusively," and "no more than" the information "required" or "essential" to make possible the official's eligibility assessment and registration administration. *See* 52 U.S.C. § 20508(b)(1) (emphasis added). It further demonstrates that § 20508(b)(1) uses "necessary" in a strict sense.

> **b.**     **The NVRA's Structure Confirms that "Only Such … Information … Necessary" in Section 20508(b)(1) Means Solely Required Information**

The statutory context confirms that the term "necessary" in Section 20508(b)(1) "cannot be emptied entirely of its distinctive meaning by being equated with 'desirable.'" *Women's Medical Professional Corp.*, 353 F.3d at 447; *see also Cinnamon Hills*, 685 F.3d at 923. After all, the NVRA's purpose was to "increase the number of eligible citizens who register to vote in elections for Federal office," and counteract "discriminatory and unfair registration laws and procedures [that] can have a direct and damaging effect on voter participation in elections." 52 U.S.C. § 20501. In this context, it would make little sense for Congress to limit states to requiring "only" information that is "necessary" for registration if those terms are defined to lose all their limiting force. And while Defendants argue that States should

29

be given "'considerable deference' when setting election procedures," Br. 45, the Elections Clause power gives Congress power to set federal election procedures and thus "there is no compelling reason not to read Elections Clause legislation simply to mean what it says." *ITCA*, 570 U.S. at 15.

Defendants heavily rely on the different language between §§ 20504(c)(2)(B) and 20508(b)(1). Br. at 39-41. This is a red herring. Section 20504(c)(2)(B) pertains to the contents of a voter registration application as part of a state driver's license applicant; states "may require only the minimum amount of information necessary to" prevent duplicate voter registrations and "enable State election officials to assess" eligibility and administer "the election process." *Id.* Because there are other important divergences between §§ 20504(c)(2)(B) and 20508(b)(1), the presence of the word "minimum" in isolation in the motor-voter statute does not—in the context of interpreting the statute as a whole—indicate that the motor-voter provision is a higher bar. *Robinson v. Shell Oil*, 519 U.S. 337, 340-41 (1997) (statutory interpretation). Moreover, even if the motor-voter provision imposes an exceptionally high bar on what information that can be required, that does not tell this Court much about the meaning of "necessary" in 20508(b)(1) or somehow *lower* the requirements of the text of that different statute.[9]

---

[9] Defendants rely on *Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016), for the proposition that election officials have "greater discretion to request information …

30

In any event, the motor-voter provision's different wording makes sense in the context of the unique challenges of integrating voter registration into a state driver's license application. Just prior to the minimum information necessary requirement, Section 20504(c)(2)(A) bars the application from "requir[ing] any information that duplicates information required in the driver's license portion of the form" with certain exceptions. The statute *then* states that the State may require "only the minimum amount of information necessary." 52 U.S.C. § 20504(c)(2)(B). Emphasizing the "minimum" amount of information makes sense to reinforce that states should not request information that is duplicative of the driver's license form. *See Stringer v. Hughs*, No. SA-20-CV-46, 2020 WL 6875182 at *22 (W.D. Tex. Aug. 28, 2020) (NVRA "prohibition against duplicate information" as "plain and unambiguous").

The structure of § 20508(b)(1) is simply different from the motor-voter provision. Section 20508(b)(1) condenses the restrictions in §§ 20504(c)(2)(A) and (B) into one subsection. It does not include language to prevent "duplicate voter registrations"—which makes sense as this form is stand-alone, not being filled out alongside a driver's license application. The requirement in § 20508(b)(1) is a high bar—"only" (or solely) that information "necessary."

---

under §20508," Br. at 40. But *Fish* merely identified the very high bar of the motor-voter provision; it did not define the meaning of "necessary" under §20508(b)(1), nor was that meaning at issue.

## 2.    The Documentation Policy Is Not "Necessary"

Applying any reasonable definition of "necessary" (not merely "preferable," *Women's Medical Professional Corp.*, 353 F.3d at 447), the Policy fails. Again, Defendants did not argue below that the Policy was essential or even useful for administrative review—and that argument is accordingly forfeited here.

First, it is undisputed that the State Form requires a detailed attestation providing information necessary to assess whether a voter meets the qualification for voting related to past felony convictions. The latest iteration of the State Form now asks applicants to state, if known, their crime(s) and date and place of conviction, and whether they have received a pardon or had their voting rights restored. R. 156-10. While Defendants rely heavily on the Lim deposition to argue that election officials need documentation for administration purposes, *e.g.*, Br. 42, that testimony was referring to procedures in place prior to the creation of the new voter registration form, which now requests sufficient felony conviction details to determine eligibility. Doc. 151-3. Tennessee's voter registration form now provides more specific attested information than the general attestation found sufficient in *Fish* "for state officials to carry out their eligibility-assessment and registration duties—more specifically, their duties to register qualified applicants to vote." 840 F.3d at 738.

This Court should begin with the presumption that this is all that is necessary for at least three reasons. First, "Congress has historically relied on an attestation requirement 'under penalty of perjury' as a gate-keeping requirement for access to a wide variety of important federal benefits." *Id.* at 737. Second, attestation under penalty of perjury is all the State requires for establishing other voter qualifications such as citizenship, age, and residency—Defendants have given no reason why the felony qualification should be treated differently. And third, the legislative history of the NVRA strongly suggests that Congress viewed additional documentation requirements for proving voter qualifications as unnecessary and improper. Indeed, Congress considered an amendment that would have expressly permitted States to require documentary proof of citizenship with registration and rejected it as "not necessary or consistent with the purposes of this Act." H.R. Rep. No. 103-66, at 23-24. (1993) (Conf. Rep.).[10]

*Even if* it were necessary to look beyond the registration form to verify whether an applicant with a felony conviction is eligible to vote (it is not), Tennessee election officials already have access to information sufficient to confirm eligibility, obviating the need to burden applicants with providing documentation. Indeed, in many if not most cases, Elections Officials are actually the custodians of the relevant

---

[10] Defendants' reliance on *McKay v. Thompson*, 226 F.3d 752 (6th Cir. 2000), is misplaced. That case did not concern a requirement for voters to provide documentation beyond the form itself.

information, as many of the eligible voters who are rejected are individuals who have had their voting rights restored and would need to present the letter of restoration to satisfy Defendants' documentation requirement. Restoration letters are documents created and kept by the Elections Division. Lim Dep., R. 151-3 at 1161:1-6. And the Elections Division maintains a database of individuals whose voting rights have been restored. Hall Dep., R. 156-5 at 2449:19-2450:10. In fact, while the restoration letters are sent to the county election officials where a person first registers to vote after restoration, there is no policy requiring the letters to ever be given to the voter and so restored voters may never receive these letters. *See* R. 156-23 at 2619-2620. But each one is on file with the Elections Division. Lim Dep., R. 151-3 at 1157:23-1158:1. Defendants' insistence on applicants providing these documents already in the Elections Division's possession cannot possibly meet any plausible necessity standard.

In fact, Elections Division testimony showed that it has a suite of databases with criminal conviction data available to it, vastly more than are available to the average applicant. *See* R. 151-03 at 1157-1161; R. 185-6 at 3048 (discussing databases Coordinator of Elections' office uses to search for records of convictions). Even when an applicant provides documentation showing their conviction is not disqualifying, Defendants *still* do a complete records search for any convictions using the extensive databases available to them. R. 156-22 at 2590-91; *see also* Hall

34

Dep., R. 156-05 at 2446:14-2447:13.  Defendants do not dispute that these databases allow Defendants to collect, maintain, and distribute accurate information about felony convictions, including Tennessee state felonies, federal felonies, and out of state felonies. *See* Lim Dep., R. 151-3 at 1124:5-10, 1206:15-1208:2, 1213:21-24, 1216:6-1217:15, 1220:1-7.  Finally, if documentation were for some reason necessary, Defendants do not dispute that county election officials can reach out to other county officials or the Election Division, *see* Hall Dep., R. 156-5, at 2449:19-2450:10; McCallister Dep., R. 156-8 at 2495:5-12; Lim Dep., R. 151-3 at 1204:16-22, or search or request public records or contact courts and other relevant agencies, *see* Hall Dep., R. 156-5, at 2460:4-23; Phillips Dep. R. 156-7 at 2484:10-22, 2485:23-2486:1.  Because the State already has access to this documentation, Defendants' insistence on burdening applicants with providing that documentation is unnecessary.

Defendants' sole argument to the contrary is administrability, which is forfeited. Further, Defendants have provided no evidence to support their *ipse dixit*, citing no record evidence supporting their assertions that accessing "information in their possession" "is unduly burdensome" to election officials or that doing so "creates" any—much less "enormous"—"administrative problems for the electoral process." *Compare* Br. 43, 44. Defendants could have proffered an expert witness on administrability, as Plaintiffs did, but they did not. Thus, there is *no* basis to

conclude that Defendants' belated assertions are accurate, and *no* genuine dispute as to material fact. *See Troche v. Crabtree*, 814 F.3d 795, 798 (6th Cir. 2016) (emphasis added).

Defendants' claim that the existence of the Challenged Policy alone is enough to show that Tennessee determined that the policy is *necessary* is plainly incorrect. Br. at 44. If this were the case, then Defendants' understanding of necessary would swallow the rule: courts could never evaluate whether policies were "necessary" under the NVRA. Defendants also muddle the summary judgment standard: "The essential question is 'whether *the evidence* presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Troche*, 814 F.3d at 798 (emphasis added). Here, Defendants erroneously fault the district court for failing to infer evidence "from the record's silence." Br. at 45. The district court must examine the evidence before it—it cannot presume disagreement or the existence of evidence from a silent record. Finally, Defendants fault the district court for finding that the State has the necessary information to assess eligibility, Br. at 46-7—but do so in reliance on the October 2021 deposition that is outdated following the July 2023 policy's implementation.

Defendants have put forward no evidence that specific attestation is insufficient to enable state officials to make eligibility determinations, and no evidence to support their assertions as to the burden of state official verification even

if specific attestation were insufficient. They did not do so at the district court, or here.

### 3. The District Court's Ruling Is Consistent with Controlling Supreme Court and Sixth Circuit Precedent

Defendants rely heavily on *ITCA*'s recognition that states may create their own registration forms that "may require information the Federal Form does not." 570 U.S. at 12. True enough. But those requirements still must satisfy Section 9's necessity requirement. Nothing in *ITCA*—which did not decide whether a documentary proof of citizenship requirement would comply with Section 9—holds otherwise. In any event, the "necessary" standard is inherently a factual one. Certainly, nothing in *ITCA* suggests that any and all documentation requirements satisfy the "necessary" standard.[11]

*ITCA* in fact rejected Defendants' arguments. In *ITCA*, Justice Scalia, writing for the majority, rejected Arizona's argument that its statutory interpretation was necessary to avoid conflict between the NVRA and "Arizona's constitutional authority to establish qualifications … for voting." *Id.* at 15-16.

*ITCA* reinforced that the Elections Clause is "broad" in scope and explained that "Times, Places, and Manner" in the Clause includes "regulations relating to

---

[11] Notably, Arizona's documentary proof of citizenship requirement at issue in *ITCA* specifically *did not* require additional documentation from individuals whose documentary proof of citizenship was already on file with the separate state motor vehicles agency because Arizona election officials could independently verify that data with only the applicant's ID number. *See* A.R.S. 16-1666(F).

'registration.'" *ITCA*, 570 U.S. at 8-9. Because the NVRA regulates voter registration, with the purpose of reinforcing qualified voters' right to vote, under Supreme Court and Sixth Circuit precedent it is within the broad congressional authority to regulate elections that the Elections Clause provides. *See also U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 382 (6th Cir. 2008) (NVRA "places limits" on "registration procedures and policies"); *Harkless v. Brunner*, 545 F.3d 445, 454-55 (6th Cir. 2008).

Defendants rely heavily on Justice Alito's dissenting opinion and dicta in *ITCA* to unpersuasively attempt to evade the weight of this authority. It's true *ITCA* suggested possible constitutional questions "if a federal statute precluded a State from obtaining the information necessary[12] to enforce its voter qualifications," 570 U.S. at 17, but the whole question here is whether the information Defendants seek is "necessary" under 52 U.S.C. § 20508(b). If it is, then § 20508(b) is no bar to Tennessee obtaining it and there's no conflict between the federal statute and state authority. If it's unnecessary (it is), *ITCA*'s constitutional question is no help to Defendants.[13]

---

[12] The Court's use of the term "necessary" here plainly means something more than just "useful." Otherwise, it would have upheld the State's documentary proof of citizenship requirement even for Federal Form applicants.

[13] Moreover, *ITCA* avoided any constitutional question rather than resolving it—and Defendants do not attempt to either, merely arguing nebulously and without citation that constitutional doubt requires reversal. Br. at 50-51.

Reliance on Justice Alito's *dissenting* opinion for the argument that states' discretion to require information not on the federal form is essentially unfettered is also unavailing. Br. at 48-49; *see Fish*, 840 F.3d at 743 (noting the dissent "clearly tells [this Court] what the law is not"). Justice Scalia's majority opinion in *ITCA* rejected the proposition that states may require such information without regard to the provisions of the NVRA. 570 U.S. at 13-14. *ITCA* explained that courts should "read Elections Clause legislation simply to mean what it says" and applied that principle in holding that the NVRA bars states from "demand[ing] that an applicant submit additional information beyond that required by the Federal Form" *Id.* at 15. Justice Alito's dissenting *ITCA* opinion did not carry the day.

Defendants' argument that the injunction impermissibly constrains Tennessee's "constitutional authority to establish qualifications … for voting" likewise fails. *See* Br. 64. First, it is inconsistent with *ITCA*. *ITCA* suggested possible constitutional questions only "if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications," 570 U.S. at 17-18, but this concern is inapposite here: the information Tennessee demands from voters is unnecessary. *See supra* Part II.B. Second, as Supreme Court and Sixth Circuit precedent establishes, regulation of voter registration is consistent with the Elections Clause and its displacement of state authority. *See supra* Legal Background*; Miller*, 129 F.3d at 836. Third, Defendants' selective quotation from *Pa. State Conf. v. Sec'y*

39

*of Commw.*, 97 F.4th 120 (3d Cir. 2024), is irrelevant: that observation came only *after* determining voter eligibility was not at stake and related to ballot-counting. *Compare id.* at 135 *with* Br. 51-52.

### C.    The Challenged Policy Violates the NVRA's Mandate to Ensure Registration of Eligible Voters Who Submit Timely, Valid Registration Forms.

The NVRA requires states to "ensure that any eligible applicant is registered to vote" in federal elections upon timely receipt of a "valid voter registration form." 52 U.S.C. § 20507(a)(1)(B). The Supreme Court has held that "valid" in this context means "a completed copy of the form." *ICTA*, 570 U.S. at 12. Thus, when an eligible applicant submits a timely completed registration form, the state must ensure that the applicant is registered to vote in federal elections.

The district court was right to conclude that Tennessee's longstanding policy of rejecting timely completed registration forms submitted by eligible voters with felony convictions absent documentation violates this straightforward rule. There is, as the court found, no genuine dispute that applicants with felony convictions who never lost the right to vote or had their rights restored are "eligible" to vote. MSJ Memo, R. 221 at 3688. Nor was there any genuine dispute that from 2014 to at least July 21, 2023, Tennessee directed election officials reject *all* timely completed registration forms indicating a felony conviction unaccompanied by documentation—even when attested information on the face of the form confirmed

40

that the applicant was eligible to vote. *Id.* at 3686; Resp. to Stmt. of Facts, R. 181 at 2909-11; R. 156-23 at 2604; Br. at 10. By its terms, this policy *ensures* that eligible applicants with felony convictions who timely submitted completed registration forms without documentation are *rejected* rather than registered as the NVRA requires. R. 156-23 at 2604.

Defendants' arguments below centered on mootness: because they had purportedly ceased applying this policy to *some* eligible applicants with felony convictions, they could not be found in violation of § 20507(a)(1)(B). Defs.' MSJ, R. 151 at 1083; Defs.' Response to Pls.' MSJ, R. 180 at 2869-73, 2880-81. The district court rejected this voluntary cessation theory, finding the state's sudden policy shift after the close of discovery on the virtual eve of dispositive briefing did not mean the challenged policy "could not reasonably be expected to recur." MSJ Memo., R. 221 at 3672.

Furthermore, even if Defendants' policy shift were genuine and not mere litigation strategy, their current policy *still* violates Section 20507(a)(1)(B) by continuing to require rejection of completed forms submitted without documentation by eligible voters with felony convictions. First, Defendants' contention that they now only reject applications indicating pre-1973 convictions that are "infamous" is false. Br. at 10. According to their July 2023 memo, registration forms indicating a pre-1973 conviction are to be processed only if they indicate a conviction for crimes

41

that could not have rendered them infamous. R. 151-2 at 1096. All forms from individuals who were convicted of one of the pre-1973 *potentially* infamous crimes without providing extra documentation are to be summarily rejected even if the applicant was never *actually* rendered infamous. *Id.* Thus, Defendants' current policy fails to ensure that these eligible applicants—who never lost the right to vote in the first place—will be registered in accordance with Section 20507(a)(1).

Second, Defendants' policy shift did not end their policy of rejecting valid, timely registration forms submitted by eligible applicants whose voting rights were previously restored if they fail to submit proof of restoration. *See id.*; R. 221 at 3686; Br. at 11. While the passage of time may make it rare for election officials to encounter individuals seeking to register to vote with non-infamous pre-1973 convictions, *see* Br. at 11, the state's rejection of valid registration forms submitted by eligible individuals who have had their voting rights restored is a regular occurrence. This is because Defendants do not provide individuals who restore their voting rights in Tennessee with documentation confirming that they have had their rights restored. *See* Sivley Dep., R. 156-06 at 2469:16-18 (County AOEs, not applicant, receive Elections Division eligibility determination).

Although state law requires Defendants to issue eligible individuals a Certificate of Restoration of Voting Rights (COR) qualifying as "sufficient proof that the person … is no longer disqualified from voting," Defendants' rights

42

restoration procedures do not provide for this. T.C.A. § 40-29-203(c). Instead, Defendants require an individual requesting rights restoration to find government officials willing to certify a "COR form" for each disqualifying felony conviction and submit that form to the county administrator of elections (AOE) where they intend to register to vote, along with a completed voter registration application. *See* T.C.A. § 40-29-203(d); R. 185-6 at 3045, 3076-77. The Elections Division then verifies the applicant has met the criteria for rights restoration, and if so, creates a letter directing the AOE to add that voter to the rolls, all of which are archived. T.C.A. § 40-29-203(d); R. 185-6 at 3045; 156-23 at 2619-20. Although the state maintains a "restoration database" of individuals whose rights have been restored, the Election Division sends confirmation of restoration only to AOEs, not the restored individual herself. *See* Griffy Dep., R. 156-5 at 2442:8-12; R. 185-6 at 3041; Sivley Dep., R. 156-06 at 2469:16-18. Thus, when this person registers to vote again in future elections and marks that she has a felony conviction but has had her rights restored, Defendants will reject her form as invalid if unaccompanied by proof that she does not have but Defendants certainly do. *See* Hall Dep., R. 156-5 at 2449:19-25; Sivley Dep., R. 156-6 at 2471:1-23; *see also* R. 291-31 at 6786-87. These rejections put restored individuals into a catch-22 and contravene § 20507(a)(1)(B)'s mandate to ensure *eligible* applicants are registered.

43

The only legal argument Tennessee mustered below in answer to this straightforward violation (beyond mootness) was to note that its obligation to "ensure" registration is limited to "eligible" applicants. True, the NVRA does not "preclude States from 'deny[ing] registration based on information ... *establishing* the applicant's *in*eligibility." *ICTA*, 570 U.S. at 15 (emphasis added). But the NVRA *does* prohibit Defendants from rejecting applicants whose attested registration forms facially indicate eligibility simply because the applicant did not also supply unnecessary documentation often in the state's sole possession. *See supra* Part II.B.

For the first time on appeal, Defendants now also argue that their policy is allowed because "valid" means whatever they want it to mean.[14] Br. at 53. They say states decide what qualifies as a "valid" state form for purposes of federal elections; and they've decided that a Tennessee form submitted by an applicant with felony convictions is not "valid" if received without unnecessary extra documentation that is *not* part of the state form. *Id.*[15] This creative interpretation sidesteps the NVRA's plain text, structure, and purpose.

---

[14] This argument appears nowhere in Defendants' papers below and is forfeited. As the district court observed, Defendants did not dispute that "valid" under Section 20507(a)(1) means a completed copy of the registration form. MSJ Memo, R. 221 at 3688.

[15] While Tennessee's form asks the applicant to provide a copy of their pardon or COR, it does not indicate that inclusion is required for the application's validity, nor mention documentation concerning a pre-1973 conviction. R. 156-10.

The Supreme Court, interpreting the very same provision, has read "valid" straightforwardly to mean "a completed copy of the form." *ICTA*, 570 U.S. at 12; *see also* Black's Law Dictionary (6th ed. 1990) (defining valid as "[h]aving legal strength or force"). This same definition must apply to both the state and federal forms because Section 20507(a)(1)(B) makes no distinction between valid state forms and valid federal forms; the provision applies broadly to "registration by mail under section 20505," which governs both state and federal forms. 52 U.S.C. §§ 20507(a)(1)(B); 20505.

Although Section 20505 allows states to "develop and use" a state form, nothing therein supports Defendants' contention that they have *unfettered* discretion in designing such forms for use in federal elections. *Id.* § 20505(a)(2). The state form must "meet[] all of the criteria stated in section 20508(b)"—i.e., the *same* criteria applicable to the federal form. *Id.*; § 20508(b). Both the state and federal forms must, for example, specify each eligibility requirement and ask for the applicant's signed attestation that she satisfies each requirement. *Id.* § 20508(b)(2). And, like the federal form, the state form may ask for "*only* such identifying information … and other information … as is necessary … to assess … eligibility of the applicant and to administer voter registration and other parts of the electoral process." *Id.* § 20508(b)(1). While the criteria for state forms was not at issue in *ITCA*, the Supreme Court there affirmed that a state form must "satisf[y] the same criteria as the federal

45

form." 570 U.S. at 23-24. House Committee reports describing the purpose and function of Section 20505 further confirm that state may only develop and use its own mail registration form for federal elections "provided it meets the requirements of this Act." H.R. Rep. 103-9 (1993), at 9.

Thus, while a state may implicitly decide what counts as a "completed" state form by determining what information it solicits from applicants, the state cannot determine validity based on completion of a form that violates Section 20508(b)(1)'s requirements. Tennessee's state form provides all the attested information the state needs to determine eligibility of voters with felony convictions; the state cannot condition validity of a form under the NVRA on submission of further needless paperwork. *See supra* Part II.B.

The district court therefore correctly ruled that Defendants' policy of rejecting mail registration forms from eligible voters with felony convictions absent further documentary proof violates Section 20507(a)(1)(B) of the NVRA.

### D.    Tennessee's Policy Violates the Uniformity and Non-Discriminatory Provision of the NVRA.

The district court's holding that the Policy violates the NVRA's requirements that registration procedures be uniform and nondiscriminatory.

First, the district court was correct that the material facts were undisputed. As a result, Tennessee's voter registration policy applies differently to voters with felony convictions, a discrimination which is unjustified because not having a felony

46

conviction is not an eligibility criterion under Tennessee law. Second, Defendants have forfeited the argument that the uniformity requirement does not apply to voter registration; and even if they hadn't forfeited this argument, it is wrong.

### 1. The District Court Correctly Held That Tennessee's Voter Registration Policy Applies Nonuniformly and is Discriminatory.

The district court did not err in granting summary judgment to Plaintiffs on their claim that Defendants' voter registration policy was nonuniform and discriminatory in violation of Section 8(b). As explained *supra* Part II.C. the district court held that Defendants reject all voter registrations from people with felony convictions even when the registrant has attested to information establishing their eligibility. The district court then identified the following facts as material to the determination of whether the Uniformity and Non-Discriminatory Provision had been violated, *inter alia*: 1) Defendants reject the voter registration applications of registrants with felony convictions without regard to details on the form establishing eligibility; 2) Defendants require rejected registrants to provide documentary proof of eligibility to overcome the denial; and 3) counties and Defendants already have the information necessary to verify the eligibility of the applicants. MSJ Memo., R. 221 at 3652-60, 3686-88. The district court then determined that those material facts are undisputed. *Id.* at 3688. As a result, the district court came to the inevitable conclusion that Defendant unjustifiably applies a burdensome process for voter

registration on a class of eligible voters that it does not apply to other voters, in violation of Section 8(b). *Id.* at 3691.

Defendants unpersuasively attempt to walk back their admissions by taking issue with the district court's assessment of the material facts. The state claims that it argued below that its policy "does not single out any class of applicants based on an irrelevant characteristic." *See* Br. at 56. But conviction of a felony itself is not an inherently relevant characteristic because it does not always disqualify a voter and therefore is not an eligibility criterion–Tennessee cannot and has not attempted to dispute the fact that many Tennesseans with felony convictions have the right to vote. The relevant characteristic would be having been convicted of an *infamous* felony and not having already been restored to voting rights. But that is not the class that Defendants have singled out. Defendants indisputably have all the information they need on the face of the registration form itself to distinguish between people who have been convicted of felonies who are disqualified from voting and people who have been convicted of felonies who are not disqualified. Thus, their policy discriminates based on a broad characteristic—one which does not always disqualify those in possession of that characteristic—and cannot be allowed under the NVRA.

Moreover, Defendants' policy is not well-crafted to achieve its alleged interests in "verifying voter eligibility, accurate recordkeeping, and preventing fraud." *Id.* Defendants ask registrants with felony convictions to provide information

sufficient to determine eligibility on the form itself, but then institute a policy that entirely ignores that information. The form itself requires applicants to attest to the facts they present under penalty of perjury, including the facts about felony conviction, which the state considers sufficient to verify a range of other eligibility criteria, from age to residency to citizenship. Though the state has never made this argument, if the threat of perjury is not enough to assuage their interest in preventing fraud, the best way to ensure an applicant is being truthful about the facts of their felony conviction would be to have officials verify the information by using the sources already available to them rather than relying on documents from a person whom they believe to be suspicious.

Taking all inferences in Defendants' favor, the district court correctly concluded that Defendants' policy violates the uniform and non-discriminatory clause because it singles out a class based on an improper characteristic. The NVRA's uniform and non-discriminatory requirement is strict, but even if this discrimination could be justified, the policy does not serve the state's proffered interests. Therefore, the district court did not err in its determination that rejecting voter registration applications and requiring additional documentation of applicants with felony convictions violates Section 8(b).

49

### 2.    The Uniformity Provision Applies to Defendants' Voter Registration Policy.

Defendant's argument that the Uniformity Provision does not apply to voter registration applications is forfeited. *Supra* Part II.A. Even if Defendants had not forfeited this argument, Defendants are wrong.

Numerous courts have already rejected Defendants' argument that Section 8's list maintenance provisions do not apply to voter registration applications, because such a reading would violate the plain language and "common-sense reading" of the statute. First, the section is entitled "Requirements with respect to administration of *voter registration*," and the header of the relevant subsection is "Confirmation of *voter registration*." 52 U.S.C. 20507(b) (emphasis added). Under the plain language, the provisions apply to voter registration. In accordance with this straightforward interpretation, the Eleventh Circuit recently held that voter registration applications rejected because of a felony conviction were records covered by Section 8's Public Disclosure Provision, because voter registration "concern[s] the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Greater Birmingham Ministries v. Sec'y of State for Alabama*, 105 F.4th 1324, 1331–32 (11th Cir. 2024).

Likewise, the Fourth Circuit recognized that the relevant phrase "programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" must "unmistakably encompass[] completed voter

50

registration applications." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 336 (4th Cir. 2012). This argument applies in equal force to the Uniformity Provision located in the same statute, which uses nearly identical language: "[a]ny State program or activity" to ensure the "maintenance of an accurate and current voter registration roll." 52 U.S.C. 20507(b). As both the Fourth and Eleventh Circuits recognized, whether a voter registration applicant was rejected plainly concerns "ensuring the accuracy and currency of official lists of eligible voters" because "[p]ermitting an ineligible voter to remain on *or be added to* the voter rolls renders [the state's] records less accurate and less current." *GBM*, 105 F.4th at 1329 (emphasis added). Similarly, Section 8(b) specifically concerns the "maintenance of an *accurate and current* voter registration roll," which cannot occur without the acceptance or rejection of voter registration applications. 52 U.S.C. § 20507(b) (emphasis added).

Defendants posit that maintenance means that "officials must 'keep up' or 'in good order' the list of registered voters" Br. at 57. However, as in *GBM,* Defendants here attempt to "offer[] a narrower interpretation of [their] own definition" by applying it only to removals. *Cf.* Br. at 57; *see GBM*, 105 F.4th at 1324, 1330. Because a necessary precondition of "keeping up" an accurate, current list of registered voters is the acceptance and rejection of voter registration applications, under Defendants' own definition "maintenance" must encompass these activities.

51

Moreover, the NVRA specifically contemplates that "the administration of voter registration" includes "ensur[ing] that any eligible applicant is registered to vote in an election," 52 U.S.C. § 20507(a)(1), not merely the removal of voters. A contrary understanding would be a "cramped" view of the statute, contradicting the statute's express intent. *See GBM,* 105 F.4th at 1330 ("[I]f Congress had intended for [the Public Disclosure Provision] to refer only to the mandatory program required by (a)(4), it knew how to say so.").

Defendants mischaracterize *Husted v. A. Philip Randolph Institute,* 584 U.S. 756 (2018). *Husted* said that the uniformity requirement is a "general limitation … applicable to state removal programs." *Id.* at 764. It did not decide or even consider whether the uniformity provision applies to registration. In explaining that uniformity is a "general limitation," *id.*, it did not hold that uniformity solely applies to state removal programs and in fact stated the contrary.

In citing the out-of-circuit district court case *Mi Familia Vota*, Defendants ignore in-circuit case law that contradicts their argument. *Project Vote v. Blackwell*, 455 F. Supp. 2d 694 (N.D. Ohio 2006), held that requirements that only compensated and not uncompensated voter registration workers comply with state pre-registration, training, and compelled disclosure requirements were in conflict with the NVRA's uniformity provision. *Id.* at 703. Further, while the district court in *Mi Familia Vota* wrongly concluded that the Uniformity Provision does not apply to

52

"individuals not yet registered to vote," the court nevertheless denied summary judgment for the state—and later granted judgment against the state at trial—because Arizona's documentary proof of eligibility requirement "causes nonuniform and discriminatory registration investigation and cancellation" in violation of Section 8(b). *Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1095 (D. Ariz. 2023) (summary judgment); *Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2024 WL 862406, at *41 (D. Ariz. Feb. 29, 2024) (trial judgment). In *Mi Familia Vota,* the district court held that because Defendant admitted the citizenship check *only* applied to voter registrants who were naturalized citizens, the policy violated Section 8(b)'s Uniformity Provision. *Mi Familia Vota v. Fontes*, 2024 WL 862406 at *41.

Here, Defendants admit that all voter registration applicants with felony convictions will be denied and asked to submit documentary proof of eligibility regardless of whether their form indicates that they are ineligible. As in *Mi Familia Vota* (and the district court's decision in this case), this admission ends the inquiry. Where, as here, Defendants' policy of rejecting valid voter registration indisputably *only* subjects certain voter registration applicants and not others to an additional, unnecessary documentation requirement, and that distinction does not correspond to eligibility requirements, the policy violates the Uniformity Provision.

## III.   The District Court's Injunctive Relief Is Proper.

"It is well-established that federal courts possess broad discretion to fashion equitable remedies." *Coal. for Gov't Procurement v. Fed. Prison Indus.,* 365 F.3d 435, 460 (6th Cir. 2004). The NVRA specifically authorizes injunctive relief to remedy violations. 52 U.S.C. § 20510(b)(2). Consistent with this broad remedial authority and the NVRA's specificity, the district court's injunctive relief was proper.

First, permanent injunctive relief was proper. Courts regularly find irreparable harm to support injunctive relief where organizations sue under the NVRA. *E.g., Action NC v. Strach*, 216 F. Supp. 3d 597, 643 (M.D.N.C. 2016); *see also, e.g., Common Cause Indiana v. Lawson,* 937 F.3d 944, 949 (7th Cir. 2019); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). TN NAACP demonstrated ongoing harm to its core activities and ability to achieve its mission of registering voters due to the Policy, both in volunteer hours and in obstacles—sometimes insurmountable—to registering voters whom TN NAACP is aiding. *Supra* Part I.A. This harm is irreparable because it perceptibly impairs TN NAACP's ability to register voters, in contravention to its mission and direct services to voters, and, "after the registration deadlines … pass, there can be no do over and no redress." *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (finding irreparable harm where policies "ma[d]e it more difficult for [plaintiff organizations] to accomplish their primary mission of registering voters"). The harm

"is not fully compensable by money damages" because "the nature of [TN NAACP's] loss"—unregistered voters, loss of volunteer time, and harm to the organization's accomplishment of its mission—"make[s] damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).

And eligible Tennesseans with felony convictions continue to suffer irreparable harm—the denial of the fundamental right to vote—because of Defendants' unlawful Policy. Tennessee NAACP has in fact identified multiple specific individuals who have been denied the fundamental right to vote on this basis. *Supra* Part I.A. This Court "give[s] 'careful consideration' to concerns that a state regulation will violate the fundamental right to vote." Op. Granting Stay at 15. The Court has looked to whether a policy or practice restricts *anyone's* right to vote in determining irreparable harm. "A restriction on the fundamental right to vote … constitutes irreparable injury." *Obama for America v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *see also Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020); *Michigan State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016). And "when constitutional rights are threatened or impaired, irreparable injury is presumed." *Johnson*, 833 F.3d at 669. Because the Policy denies eligible Tennesseans the right to vote, it perpetrates irreparable harm and injunctive relief is warranted.

55

A statewide injunction that might incidentally benefit nonparties is permissible where "necessary to protect the particular plaintiffs before the court." *Labrador v. Poe by & through Poe*, 144 S. Ct. 921, 936 (2024). Statewide injunctive relief is necessary because TN NAACP conducts voter registration and assists voters statewide, whether or not they are TN NAACP members. An injunction barring Defendants from enforcing their policy against individuals TN NAACP assists is unworkable, because of the nature of TN NAACP's assistance. Predictably, members would need to advocate to local election officials on behalf of eligible Tennesseans with felony convictions, arguing that they could not be subject to the Policy *because* TN NAACP was assisting them. In effect, TN NAACP would be required to continue its laborious and individualized advocacy on behalf of eligible Tennesseans with felony convictions—the precise harm caused by the Policy. The drain on TN NAACP's organizational resources would continue, merely displaced to a different stage of voter assistance. Furthermore, this limited injunction would be unworkable: how would election officials know which registrants TN NAACP had assisted, and what would be the threshold for assistance?

Additionally, an injunction that applies only to individuals being assisted by the NAACP would exacerbate, not remedy, Defendants' NVRA violations. A procedure that allows *only* voters who register with the assistance of TN NAACP to be exempt from Defendants' unlawful Policy cannot pass muster as uniform or non-

discriminatory under the NVRA. The district court's injunction was an appropriate

exercise of its equitable powers, not an abuse of discretion.

## CONCLUSION

This Court should affirm the permanent injunction.

September 13, 2024                             Respectfully submitted,

Charles K. Grant                              /s/ *Blair S. Bowie*
Denmark J. Grant                              Blair S. Bowie
BAKER, DONELSON, BEARMAN,                      Danielle M. Lang
CALDWELL & BERKOWITZ, PC                       Alice C.C. Huling
211 Commerce Street, Suite 800                 Kathryn Huddleston
Nashville, TN 37201                            Valencia Richardson
(615) 726-5600                                 Ellen M. Boettcher
                                              Kate Uyeda
                                              CAMPAIGN LEGAL CENTER
                                              1101 14th Street NW, Suite 400
                                              Washington, DC 20005
                                              (202) 736-2200

*Counsel for Plaintiff-Appellee*

57

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 5(c)(1) because it contains 12,984 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Blair S. Bowie*
Blair S. Bowie
*Counsel for Plaintiff-Appellee*

58

## CERTIFICATE OF SERVICE

I certify that on September 13, 2024, an electronic copy of the foregoing Answer was filed with the Clerk of Court for the U.S. Court of Appeals for the Sixth Circuit, using the appellate CM/ECF system. I further certify that all parties in this case are represented by lead counsel who are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

*/s/ Blair S. Bowie*
Blair S. Bowie
*Counsel for Plaintiff-Appellee*

## DESIGNATION OF RELEVANT DOCUMENTS

| District Court Record Entry | Description | Page ID# |
|---|---|---|
| 102 | Plaintiff's First Amended Complaint | 610-660 |
| 150 | Defendants' Motion for Summary Judgment | 1044-47 |
| 151 | Defendants' Memorandum in Support of Motion for Summary Judgment | 1048-90 |
| 151-1 | Declaration of Mark Goins | 1091-94 |
| 151-2 | Older Felonies Mem., R. 151-2 | 1095-96 |
| 151-3 | Transcript of October 29, 2021 Deposition of Jessica Lim | 1097-1306 |
| 151-4 | Transcript of May 17, 2023 Deposition of Loretta Morris | 1307-92 |
| 153 | Plaintiff's Motion for Summary Judgment, R. 153 | 2274-77 |
| 154 | Plaintiff's Memorandum in Support of Motion for Summary Judgment | 2278-2314 |
| 156-2 | Declaration of Gloria Jean Sweet-Love | 2355-58 |
| 156-4 | Excerpts of Transcript of October 29, 2021 Deposition of Jessica Lim | 2381-2433 |
| 156-5 | Excerpts of March 24, 2023 Deposition Transcript of Steven Griffy and Donald Hall | 2434-64 |
| 156-6 | Excerpts of May 18, 2023 Deposition Transcript of Sherri Silvey | 2465-76 |
| 156-7 | Excerpts of May 19, 2023 Deposition of Linda Phillips | 2477-86 |
| 156-8 | Excerpts of May 24, 2023 Deposition of Judy McAllister | 2487-95 |
| 156-9 | Excerpts of May 26, 2023 Deposition of Vicki Collins | 2496-2502 |
| 156-10 | Current State Voter Registration Form | 2503-04 |
| 156-22 | Elections Division Internal Policy | 2578-2601 |
| 156-23 | Voting Rights Restoration Training Powerpoint | 2602-20 |
| 156-25 | Felony Q&A Study Answer Key | 2629-32 |

| 156-27 | Felony Conviction Search Email Redacted, R. 156-27 at 2653 | 2653-54 |
|--------|--------|--------|
| 156-30 | September 2020 Email between Jessica Lim and Aletta West | 2667-68 |
| 180 | Defendants' Response to Plaintiff's Motion for Partial Summary Judgment | 2858-89 |
| 180-1 | Supplemental Declaration of Mark Goins | 2890-93 |
| 181 | Defendants' Response to Plaintiff's Statement of Undisputed Material Facts | 2911, 2924-2925, 2894-2935 |
| 185-6 | Expert Declaration and Report of Dr. Traci Burch | 3022-77 |
| 192 | Plaintiff's Reply Brief in Support of Motion for Summary Judgment | 3222-34 |
| 192-1 | Second Declaration of Gloria Jean Sweet-Love | 3235-39 |
| 221 | Memorandum Opinion re Motion for Summary Judgment as to Counts 4-6 | 3641-91 |
| 222 | Order on Motion for Summary Judgment as to Counts 4-6 | 3692-93 |
| 224 | Joint Status Report | 3699-3701 |
| 225 | Order on Briefing for Proposed Injunctions | 3702 |
| 226 | Plaintiff's Notice of Filing Proposed Order of Injunctive Relief | 3703-3707 |
| 226-1 | Plaintiff's Proposed Order of Injunctive Relief | 3708-12 |
| 227 | Defendants' Notice of Filing Proposed Order of Injunctive Relief | 3713-15 |
| 227-1 | Defendants' Proposed Order of Injunctive Relief | 3716-18 |
| 229 | Order on Briefing of Objections | 3722-23 |
| 232 | Defendants' objections to Plaintiff's Proposed Order on Count Six | 3743-3753 |
| 234 | Plaintiff's Objections to Defendants' Proposed Order on Count Six | 3759-69 |
| 234-1 | Declaration of Charles K. Grant | 3770-72 |
| 237 | Order on Proposed Injunctions | 3924-27 |
| 242 | Notice of Appeal | 3865-67 |

| 267 | Order on Emergency Motion for a Stay | 4714 |
|---|---|---|
| 291-29 | Third Declaration of Gloria Jean Sweet-Love | 6763-70 |
| 291-30 | Declaration of Ian Randolph | 6771-80 |
| 291-31 | Declaration of Tiffany Tipton-Boyd | 6781-87 |
| 291-32 | Declaration of Harrell Carter, Jr. | 6788-6792 |

# ADDENDUM

Under Federal Rule of Appellate Procedure 28(f), the appellees herein reproduce 52 U.S.C. §§ 20501–20508, 20510 (National Voter Registration Act of 1993), T.C.A. §§ 40-29-101, 40-29-201, 40-29-203 (2023), and A.R.S. 16-1666 which are relevant to these proceedings.

*    *    *

## 52 U.S.C. § 20501. Findings and purposes

### (a) Findings

The Congress finds that—

(1) the right of citizens of the United States to vote is a fundamental right;

(2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and

(3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

### (b) Purposes

The purposes of this chapter are—

(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

(2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

(3) to protect the integrity of the electoral process; and

(4) to ensure that accurate and current voter registration rolls are maintained.

## 52 U.S.C. § 20502. Definitions

As used in this chapter—

(1) the term "election" has the meaning stated in section 30101(1) of this title;

(2) the term "Federal office" has the meaning stated in section 30101(3) of this title;

(3) the term "motor vehicle driver's license" includes any personal identification document issued by a State motor vehicle authority;

(4) the term "State" means a State of the United States and the District of Columbia; and

(5) the term "voter registration agency" means an office designated under section 20506(a)(1) of this title to perform voter registration activities.

## 52 U.S.C. § 20503. National procedures for voter registration for elections for Federal office

### (a) In general

Except as provided in subsection (b), notwithstanding any other Federal or State law, in addition to any other method of voter registration provided for under State law, each State shall establish procedures to register to vote in elections for Federal office—

(1) by application made simultaneously with an application for a motor vehicle driver's license pursuant to section 20504 of this title;

(2) by mail application pursuant to section 20505 of this title; and

(3) by application in person—

(A) at the appropriate registration site designated with respect to the residence of the applicant in accordance with State law; and

(B) at a Federal, State, or nongovernmental office designated under section 20506 of this title.

### (b) Nonapplicability to certain States

This chapter does not apply to a State described in either or both of the following paragraphs:

(1) A State in which, under law that is in effect continuously on and after August 1, 1994, there is no voter registration requirement for any voter in the State with respect to an election for Federal office.

(2) A State in which, under law that is in effect continuously on and after August 1, 1994, or that was enacted on or prior to August 1, 1994, and by its terms is to come into effect upon the enactment of this chapter, so long as

64

that law remains in effect, all voters in the State may register to vote at the polling place at the time of voting in a general election for Federal office.

## §20504. Simultaneous application for voter registration and application for motor vehicle driver's license

### (a) In general

(1) Each State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application.

(2) An application for voter registration submitted under paragraph (1) shall be considered as updating any previous voter registration by the applicant.

### (b) Limitation on use of information

No information relating to the failure of an applicant for a State motor vehicle driver's license to sign a voter registration application may be used for any purpose other than voter registration.

### (c) Forms and procedures

(1) Each State shall include a voter registration application form for elections for Federal office as part of an application for a State motor vehicle driver's license.

(2) The voter registration application portion of an application for a State motor vehicle driver's license—

(A) may not require any information that duplicates information required in the driver's license portion of the form (other than a second signature or other information necessary under subparagraph (C));

(B) may require only the minimum amount of information necessary to—

(i) prevent duplicate voter registrations; and

(ii) enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;

(C) shall include a statement that—

(i) states each eligibility requirement (including citizenship);

(ii) contains an attestation that the applicant meets each such requirement; and

(iii) requires the signature of the applicant, under penalty of perjury;

(D) shall include, in print that is identical to that used in the attestation portion of the application—

(i) the information required in section 20507(a)(5)(A) and (B) of this title;

(ii) a statement that, if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and

(iii) a statement that if an applicant does register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes; and

(E) shall be made available (as submitted by the applicant, or in machine readable or other format) to the appropriate State election official as provided by State law.

**(d) Change of address**

Any change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as notification of change of address for voter registration with respect to elections for Federal office for the registrant involved unless the registrant states on the form that the change of address is not for voter registration purposes.

**(e) Transmittal deadline**

(1) Subject to paragraph (2), a completed voter registration portion of an application for a State motor vehicle driver's license accepted at a State motor vehicle authority shall be transmitted to the appropriate State election official not later than 10 days after the date of acceptance.

(2) If a registration application is accepted within 5 days before the last day for registration to vote in an election, the application shall be transmitted to the appropriate State election official not later than 5 days after the date of acceptance.

## 52 U.S.C. § 20505. Mail registration

### (a) Form

(1) Each State shall accept and use the mail voter registration application form prescribed by the Federal Election Commission pursuant to section 20508(a)(2) of this title for the registration of voters in elections for Federal office.

(2) In addition to accepting and using the form described in paragraph (1), a State may develop and use a mail voter registration form that meets all of the criteria stated in section 20508(b) of this title for the registration of voters in elections for Federal office.

(3) A form described in paragraph (1) or (2) shall be accepted and used for notification of a registrant's change of address.

**(b) Availability of forms**

The chief State election official of a State shall make the forms described in subsection (a) available for distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs.

**(c) First-time voters**

(1) Subject to paragraph (2), a State may by law require a person to vote in person if—

(A) the person was registered to vote in a jurisdiction by mail; and

(B) the person has not previously voted in that jurisdiction.

(2) Paragraph (1) does not apply in the case of a person—

(A) who is entitled to vote by absentee ballot under the Uniformed and Overseas Citizens Absentee Voting Act [52 U.S.C. 20301 et seq.];

(B) who is provided the right to vote otherwise than in person under section 20102(b)(2)(B)(ii) of this title; or

(C) who is entitled to vote otherwise than in person under any other Federal law.

**(d) Undelivered notices**

If a notice of the disposition of a mail voter registration application under section 20507(a)(2) of this title is sent by nonforwardable mail and is returned undelivered, the registrar may proceed in accordance with section 20507(d) of this title.

67

## 52 U.S.C. § 20506. Voter registration agencies

### (a) Designation

(1) Each State shall designate agencies for the registration of voters in elections for Federal office.

(2) Each State shall designate as voter registration agencies—

(A) all offices in the State that provide public assistance; and

(B) all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities.

(3)(A) In addition to voter registration agencies designated under paragraph (2), each State shall designate other offices within the State as voter registration agencies.

(B) Voter registration agencies designated under subparagraph (A) may include—

(i) State or local government offices such as public libraries, public schools, offices of city and county clerks (including marriage license bureaus), fishing and hunting license bureaus, government revenue offices, unemployment compensation offices, and offices not described in paragraph (2)(B) that provide services to persons with disabilities; and

(ii) Federal and nongovernmental offices, with the agreement of such offices.

(4)(A) At each voter registration agency, the following services shall be made available:

(i) Distribution of mail voter registration application forms in accordance with paragraph (6).

(ii) Assistance to applicants in completing voter registration application forms, unless the applicant refuses such assistance.

(iii) Acceptance of completed voter registration application forms for transmittal to the appropriate State election official.

(B) If a voter registration agency designated under paragraph (2)(B) provides services to a person with a disability at the person's home, the agency shall provide the services described in subparagraph (A) at the person's home.

(5) A person who provides service described in paragraph (4) shall not—

(A) seek to influence an applicant's political preference or party registration;

(B) display any such political preference or party allegiance;

(C) make any statement to an applicant or take any action the purpose or effect of which is to discourage the applicant from registering to vote; or

(D) make any statement to an applicant or take any action the purpose or effect of which is to lead the applicant to believe that a decision to register or not to register has any bearing on the availability of services or benefits.

(6) A voter registration agency that is an office that provides service or assistance in addition to conducting voter registration shall—

(A) distribute with each application for such service or assistance, and with each recertification, renewal, or change of address form relating to such service or assistance—

(i) the mail voter registration application form described in section 20508(a)(2) of this title, including a statement that—

(I) specifies each eligibility requirement (including citizenship);

(II) contains an attestation that the applicant meets each such requirement; and

(III) requires the signature of the applicant, under penalty of perjury; or

(ii) the office's own form if it is equivalent to the form described in section 20508(a)(2) of this title,

unless the applicant, in writing, declines to register to vote;

(B) provide a form that includes—

(i) the question, "If you are not registered to vote where you live now, would you like to apply to register to vote here today?";

(ii) if the agency provides public assistance, the statement, "Applying to register or declining to register to vote will not affect the amount of assistance that you will be provided by this agency.";

(iii) boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote (failure to check either box being deemed to constitute a declination to register for purposes of subparagraph (C)), together with the statement (in close

proximity to the boxes and in prominent type), "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME.";

(iv) the statement, "If you would like help in filling out the voter registration application form, we will help you. The decision whether to seek or accept help is yours. You may fill out the application form in private."; and

(v) the statement, "If you believe that someone has interfered with your right to register or to decline to register to vote, your right to privacy in deciding whether to register or in applying to register to vote, or your right to choose your own political party or other political preference, you may file a complaint with _____.", the blank being filled by the name, address, and telephone number of the appropriate official to whom such a complaint should be addressed; and

(C) provide to each applicant who does not decline to register to vote the same degree of assistance with regard to the completion of the registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance.

(7) No information relating to a declination to register to vote in connection with an application made at an office described in paragraph (6) may be used for any purpose other than voter registration.

**(b) Federal Government and private sector cooperation**

All departments, agencies, and other entities of the executive branch of the Federal Government shall, to the greatest extent practicable, cooperate with the States in carrying out subsection (a), and all nongovernmental entities are encouraged to do so.

**(c) Armed Forces recruitment offices**

(1) Each State and the Secretary of Defense shall jointly develop and implement procedures for persons to apply to register to vote at recruitment offices of the Armed Forces of the United States.

(2) A recruitment office of the Armed Forces of the United States shall be considered to be a voter registration agency designated under subsection (a)(2) for all purposes of this chapter.

**(d) Transmittal deadline**

(1) Subject to paragraph (2), a completed registration application accepted at a voter registration agency shall be transmitted to the appropriate State election official not later than 10 days after the date of acceptance.

(2) If a registration application is accepted within 5 days before the last day for registration to vote in an election, the application shall be transmitted to the appropriate State election official not later than 5 days after the date of acceptance.

## 52 U.S.C. § 20507. Requirements with respect to administration of voter registration

**(a) In general**

In the administration of voter registration for elections for Federal office, each State shall—

(1) ensure that any eligible applicant is registered to vote in an election—

(A) in the case of registration with a motor vehicle application under section 20504 of this title, if the valid voter registration form of the applicant is submitted to the appropriate State motor vehicle authority not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(B) in the case of registration by mail under section 20505 of this title, if the valid voter registration form of the applicant is postmarked not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(C) in the case of registration at a voter registration agency, if the valid voter registration form of the applicant is accepted at the voter registration agency not later than the lesser of 30 days, or the period provided by State law, before the date of the election; and

(D) in any other case, if the valid voter registration form of the applicant is received by the appropriate State election official not later than the lesser of 30 days, or the period provided by State law, before the date of the election;

(2) require the appropriate State election official to send notice to each applicant of the disposition of the application;

(3) provide that the name of a registrant may not be removed from the official list of eligible voters except—

> (A) at the request of the registrant;

> (B) as provided by State law, by reason of criminal conviction or mental incapacity; or

> (C) as provided under paragraph (4);

(4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of—

> (A) the death of the registrant; or

> (B) a change in the residence of the registrant, in accordance with subsections (b), (c), and (d);

(5) inform applicants under sections 20504, 20505, and 20506 of this title of—

> (A) voter eligibility requirements; and

> (B) penalties provided by law for submission of a false voter registration application; and

(6) ensure that the identity of the voter registration agency through which any particular voter is registered is not disclosed to the public.

**(b) Confirmation of voter registration**

Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office—

(1) shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 (42 U.S.C. 1973 et seq.) [now 52 U.S.C. 10301 et seq.]; and

(2) shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote, except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters if the individual—

(A) has not either notified the applicable registrar (in person or in writing) or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then

(B) has not voted or appeared to vote in 2 or more consecutive general elections for Federal office.

**(c) Voter removal programs**

(1) A State may meet the requirement of subsection (a)(4) by establishing a program under which—

(A) change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed; and

(B) if it appears from information provided by the Postal Service that—

(i) a registrant has moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information; or

(ii) the registrant has moved to a different residence address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) to confirm the change of address.

(2)(A) A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

(B) Subparagraph (A) shall not be construed to preclude—

(i) the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a); or

(ii) correction of registration records pursuant to this chapter.

**(d) Removal of names from voting rolls**

(1) A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant—

(A) confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or

(B)(i) has failed to respond to a notice described in paragraph (2); and

(ii) has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

(2) A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:

(A) If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.

(B) If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

(3) A voting registrar shall correct an official list of eligible voters in elections for Federal office in accordance with change of residence information obtained in conformance with this subsection.

**(e) Procedure for voting following failure to return card**

(1) A registrant who has moved from an address in the area covered by a polling place to an address in the same area shall, notwithstanding failure to notify the registrar of the change of address prior to the date of an election, be permitted to vote at that polling place upon oral or written affirmation by the registrant of the change of address before an election official at that polling place.

74

(2)(A) A registrant who has moved from an address in the area covered by one polling place to an address in an area covered by a second polling place within the same registrar's jurisdiction and the same congressional district and who has failed to notify the registrar of the change of address prior to the date of an election, at the option of the registrant—

(i) shall be permitted to correct the voting records and vote at the registrant's former polling place, upon oral or written affirmation by the registrant of the new address before an election official at that polling place; or

(ii)(I) shall be permitted to correct the voting records and vote at a central location within the same registrar's jurisdiction designated by the registrar where a list of eligible voters is maintained, upon written affirmation by the registrant of the new address on a standard form provided by the registrar at the central location; or

(II) shall be permitted to correct the voting records for purposes of voting in future elections at the appropriate polling place for the current address and, if permitted by State law, shall be permitted to vote in the present election, upon confirmation by the registrant of the new address by such means as are required by law.

(B) If State law permits the registrant to vote in the current election upon oral or written affirmation by the registrant of the new address at a polling place described in subparagraph (A)(i) or (A)(ii)(II), voting at the other locations described in subparagraph (A) need not be provided as options.

(3) If the registration records indicate that a registrant has moved from an address in the area covered by a polling place, the registrant shall, upon oral or written affirmation by the registrant before an election official at that polling place that the registrant continues to reside at the address previously made known to the registrar, be permitted to vote at that polling place.

**(f) Change of voting address within a jurisdiction**

In the case of a change of address, for voting purposes, of a registrant to another address within the same registrar's jurisdiction, the registrar shall correct the voting registration list accordingly, and the registrant's name may not be removed from the official list of eligible voters by reason of such a change of address except as provided in subsection (d).

**(g) Conviction in Federal court**

(1) On the conviction of a person of a felony in a district court of the United States, the United States attorney shall give written notice of the conviction to the chief State election official designated under section 20509 of this title of the State of the person's residence.

(2) A notice given pursuant to paragraph (1) shall include—

(A) the name of the offender;

(B) the offender's age and residence address;

(C) the date of entry of the judgment;

(D) a description of the offenses of which the offender was convicted; and

(E) the sentence imposed by the court.

(3) On request of the chief State election official of a State or other State official with responsibility for determining the effect that a conviction may have on an offender's qualification to vote, the United States attorney shall provide such additional information as the United States attorney may have concerning the offender and the offense of which the offender was convicted.

(4) If a conviction of which notice was given pursuant to paragraph (1) is overturned, the United States attorney shall give the official to whom the notice was given written notice of the vacation of the judgment.

(5) The chief State election official shall notify the voter registration officials of the local jurisdiction in which an offender resides of the information received under this subsection.

**(h) Omitted**

**(i) Public disclosure of voter registration activities**

(1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

(2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in

76

subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

**(j) "Registrar's jurisdiction" defined**

For the purposes of this section, the term "registrar's jurisdiction" means—

(1) an incorporated city, town, borough, or other form of municipality;

(2) if voter registration is maintained by a county, parish, or other unit of government that governs a larger geographic area than a municipality, the geographic area governed by that unit of government; or

(3) if voter registration is maintained on a consolidated basis for more than one municipality or other unit of government by an office that performs all of the functions of a voting registrar, the geographic area of the consolidated municipalities or other geographic units.

## 52 U.S.C. § 20508. Federal coordination and regulations

**(a) In general**

The Election Assistance Commission—

(1) in consultation with the chief election officers of the States, shall prescribe such regulations as are necessary to carry out paragraphs (2) and (3);

(2) in consultation with the chief election officers of the States, shall develop a mail voter registration application form for elections for Federal office;

(3) not later than June 30 of each odd-numbered year, shall submit to the Congress a report assessing the impact of this chapter on the administration of elections for Federal office during the preceding 2-year period and including recommendations for improvements in Federal and State procedures, forms, and other matters affected by this chapter; and

(4) shall provide information to the States with respect to the responsibilities of the States under this chapter.

**(b) Contents of mail voter registration form**

The mail voter registration form developed under subsection (a)(2)—

(1) may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State

election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;

(2) shall include a statement that—

(A) specifies each eligibility requirement (including citizenship);

(B) contains an attestation that the applicant meets each such requirement; and

(C) requires the signature of the applicant, under penalty of perjury;

(3) may not include any requirement for notarization or other formal authentication; and

(4) shall include, in print that is identical to that used in the attestation portion of the application—

(i) the information required in section 20507(a)(5)(A) and (B) of this title;

(ii) a statement that, if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and

(iii) a statement that if an applicant does register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes.

\*     \*     \*

## §20510. Civil enforcement and private right of action

### (a) Attorney General

The Attorney General may bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out this chapter.

### (b) Private right of action

(1) A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved.

(2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

(3) If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).

**(c) Attorney's fees**

In a civil action under this section, the court may allow the prevailing party (other than the United States) reasonable attorney fees, including litigation expenses, and costs.

**(d) Relation to other laws**

(1) The rights and remedies established by this section are in addition to all other rights and remedies provided by law, and neither the rights and remedies established by this section nor any other provision of this chapter shall supersede, restrict, or limit the application of the Voting Rights Act of 1965 (42 U.S.C. 1973 et seq.) [now 52 U.S.C. 10301 et seq.].

(2) Nothing in this chapter authorizes or requires conduct that is prohibited by the Voting Rights Act of 1965

\*    \*    \*

## 2023 Tennessee Code Title 40, Chapter 29, Part 1, Section 101: Jurisdiction

**(a)** Persons rendered infamous or deprived of the rights of citizenship by the judgment of any state or federal court may have their full rights of citizenship restored by the circuit court.

**(b)** Those pardoned, if the pardon does restore full rights of citizenship, may petition for restoration immediately after the pardon; provided, that a court shall not have jurisdiction to alter, delete or render void special conditions of a pardon pertaining to the right of suffrage.

**(c)** Those convicted of an infamous crime may petition for restoration upon the expiration of the maximum sentence imposed for the infamous crime.

## 2023 Tennessee Code Title 40, Chapter 29, Part 2, Section 201: Application

**(a)** The provisions and procedures of this part shall apply to and govern restoration of the right of suffrage in this state to any person who has been disqualified from exercising that right by reason of a conviction in any state or federal court of an infamous crime.

**(b)** This part shall apply to any person convicted of an infamous crime after May 18, 1981.

**(c)** This part shall apply only to restoration of the right of suffrage. For restoration of all other rights of citizenship forfeited as the result of a conviction for an infamous crime, part 1 of this chapter shall apply.

## 2023 Tennessee Code Title 40, Chapter 29, Part 2, Section 203: Certificate of voting rights restoration

**(a)** A person eligible to apply for a voter registration card and have the right of suffrage restored, pursuant to § 40-29-202, may request, and then shall be issued, a certificate of voting rights restoration upon a form prescribed by the coordinator of elections, by:

> **(1)** The pardoning authority;

> **(2)** The warden or an agent or officer of the incarcerating authority; or

**(3)** A parole officer or another agent or officer of the supervising authority.

**(b)** The issuing authority shall supply the person being released with a written statement explaining the purpose and effect of the certificate of voting rights restoration and explaining the procedure by which the person may use the certificate to apply for and receive a voter registration card and become eligible to vote.

**(c)** A certificate of voting rights restoration issued pursuant to subsection (a) shall be sufficient proof that the person named on the certificate is no longer disqualified from voting by reason of having been convicted of an infamous crime.

**(d)** Any person issued a certificate of voting rights restoration pursuant to this section shall submit the certificate to the administrator of elections of the county in which the person is eligible to vote. The administrator of elections shall send the certificate to the coordinator of elections who shall verify that the certificate was issued in compliance with this section. Upon determining that the certificate complies with this section, the coordinator shall notify the appropriate administrator of elections and, after determining that the person is qualified to vote in that county by using the same verification procedure used for any applicant, the administrator shall grant the application for a voter registration card. The administrator shall issue a voter registration card and the card shall be mailed to the applicant in the same manner as provided for any newly issued card.

*    *    *

**Arizona Revised Statutes § 16-166. Verification of registration**

A. Except for the mailing of sample ballots, a county recorder who mails an item to any elector shall send the mailing by nonforwardable first class mail marked with the statement required by the postmaster to receive an address correction notification. If the item is returned undelivered, the county recorder shall send a follow-up notice to that elector within three weeks of receipt of the returned notice. The county recorder shall send the follow-up notice to the address that appears in the general county register or to the forwarding address provided by the United States postal service. The follow-up notice shall include an appropriate internet address for revising voter registration information or a registration form and the information prescribed by section 16-131, subsection C and shall state that if the elector does not complete and return a new registration form with current information to the county recorder or make changes to the elector's voter registration information that is maintained online within thirty-five days, the elector's registration status shall be changed from active to inactive.

B. If the elector provides the county recorder with a new registration form or otherwise revises the elector's information, the county recorder shall change the general register to reflect the changes indicated on the new registration. If the elector indicates a new residence address outside that county, the county recorder shall forward the voter registration form or revised information to the county recorder of the county in which the elector's address is located.  If the elector provides a new residence address that is located outside this state, the county recorder shall cancel the elector's registration.

C. The county recorder shall maintain on the inactive voter list the names of electors who have been removed from the general register pursuant to subsection A or E of this section for a period of four years or through the date of the second general election for federal office following the date of the notice from the county recorder that is sent pursuant to subsection E of this section.

D. On notice that a government agency has changed the name of any street, route number, post office box number or other address designation, the county recorder shall revise the registration records and shall send a new verification of registration notice to the electors whose records were changed.

E. The county recorder on or before May 1 of each year preceding a state primary and general election or more frequently as the recorder deems necessary may use the change of address information supplied by the postal service through its

82

licensees and the information provided by an electronic voter registration information center to identify registrants whose addresses may have changed. If it appears from information provided by the postal service or an electronic voter registration information center that a registrant has moved to a different residence address, the county recorder shall send the registrant a notice of the change by forwardable mail and a postage prepaid preaddressed return form or an appropriate internet address for revising voter registration information by which the registrant may verify or correct the registration information. If the registrant fails to revise the information or return the form postmarked not later than thirty-five days after the mailing of the notice, the elector's registration status shall be changed from active to inactive. If the notice sent by the recorder is not returned, the registrant may be required to provide affirmation or confirmation of the registrant's address in order to vote.  If the registrant does not vote in an election during the period after the date of the notice from the recorder through the date of the second general election for federal office following the date of that notice, the registrant's name shall be removed from the list of inactive voters. If the registrant has changed residence to a new county, the county recorder shall provide information on how the registrant can continue to be eligible to vote.

F. The county recorder shall reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship.  Satisfactory evidence of citizenship shall include any of the following:

1. The number of the applicant's driver license or nonoperating identification license issued after October 1, 1996 by the department of transportation or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver license or nonoperating identification license that the person has provided satisfactory proof of United States citizenship.

2. A legible photocopy of the applicant's birth certificate that verifies citizenship to the satisfaction of the county recorder.

3. A legible photocopy of pertinent pages of the applicant's United States passport identifying the applicant and the applicant's passport number or presentation to the county recorder of the applicant's United States passport.

4. A presentation to the county recorder of the applicant's United States naturalization documents or the number of the certificate of naturalization.  If only the number of the certificate of naturalization is provided, the applicant

shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States immigration and naturalization service by the county recorder.

5. Other documents or methods of proof that are established pursuant to the immigration reform and control act of 1986.

6. The applicant's bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number.

G. Notwithstanding subsection F of this section, any person who is registered in this state on the effective date of this amendment to this section is deemed to have provided satisfactory evidence of citizenship and shall not be required to resubmit evidence of citizenship unless the person is changing voter registration from one county to another.

H. For the purposes of this section, proof of voter registration from another state or county is not satisfactory evidence of citizenship.

I. A person who modifies voter registration records with a new residence ballot shall not be required to submit evidence of citizenship.  After citizenship has been demonstrated to the county recorder, the person is not required to resubmit satisfactory evidence of citizenship in that county.

J. After a person has submitted satisfactory evidence of citizenship, the county recorder shall indicate this information in the person's permanent voter file.  After two years the county recorder may destroy all documents that were submitted as evidence of citizenship.