# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

TENNESSEE CONFERENCE OF THE NATIONAL ASSOCIATION
FOR THE ADVANCEMENT OF COLORED PEOPLE,

*Plaintiff-Appellee,*

v.

TRE HARGETT & MARK GOINS,

*Defendants-Appellants.*

On appeal from the United States District Court
for the Middle District of Tennessee
No. 3:20-cv-1039

## Reply Brief for the Appellants

Jonathan Skrmetti
*Attorney General and Reporter*

Zachary Barker
*Senior Assistant Attorney General*

Dawn Jordan
*Special Counsel*

J. Matthew Rice
*Solicitor General*

Philip Hammersley
*Assistant Solicitor General*

State of Tennessee
Office of the Attorney General
P.O. Box 20207
Nashville, TN 37202
Philip.Hammersley@ag.tn.gov

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................i

TABLE OF AUTHORITIES....................................................iii

INTRODUCTION...................................................................1

ARGUMENT .........................................................................2

I.   The NAACP Lacks Organizational Standing to Challenge the Documentation Policy ......................................................2

   A.   The NAACP's standing theories fail as a matter of law ........2

      1.   The NAACP abandons the district court's diversion-of-resources holding .......................................2

      2.   The NAACP cannot rely on *Havens*...............................3

      3.   The NAACP's causation theory is too attenuated.........8

   B.   NAACP's standing theories fail as a matter of fact ...............9

      1.   The NAACP lacks "specific facts" showing that it suffers an ongoing injury ................................................9

      2.   The NAACP is not entitled to a remand......................15

II.  The Documentation Policy Complies with the NVRA...................16

   A.   The Documentation Policy does not require applicants to submit unnecessary information ......................................16

      1.   The Documentation Policy requests "only" information "necessary" to verify voter eligibility.......16

      2.   The Documentation Policy passes statutory muster under Supreme Court precedent.....................27

      3.   The permanent injunction raises serious constitutional concerns .............................................29

   B.   The Documentation Policy ensures that eligible applicants are registered to vote...........................................29

   C.   The Documentation Policy complies with the NVRA's uniformity-and-nondiscrimination requirement..................31

III. The District Court Granted Improper Relief................................32

A.   The NAACP never proved that it needs a permanent injunction to prevent irreparable harm ................................. 32

B.   The district court erred by granting a universal injunction rather than an appropriately tailored remedy. .................................................................... 33

CONCLUSION ............................................................................ 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. McCreary County*,
607 F.3d 439 (6th Cir. 2010) ............................................................ 27

*Ariz. All. for Retired Ams. v. Mayes*,
2024 WL 4246721 (9th Cir. 2024) ................................................ 3, 6, 7

*Berger v. Medina Cnty. Ohio Bd. of Cnty. Comm'rs*,
295 F. App'x 42 (6th Cir. 2008) ........................................................ 15

*Dickson v. Direct Energy, LP*,
69 F.4th 338 (6th Cir. 2023) ............................................................ 14

*FAA v. Cooper*,
566 U.S. 284 (2012) ........................................................................ 18

*Fair Elections Ohio v. Husted*,
770 F.3d 456 (6th Cir. 2014) ........................................................ 4, 15

*Fish v. Kobach*,
840 F.3d 710 (10th Cir. 2016) ................................................ 19, 22, 23

*Friends of George's, Inc. v. Mulroy*,
108 F.4th 431 (6th Cir. 2024) .......................................................... 15

*Lockhart v. Napolitano*,
573 F.3d 251 (6th Cir. 2009) ............................................................ 17

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .................................................................... 11, 14

*In re MCP No. 165*,
21 F.4th 357 (6th Cir. 2021) ............................................................ 18

*Printz v. United States*,
521 U.S. 898 (1997) ........................................................................ 26

iii

*Republican Nat'l Comm. v. Mi Familia Vota,*
2024 WL 3893996 (2024) ...................................................... 28

*Russello v. United States,*
464 U.S. 16 (1983) ............................................................ 19, 20

*Tenn. Conf. of the NAACP v. Lee,*
105 F.4th 888 (6th Cir. 2024) ..................................... *passim*

*Turaani v. Wray,*
988 F.3d 313 (6th Cir. 2021) ............................................... 9

*United States v. Hensley,*
110 F.4th 900 (6th Cir. 2024) ........................................... 24

*United States v. SCRAP,*
412 U.S. 669 (1973) .............................................. 10, 11, 14

*Wallace v. Leidos Innovations Corp.,*
805 F. App'x 389 (6th Cir. 2020) .......................................... 4

*Whole Woman's Health v. Jackson,*
141 S. Ct. 2494 (2021) ...................................................... 28

## Statutes

52 U.S.C. § 20501 ............................................................... 20

52 U.S.C. § 20504 ......................................................... 19, 20

52 U.S.C. § 20505 ......................................................... 27, 28

52 U.S.C. § 20507 ................................................ 29, 30, 31, 32

52 U.S.C. § 20508 .................................................... *passim*

Ariz. Rev. Stat. Ann. § 16-121.01 ..................................... 28

# INTRODUCTION

The NAACP's response attempts to wish away the fatal deficiencies pointed out in this Court's stay decision and the State's opening brief. It ignores this Court's stay decision on standing. It ignores that the organization seeks prospective relief. It ignores that this case arises from the entry of summary judgment rather than the pleadings. It ignores evidence that contradicts the district court's reasoning. And it ignores provisions in the NVRA that refute its statutory arguments—as well as case law interpreting those provisions. Whether because the NAACP lacks standing or because the Documentation Policy complies with the NVRA, this Court should reverse the judgment below.

# ARGUMENT

## I. The NAACP Lacks Organizational Standing to Challenge the Documentation Policy.

The Response confirms what the State has argued all along—this dispute does not belong in federal court because the NAACP lacks standing—both as a matter of fact and as a matter of law. State's Br. 17-36.

### A. The NAACP's standing theories fail as a matter of law.

#### 1. The NAACP abandons the district court's diversion-of-resources holding.

The district court held that the Documentation Policy injures the NAACP by "caus[ing] the organization's scarce volunteer time and money to be diverted away from its other mission furthering activities" and towards "voter registration assistance." Memo. Op., R. 221 at 3668. That alone provided the basis for the district court's decision that the NAACP possessed standing; the court did not consider whether the Documentation Policy impaired the NAACP's core business activities. *See id.*

That reasoning no longer flies in a post-*Alliance for Hippocratic Medicine* world. State's Br. 19-22. As the Court wrote in its stay decision, "the Supreme Court clarified" in *Alliance for Hippocratic Medicine* "that *Havens*'s 'unusual' facts did not support a categorical rule allowing standing whenever 'an organization diverts its resources in response to a

2

defendant's actions.'" *Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888, 903 (6th Cir. 2024) (per curiam); *see Ariz. All. for Retired Ams. v. Mayes*, 2024 WL 4246721, at *4-10 (9th Cir. 2024). Perhaps acknowledging as much, the NAACP jettisons the argument it advanced below (accepted by the district court) that "an organization" can establish standing by showing a "drain on [its] resources" even without a "perceptible impairment to 'the organization's activities.'" NAACP Resp., R. 182 at 2946 (citation omitted). That argument was wrong then and it is wrong now.

### 2. The NAACP cannot rely on *Havens*.

After abandoning the categorical rule used by the district court, the NAACP (at 10-17) goes all in on *Havens*. But this case falls outside *Havens*'s "narrow domain"—and thus the NAACP lacks standing—for multiple independent reasons. *Tenn. NAACP*, 105 F.4th at 903.

First, the organizational plaintiff in *Havens* (HOME) requested damages rather than injunctive relief, which is the remedy that the NAACP seeks here. This Court's stay decision explained why "[t]hat difference matters," *see id.* at 903-04—namely, because standing is not dispensed "in gross," *id.* at 904 (citation omitted), and because the "standard

for obtaining forward-looking relief is different than the standard for recovering damages," State's Br. 26; *see Tenn. NAACP*, 105 F.4th at 904.

Second, the NAACP differs from HOME because the challenged conduct does not interfere with its own legal rights. HOME "enjoyed 'a broad legal right'" under federal law "to 'truthful information concerning the availability of housing.'" State's Br. 23 (quoting *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 n.1 (6th Cir. 2014)). And that statutory right "cu[t] to the core" of its counseling-and-referral services, *Fair Elections*, 770 F.3d at 460 n.1, which means the defendant in *Havens* directly interfered with HOME's legal rights. But here, the NAACP never claims that the Documentation Policy interferes with a legal right "intrinsic to the organization's activities." *Id.* On the contrary, the Documentation Policy only "regulates other parties." *Tenn. NAACP*, 105 F.4th at 902.

Those two points alone provide enough reason to reverse the judgment. Both this Court and the State raised those differences as a basis for distinguishing *Havens*. *See* State's Br. 23-24, 26-27; *Tenn. NAACP*, 105 F.4th at 903-05. Yet the Response ignores those issues entirely. It is not this Court's responsibility to rebut those arguments for the NAACP, *see Wallace v. Leidos Innovations Corp.*, 805 F. App'x 389, 394

(6th Cir. 2020), especially given the NAACP's failure to *mention*—let alone engage with—this Court's standing analysis in the stay decision.

Anyway, even if the Court comes up with reasons for the NAACP why those two distinctions make no difference, the NAACP still cannot rely on *Havens* because the organization never proved that it "is in the business of registering voters." *Tenn. NAACP*, 105 F.4th at 905. The NAACP cannot take back its earlier admission that it is an "advocacy group" with the goal of "advocat[ing] for the rights of individuals who have been discriminated against." State's Br. 24 (quoting Morris Dep. Tr., R. 151-4 at 1325). Tennessee does not dispute that NAACP volunteers engage in voter-registration efforts to facilitate that goal, *see* Appellee Br. at 13-14 (collecting record citations)—but those efforts are part of the organization's overarching issue-advocacy mission, *see* Memo. Op., R. 221 at 3668. That distinguishes the NAACP from HOME.

Finally, the Response never proves how the Documentation Policy meaningfully impairs the NAACP's voter-registration efforts. *See* State's Br. 25-26. The NAACP argues (at 14-16) that the Documentation Policy causes the organization to waste time helping applicants locate and submit their relevant proof-of-eligibility materials. And *that*, it says,

provides the basis for finding impairment under *Havens*. But that argument still runs headlong into *Alliance for Hippocratic Medicine*.

A Ninth Circuit decision explains why. Several nonprofit organizational plaintiffs recently challenged an Arizona voter-registration law under the NVRA. *Ariz. All.*, 2024 WL 4246721, at *2-3. The organizations claimed that they had standing under *Havens* because the law forced them "to divert resources" towards voter registration, and thus "interfer[ed]" with their goal of registering minority voters. *Id.* at *9.

The Ninth Circuit rejected that argument and clarified when an organization has standing under *Havens* in the wake of *Alliance for Hippocratic Medicine*. That opinion confirms that an organization suffers no actionable impairment unless the challenged conduct "directly harms its *already-existing* core activities"—it is not enough to "allow the diversion of resources *in response* to a policy to confer standing." *Id.* at *8. And because the plaintiffs could "still register and educate voters" "[w]ith or without" the challenged law, they lacked standing. *Id.* at *9-11.

Like the organizations in *Arizona Alliance*, "[t]he only way in which" the Documentation Policy "arguably affects the [NAACP's] 'core voter registration activities' is by causing the [organization], in response

to the [policy], to decide to shift some resources from one set of pre-existing activities in support of their overall mission to another, new set of such activities." *Id.* at *11. But that "represent[s] the same diversion-of-resources and frustration-of-mission injury that *Hippocratic Medicine* rejected." *Id.* Simply put, "there is no sense in which" the Documentation Policy "can be said to directly injure the organizatio[n's] pre-existing core activities, apart from the [NAACP's] response to that provision." *Id.*

The NAACP's contrary arguments (at 14-16) gain no traction. The NAACP says that the Documentation Policy forces the organization to spend more time helping certain prospective voters prepare their applications, Appellee Br. 15-16—time that its volunteers could have spent elsewhere, *id.* But that does not prove how the Documentation Policy impairs the NAACP's "daily operations" or materially interferes with the organization's ability to provide its services. State's Br. 25; *see Ariz. All.*, 2024 WL 4246721, at *2-11. At most, the Documentation Policy presents "a setback to the organization's abstract social interests," State's Br. 25 (quoting *Havens*, 455 U.S. at 379), because it has chosen to spend more time "taking new actions in response to what [it] view[s] as a disfavored policy," *Ariz. All.*, 2024 WL 4246721, at *9. Article III requires more.

### 3. The NAACP's causation theory is too attenuated.

The NAACP's standing theory suffers from another legal problem. It is wrong to claim that the Documentation Policy forces the NAACP to "spend extra resources." Appellee Br. 16. The organization itself chooses to spend those resources, as *Alliance for Hippocratic Medicine* confirms.

To begin, the NAACP does not dispute that, *if* would-be applicants have their rights-restoration materials on hand, the resource costs that the organization complains about would not be incurred. *See* State's Br. 28-29. That matters because it links the allegedly injurious resource costs to the independent choice of a third party, which severs the causal chain for standing purposes. *See id.* at 29-30 (citing *Crawford* and *Greater Cincinnati Coal. for the Homeless*). Instead, the NAACP questions why an applicant "would have their criminal judgment or pardon document 'on hand' at, say, a Juneteenth parade?" Appellee Br. 17.

Two points. First, that does not respond to the State's argument. Whether some applicants *actually* bring their voter-registration materials to NAACP events is beside the point. The key is that "voluntary and independent action" by third parties triggers the NAACP's resource costs.

*Turaani v. Wray*, 988 F.3d 313, 317 (6th Cir. 2021). That cuts the causal chain under *Turaani* and *Crawford*. *See* State's Br. 28-30.

Second, nothing forces the NAACP to assist applicants who do not have their materials on hand. The Documentation Policy does not regulate the NAACP, and its volunteers can still provide advice and voter-registration assistance even without going the extra mile to "follow up with the eligible voter," "communicate with various governmental authorities," or "taxi the individual to court." Sweet-Love Decl., R. 156-2 at 2357, 2358. Those costs are voluntarily incurred by the NAACP. Thus, they are too attenuated to be caused by the Documentation Policy.

Like the doctors in *Alliance for Hippocratic Medicine*, State's Br. 30-31, the NAACP tries to base standing on its decision to expend resources in response to downstream effects of government regulation of third parties. *Id.* Standing's causal chain cannot be stretched so thin.

## B. NAACP's standing theories fail as a matter of fact.

### 1. The NAACP lacks "specific facts" showing that it suffers an ongoing injury.

The Response offers no evidence to undermine this Court's standing analysis in the stay opinion or the standing arguments raised in the State's opening brief (at 32-36). Instead, the Response makes flawed

arguments based on legal authorities arising from a materially different posture (the pleadings stage) that assess an individual's standing to obtain a materially different remedy (damages).

**a.** For starters, the Response makes no attempt to defend the NAACP's "standing to challenge the Documentation Policy as applied to the Federal Form." State's Br. 35. The organization identified no specific facts showing that it has ever—or will ever—assist someone whose Federal Form application has been affected by the Documentation Policy. So at minimum, the Court should vacate the injunction insofar as it forbids the State from applying the Documentation Policy to the Federal Form.

**b.** Next, the NAACP argues (at 17 & 19), based on *United States v. SCRAP*, 412 U.S. 669, 689 n.14 (1973), that it need only show an "'identifiable trifle' of injury" to prove standing. That is incorrect. The NAACP must provide specific facts that satisfy the *Havens* framework.

The NAACP's reliance on *SCRAP* reveals that it fundamentally misunderstands the posture of this litigation. The district court entered a permanent injunction after granting the NAACP judgment as a matter of law. Order, R. 222; Order, R. 237. That means *SCRAP* carries "no relevance here" because "it involved not a Rule 56 motion for summary

judgment but a Rule 12(b) motion to dismiss on the pleadings." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). That matters because "[t]he latter, unlike the former, presumes that general allegations embrace those specific facts that are necessary to support the claim." *Id.* Moreover, *SCRAP* considered "what would suffice for § 702 review" under the APA. *Id.* And its "expansive" analysis has "never since been emulated" by the Court. *Id.* Safe to say, *SCRAP* carries no weight here.

The NAACP's response also rests on a blatant bait-and-switch. The organization pivoted to the "identifiable trifle" standard right after arguing that it has a legally tenable standing theory under *Havens*. Appellee Br. 13-20. As explained, that theory rests on the premise that the Documentation Policy "directly affects and interferes" with the NAACP's "core business activities" on an "ongoing" basis. *Id.* at 13, 14, 16; *supra* Argument I.A.2. But now that it must prove that theory up, the NAACP seemingly abandons that standard entirely and claims that it need only identify some "trifle" to obtain a permanent injunction. Appellee Br. 19.

Not so. If the NAACP can rely on *Havens* even though this case involves a request for injunctive relief, and even though the NAACP does not argue that its own statutory rights have been violated, *see supra*

Argument I.A.2, then the NAACP needed to provide "specific facts" showing that the Documentation Policy meaningfully interfered with its core preexisting activities, *id.* And it failed to do so.

**c.** Besides applying the wrong legal standard, the NAACP also closes its eyes to the evidentiary deficiencies highlighted in this Court's stay opinion and the State's Brief (at 33-36).

This Court explained why the "generic declaration" offered by Sweet-Love "likely would not suffice to allow the NAACP to seek *damages* for past harms"—much less "an *injunction* that bars Tennessee from enforcing its Documentation Policy." *Tenn. NAACP*, 105 F.4th at 906. The NAACP ignores that analysis and the State's briefing and simply restates its view that the "generic declaration" suffices. *Id.*; *see* Appellee Br. 20.

Although the NAACP (at 20) also cites two paragraphs from a supplemental declaration, those paragraphs simply affirm that the NAACP intends to provide "assistance to individuals with felony convictions." R. 192-1 at 3236-37. That does not cure the deficiencies in the first declaration. Nor does it provide specific facts showing how the Documentation Policy tangibly impairs the NAACP's preexisting activities.

To try and save its case, the NAACP claims that its summary-judgment briefing "identified … a voter who was denied the fundamental right to vote immediately before the 2020 general election because neither she nor the Election Division's attorney … could find the requisite documentation for her grace-period conviction." Appellee Br. 20 (citing R. 156-30). That does not establish the NAACP's standing.

For one, the NAACP never proves that it assisted with that application. The NAACP's ostensible basis for standing derives from the resources it diverts when helping applicants comply with the Documentation Policy. Appellee Br. 14-16. Even if those costs sufficed to establish standing, *but see* Argument I.A.2, the NAACP offers no evidence that it spent any resources on this application.

For two, the NAACP never proves that the applicant's voter-registration application "was denied." Appellee Br. 20. The NAACP identifies two emails exchanged between election official about the restoration status of an applicant. The state election officer asks questions about the applicant—but no evidence shows that the application was in fact denied.

For three, this example suffers from the same deficiency that this Court identified with Sweet-Love's declaration. It involved an individual

apparently "convicted during the 'grace' period," even though "the Documentation Policy no longer applies to those voters." *Tenn. NAACP*, 105 F.4th at 905. So this backward-looking example does not support the NAACP's claim (at 16) that it must divert resources on an ongoing basis.

Left with nothing else, the NAACP (at 18 & 20) turns to *Dickson v. Direct Energy, LP*, 69 F.4th 338 (6th Cir. 2023). But that case involved an appeal from a motion to dismiss. *See id.* at 342. So just like *SCRAP*, it is irrelevant here because the degree of evidence necessary to prevail at summary judgment differs from that necessary to state a plausible claim. *Lujan*, 407 U.S. at 889. And anyway, that case involved a materially different question. There, the Court considered whether an individual who received an unwanted voicemail in violation of federal law suffered a "concrete" injury under the *Spokeo* and *TransUnion* lines of cases. *Dickson*, 69 F.4th at 343-50. The Court did not opine on whether that voicemail alone would support prospective relief rather than damages. Nor did that decision involve an organization's challenge to government regulation of third parties; it involved a plaintiff alleging that a private entity violated his *own* statutory rights. *Dickson* is inapposite.

This case instead mirrors *Fair Elections*, *Center for Biological Diversity*, and *Reform America* where plaintiffs seeking prospective relief failed to establish their standing by specific facts. State's Br. 36. And just like in those cases, the Court should reverse here for lack of standing.

### 2. The NAACP is not entitled to a remand.

In the final sentence of its standing argument, the NAACP says the Court should remand for further proceedings if it believes the NAACP lacks standing on this record. Appellee Br. 20-21. But the NAACP provides no legal authority to support that request. The organization had an opportunity to develop its record, it moved for summary judgment on that record, and the district court granted the motion and issued a permanent injunction. The NAACP has nobody to blame but itself for failing to enter adequate evidence to support its standing. The organization has not shown that it gets a do-over if the Court finds it lacks standing. *See, e.g.*, *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431 (6th Cir. 2024).

Nor can the NAACP rely on post-judgment evidence to argue that there is a genuine dispute of material fact about its standing. *See* Appellee Br. 21 n.6; *see Berger v. Medina Cnty. Ohio Bd. of Cnty. Comm'rs*, 295 F. App'x 42, 46 (6th Cir. 2008).

## II. The Documentation Policy Complies with the NVRA.

### A. The Documentation Policy does not require applicants to submit unnecessary information.

#### 1. The Documentation Policy requests "only" information "necessary" to verify voter eligibility.

The State's Brief (at 38-44) showed how the Documentation Policy complies with § 20508(b)(1)'s text. The NAACP claims that the State forfeited its interpretive arguments (at 22-23) and presents interpretive arguments of its own (at 23-37). Both responses fail.

**a.** Tennessee did not forfeit its defense of the Documentation Policy. The State argued below that the Documentation Policy complies with § 20508(b)(1) because it seeks information that "is *necessary* to determine the eligibility of [a voter-registration] applicant." State's Resp., R. 180 at 2885 (emphasis added); *see id.* at 2883 ("Tennessee determined that it needs documentation from applicants whose voting rights have been restored so that the State may 'assess the eligibility of the applicant' and 'administer voter registration and other parts of the election process.'" (quoting 52 U.S.C. § 20508(b)(1))). And the State raised the same statutory interpretation argument it raises now—that, based on the differences between § 20504 and § 20508, election officials may seek

materials they consider helpful to voter-registration process. *See id.* at 2883-84 (citing *Fish v. Kobach*); Reply, R. 190 at 3201 (same); State's Br. 40 (same). The State also argued that the Documentation Policy facilitates review because it provides information that election officials need to act on an application. State's Resp., R. 180 at 2883.

Even if the arguments were new, the Court should still consider them because they raise purely legal issues that the parties briefed "with sufficient clarity and completeness for [the Court] to resolve" without further factual development. *Lockhart v. Napolitano*, 573 F.3d 251, 261 (6th Cir. 2009).

**b.** The NAACP's arguments about § 20508(b)(1)'s plain meaning defy interpretive conventions, judicial precedent, and common sense.

For starters, the NAACP (at 25-29) misunderstands the State's position. Tennessee agrees that courts have held that in some contexts the term "necessary" can be used to "impl[y] more than something merely helpful or conducive" and instead suggest "something 'indispensable'" or "essential." Appellee Br. 25 (quoting *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 923 (10th Cir. 2012). The State recognized the different possible meanings of "necessary" in its opening

brief (at 39). So the assorted cases that interpret "necessary" in its strictest sense are beside the point. Appellee Br. 25-29. The question is what "necessary" means in the NVRA. None of NAACP's cases address that question. Nor did those cases purport to establish a universal definition of "necessary" applicable to all statutory schemes. To the contrary, those cases actually *corroborate* the State's view that "[t]he term 'necessary' has a range of meanings." State's Br. 39 (quoting *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 282 (2022)).

Given the "chameleon-like quality" of that term, *id.* (quoting *FAA v. Cooper*, 566 U.S. 284, 289 (2012)), this Court must decide how Congress used it in § 20508(b)(1). Does "necessary" refer to information that is "useful" to verifying voter eligibility? *In re MCP No. 165*, 21 F.4th 357, 392 (6th Cir. 2021) (Larsen, J., dissenting). Or does it mean States may only require information that is "indispensable" for that purpose? *Id.* And the answer to *those* questions depends on the statutory "context" rather than a mere tally of cases that involve entirely different statutory schemes (as the NAACP seems to think). *FAA v. Cooper*, 566 U.S. 284, 294 (2012); *see In re MCP No. No. 165*, 21 F.4th at 392.

Turning to that statutory context, the State explained in its opening brief why Congress's use of "minimum necessary" in § 20504 supports its position that "necessary" in § 20508(b)(1) means "useful" or "conducive." State's Br. 39-41.  Although the NAACP labels that textbook interpretive argument "a red herring," Appellee Br. 30, the Supreme Court says otherwise.  Time and again, it has admonished that, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983).  The differences between § 20504 and § 20508 thus strengthen the State's argument that "necessary" should not be interpreted in its strictest sense.  State's Br. 39-41.

Apart from flouting interpretive conventions, the NAACP's position (at 30-31) also defies judicial precedent. The Tenth Circuit compared the language in § 20504 and § 20508 and rejected the argument that "necessary" in the NVRA should be read in the "strictest, most demanding sense." *Fish v. Kobach*, 840 F.3d 710, 734-35 (10th Cir. 2016).  It agreed that "[t]he term 'minimum'" in § 20504 "contemplates the least possible amount of information." *Id.* at 735.  The corollary to that holding is that

"necessary" in § 20508(b)(1)—when unaccompanied by the "minimum" qualifier present in § 20504—means something less than essential.

To push back on the Tenth Circuit's reasoning, the NAACP highlights differences between § 20504 and § 20508. Appellee Br. 31. The NAACP may well be right that "[t]he structure of § 20508(b)(1) is … different from the motor-voter provision." *Id.* But that does not undermine the interpretive inference the State relies upon, *Rusello*, 464 U.S. at 23, because both provisions belong to "the same statutory scheme," State's Br. 41 (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013)).

The NAACP's purpose-driven arguments (at 29-30) fare no better. It is true that the NVRA sought to "increase" voter registration and combat "discriminatory and unfair" voter-registration laws. Appellee Br. 29. But Congress also passed the NVRA "to protect the integrity of the electoral process." 52 U.S.C. § 20501(b)(3). Interpreting § 20508(b)(1) to allow States to request information that facilitates review of voter-registration applications dovetails with those purposes.

**c.** Whatever "necessary" in § 20508(b)(1) means, the Documentation Policy fits the bill because it seeks materials that officials use to verify voter eligibility and administer elections. State's Br. 42-44.

Notably, the NAACP does not dispute that "the Documentation Policy requests information that is 'useful' or 'conducive' to the eligibility-verification process." *Id.* at 42. So if the Court accepts the State's argument that "necessary" in § 20508(b)(1) refers to "useful" or "conducive" information, *id.* at 39-41, the Documentation Policy complies with the NVRA and the judgment to the contrary should be reversed.

But even if "necessary" means "indispensable" or "essential," the Documentation Policy still passes muster. *Id.* at 43-44. The NAACP resists that conclusion by advancing two arguments. It first insists (at 32-33) that the NVRA forbids Tennessee from requiring anything other than an "attestation" on the State Form to verify voter eligibility. It next argues (at 33-37) that documentary proof of eligibility is not "essential" because election officials can already access those materials even without the applicant submitting them. Those arguments fail.

***Attestation***. The NAACP wrongly asserts (at 32-33) that an applicant's attestation is all that Tennessee may require under § 20508(b).

First, the NVRA expressly empowers States to require more than just an attestation. Section 20508(b)(2) instructs that a mail-in form "shall" "contai[n] an attestation that the applicant meets each [voter

eligibility] requirement." 52 U.S.C. § 20508(b)(2). Section 20508(b)(1) in turn provides that the form "may" require applicants to supply "identifying information" and "other information … as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id.* § 20508(b)(1). So the NVRA plainly authorizes States to request more information beyond an attested form.

Second, the NAACP never proved that an attested form alone provides enough "information" for election officials to "verify voter eligibility." *Id.* Rather than provide "specific facts" to support that point, the NAACP (at 32) relies on *Fish*—a case the organization just went to great lengths to *distinguish* based on the alleged differences between § 20504 and § 20508—to argue that an attestation is all the State needs.

*Fish* does not support the NAACP's argument. The Tenth Circuit there did consider an attestation the "presumptive minimum amount of information necessary for state election officials to carry out their [duties]." 840 F.3d at 717. But the provision there limited States to "only" the "minimum amount of information necessary" to verify voter eligibility. *Id.* at 715 (quoting 52 U.S.C. § 20504(c)(2)(B)). In the context of

§ 20508(b), where States may request more than the "minimum" information, *see id.* at 733-34, such reasoning does not apply. Concluding otherwise would destroy any differences between § 20504 and § 20508.

None of the NAACP's remaining arguments persuade. The organization first claims that an attestation must be sufficient because "Congress has historically relied on an attestation requirement 'under penalty of perjury' as a gate-keeping requirement" for access to various federal benefits. Appellee Br. 33. But the NAACP never explains why it matters that Congress relies on attestation alone in other contexts. In *this* provision, Congress requires an attestation and nevertheless gives States discretion to require "other information." 52 U.S.C. § 20508(b)(1).

The NAACP next points out that "attestation under penalty of perjury is all the State requires for establishing other voter qualifications such as citizenship, age, and residency." Appellee Br. 33. Again, so what? States have the constitutional authority to establish and enforce voter qualifications. State's Br. 3-4, 50-51. That Tennessee does not *currently* require proof of age or citizenship does not mean it *cannot* require those things. Nor does it mean the State cannot choose to require documentary proof relating to the requirement that applicants not be convicted of a

disqualifying felony. Indeed, there is good reason to require proof for that voter-eligibility requirement specifically, given the recent changes in the law and the fact that some applicants may be mistaken about their eligibility status. *See* State's Response, R. 180 at 2885.

Lastly, the NAACP says that legislative history proves that the NVRA forbids States from requesting documentary proof of eligibility. Appellee Br. 33. But "[t]he use of legislative history has been all but discontinued." *United States v. Hensley*, 110 F.4th 900, 905 (6th Cir. 2024). Section 20508(b)(1)'s plain text empowers States to request additional information; the House Report that the NAACP cites does nothing to change that. Even if legislative history had value, the NAACP never explains why the views memorialized in a house report should carry greater weight than the Supreme Court's statements in *Arizona* that States *may* require documentary proof of eligibility. State's Br. 49.

***Officials Already Have Access.*** The NAACP next argues that the Documentation Policy seeks unnecessary information because "election officials already have access to information sufficient to confirm eligibility." Appellee Br. 33. That is both irrelevant and incorrect.

It is irrelevant because it rests on the flawed "premise that States cannot require applicants to provide information that election officials already have in their possession." State's Br. 47. The State explained (at 47) why the NVRA itself and Sixth Circuit precedent refute that position. The NAACP offers no response to the argument based on the NVRA. And it brushes aside the Sixth Circuit precedent (*McKay*) because that case "did not concern a requirement for voters to provide documentation beyond the form itself." Appellee Br. 33 n.10. But that distinction makes no difference. *McKay* rejects the NAACP's position that States may not seek information that they already have access to. And for good reason— proof that an applicant is not disqualified by virtue of a felony conviction *is* indispensable to the verification process. Whether election officials have access to that information already does not change the essential nature of that information that the Documentation Policy seeks.

The NAACP's argument is also factually incorrect. The record establishes that States do not always have the information they need to verify voter eligibility. *See* State's Br. 42-42, 45-46 (collecting and discussing record citations). Despite what the NAACP suggests, processing an application from a felon is not as simple as looking in a database to

check whether the applicant qualifies to register. That is because there is no centralized database where election officials can find all the relevant information. Election officials have no repository that includes comprehensive criminal records from Tennessee and from other States. Indeed, Tennessee did not begin digitizing records until the 1990s, *id.* at 46 (citing Lim Dep., R. 151-3 at 1226)—another fact the NAACP ignores. Moreover, applicants who disclose they have a felony often neglect to disclose the crime for which they were convicted or the number of convictions they have. Officials must verify the number of felonies an applicant has and ensure that, for those with multiple convictions, the applicant has completed the rights-restoration process for *each* conviction.

The NAACP responds that, even if election officials do not already have the necessary information, they can obtain it by requesting "public records or contact[ing] courts and other relevant agencies." Appellee Br. 35. The State's brief explains (at 42-43) why that is not always true. And even if it were true, that would mean that the NVRA effectively (and unconstitutionally) "conscript[s] state officers" into serving as private investigators for applicants with felony convictions, *Printz v. United States*, 521 U.S. 898, 925, 935 (1997), such that those officers are apparently

duty-bound by federal law to contact courts, agencies, and draft up public-records requests whenever an applicant so desires. That approach defies our constitutional structure and common sense. And it would bring the gears of electoral administration to a halt by burdening officials with untold amounts of work. That is not what the NVRA requires.

> ### 2. The Documentation Policy passes statutory muster under Supreme Court precedent.

The NAACP finally admits that the Supreme Court has said that States may sometimes require an applicant to submit documentary proof of voter eligibility. But it tries get around *Arizona* in two ways.

First, the NAACP says (at 37) that the Supreme Court never *held* that States may require documentary proof of eligibility because Arizona concerned the accept-and-use mandate (in what is now § 20505) rather than the specific regulations for mail-in forms (in what is now § 20508). It is true that the Supreme Court's blessing on the ability for States to request documentary proof of citizenship was dicta. But that does not mean this Court can ignore what the Supreme Court said. *See ACLU v. McCreary County*, 607 F.3d 439, 447 (6th Cir. 2010). Nor does the NAACP explain why it is right and the Supreme Court is wrong.

Second, the NAACP claims (at 37) that "the 'necessary' standard is inherently a factual one" and that nothing in *Arizona* "suggests that any and all documentation requirements satisfy the 'necessary' standard." Even if that is right, *Arizona* still refutes the NAACP's argument that the NVRA forbids States from requesting *any* proof apart from an attested form. And it is not right. Nothing in the Supreme Court's decision suggests that States developing forms under § 20505(a)(2) must make a factual showing before they exercise the discretion afforded by § 20508(b)(1).

The Supreme Court's recent decision allowing Arizona's voter-registration law to go into effect bolsters the State's position. Arizona requires voter-registration applicants to submit "satisfactory evidence" of citizenship along with State Form applications. Ariz. Rev. Stat. Ann. § 16-121.01(C). A district court enjoined that provision. And over the argument that § 16-121.01(C) violates the NVRA by requiring more information than is "necessary" under § 20508(b), the Supreme Court stayed the district court's injunction—allowing the law to go into effect. *See Republican Nat'l Comm. v. Mi Familia Vota*, 2024 WL 3893996, at *1 (2024) (order); *Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021)

(stating that an applicant must make a "'strong showing' that it is 'likely to succeed on the merits'" to obtain a stay (citation omitted)).

### 3. The permanent injunction raises serious constitutional concerns.

The Supreme Court also agreed that interpreting the NVRA in a manner that precludes States from receiving information they need to enforce voter qualifications would raise serious constitutional doubts. State's Br. 50-51. Rather than meaningfully contest that point, the NAACP responds (at 39) that the Documentation Policy seeks unnecessary information, so no problems arise. Apart from that argument being incorrect for reasons already explained, that ignores the scope of the injunction, which commands the State to register applicants even when the State lacks confirmation that they are eligible. *See* State's Br. 51.

### B. The Documentation Policy ensures that eligible applicants are registered to vote.

When responding to the State's arguments about why the Documentation Policy complies with § 20507(a)(1)(B), the NAACP buries a dispositive concession. It admits that "a state may implicitly decide what counts as a 'completed'" (and thus "valid") "state form by determining what information it solicits from applicants," so long as the State does

not "determine validity based on completion of a form that violates Section 20508(b)(1)'s requirements." Appellee Br. 46. Fair enough. But that means the NAACP's argument that the Documentation Policy violates § 20507(a) collapses into its argument that the policy violates § 20508(b). Their claim that Tennessee rejects "valid" applications from eligible applicants depends on State Forms being "valid" even without complying with the Documentation Policy because that policy imposes an unnecessary requirement under § 20508. And because the Documentation Policy complies with § 20508, the NAACP's piggyback claim fails.[1]

The NAACP next argues (at 42) that the State rejects "valid registration forms submitted by eligible individuals" on a "regular" basis. Tellingly, the NAACP cites absolutely no record evidence to support that point. It instead claims (at 43-44) that applicants do not have the materials they need to prove their eligibility. The evidence they cite does not support that assertion. Individuals who meet the requisite qualifications

---

[1] The State did not forfeit its argument that an application is not "valid" unless it is accompanied by the materials that the Documentation Policy demands. In the district court, the State argued that the Documentation Policy complies with § 20507(a)(1) because officials "will not reject [an] application" from an eligible applicant if they "submit proof that their voting rights have been restored," State's Memo., R. 151 at 1083—in other words, if the applicant submits a *valid* application.

are issued restoration certificates.  *See* Memo., R. 157-04. And that is what an applicant must submit under the Documentation Policy.  If an applicant for whatever reason does not have the required documentation, the State does not violate the NVRA by rejecting their application because (even if they are eligible) their application is invalid.

### C. The Documentation Policy complies with the NVRA's uniformity-and-nondiscrimination requirement.

The NAACP makes the same concession described above when briefing its claim that the Documentation Policy violates § 20507(b)'s uniformity-and-nondiscrimination provision.  That claim rests on the premise that the Documentation Policy imposes an "unnecessary documentation requirement" on "certain voter registration applicants and not others." Appellee Br. 53.  Again, because the documentation requirement is not unnecessary, *supra* Argument II.A, the uniformity claim fails too.

The State's opening brief provides three more reasons why this claim fails—(1) because the district court erred by characterizing this issue as undisputed, (2) because the relevant statutory provision does not apply to voter-registration procedures, and (3) because the Documentation Policy complies with § 20507(b).  State's Br. 54-58.

The NAACP does nothing to show that the district court correctly determined this issue was undisputed. It was disputed. State's Br. 55-56. The NAACP also chides the State (at 48) for attempting "to walk back their admissions"—but they cite to no admissions the State made.

The NAACP tries and fails to rebut the second argument by citing inapposite caselaw. The Fourth and Eleventh Circuit cases they cite (at 50) do not involve the uniformity provision. They involve a separate provision in the NVRA—§ 20507(i)—which contains different language.

Finally, the NAACP still cites no authorities to support its position that the Documentation Policy violates § 20507(b) by requiring applicants to submit proof of voter eligibility. Tennessee imposes the requirement on applicants from whom they need information to establish whether they are, in fact, eligible. That complies with the NVRA.

## III. The District Court Granted Improper Relief.

### A. The NAACP never proved that it needs a permanent injunction to prevent irreparable harm.

The NAACP does not dispute that the district court made no findings regarding irreparable harm. The arguments the NAACP now offers (at 54-55) are unpersuasive for reasons already explained, *see* State's Br. 59-60, but the district court's failure to engage with this issue at

32

minimum warrants a remand (if the Court concludes that the NAACP has standing and that the Documentation Policy violates the NVRA) so the court may consider it in the first instance.

**B.    The district court erred by granting a universal injunction rather than an appropriately tailored remedy.**

The NAACP defends the injunction on the theory that it is "necessary to protect the particular plaintiffs before the court." Appellee Br. 56 (citation omitted). Not so. The district court could order the NAACP to mark applications with which it assisted, thereby providing an administrable method of tailoring the relief. It failed to do that.

## CONCLUSION

This Court should vacate the permanent injunction and either remand with instructions to dismiss count six for lack of jurisdiction (if the NAACP lacks standing) or reverse the grant of summary judgment and remand with instructions to enter judgment on count six for the State Defendants (if the State prevails on the merits).

Dated: September 27, 2024

Respectfully Submitted,

Jonathan Skrmetti
*Attorney General and Reporter*

J. Matthew Rice
*Solicitor General*

Zachary Barker
*Senior Assistant Attorney General*

Dawn Jordan
*Special Counsel*


/s/ *Philip Hammersley*

Philip Hammersley
*Assistant Solicitor General*

State of Tennessee
Office of the Attorney General
P.O. Box 20207
Nashville, TN 37202
Philip.Hammersley@ag.tn.gov

*Counsel for Defendants-Appellants*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the Court's type-volume limitations because it contains 6,494 words, excluding portions omitted from the Court's required word count. This motion complies with the Court's typeface requirements because it has been prepared in Microsoft Word using fourteen-point Century Schoolbook font.

/s/ *Philip Hammersley*
Philip Hammersley
*Assistant Solicitor General*

# CERTIFICATE OF SERVICE

On September 27, 2024, I filed an electronic copy of this motion with the Clerk of the Sixth Circuit using the CM/ECF system. That system sends a Notice of Docket Activity to all registered attorneys in this case. Under Sixth Circuit Rule 25(f)(1)(A), "[t]his constitutes service on them and no other service is necessary."

*/s/ Philip Hammersley*
Philip Hammersley
*Assistant Solicitor General*
